10 CV 745

JUDGE CASTEL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

§
§
§

Plaintiff,

§
§

Case No.

v.

§
§

**JURY TRIAL DEMANDED**

STEPHEN A. CZARNIK,

§
§

Defendant.

§
§

RECEIVED
FEB ~ 1 2010
U.S.D.C. S.D.N.Y.
CASHIERS

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Commission") alleges:

### SUMMARY

1.      The federal securities laws require persons who offer and sell securities of a public company to file a registration statement for those transactions in order to provide information to investors about the business operations and financial condition of the company. Stock offerings must be either registered or exempt from registration. Rule 504, adopted as part of Regulation D, 17 C.F.R. §230.501 et seq. (1999) ("Rule 504"), exempts certain limited offerings and sales of securities that do not exceed $1,000,000, if, among other things, the sales are made only to accredited investors. Accredited investors are individuals and entities, who by virtue of their high net worth, investment expertise, or other factor, are better able to make informed decisions in the absence of registration statements.

2.      Companies that have publicly traded stock use transfer agents to keep track of the individuals and entities that own their stock. A transfer agent's core function is to issue and cancel a company's stock certificates to reflect changes in ownership. Generally, stock issued in

a registered public offering is "unrestricted," meaning that the shares can be traded free and clear without restriction. On the other hand, stock issued in an exempt offering may require "restrictive language" in the form of a stamped legend on the stock certificates. Stock certificates bearing restrictive legends cannot be traded as easily as stock without restrictive language. Before transfer agents will issue unrestricted shares in the absence of a registration, many require a lawyer's opinion from the issuer's counsel explaining why it would be legal for them to do so.

3.      Through the efforts of Stephen Czarnik ("Czarnik"), a lawyer, three stock promoters – Ryan Reynolds, Jason Wynn and Carlton Fleming (Reynolds, Wynn, and Fleming, along with their corporate proxies, are hereinafter referred to as the "Promoters") have abused and misused the Rule 504 exemption in order to illegally procure from transfer agents unrestricted certificates. The Promoters pretended that they were accredited investors intent on buying and holding stock of small companies for investment purposes. In fact, their goal was to take the companies public, immediately distributing stock in the public market. Persons who purchase shares from a company with a view to offer or sell the shares for the company in connection with a distribution of the company's securities are "underwriters," whose securities transactions must be registered.

4.      Czarnik served an essential role in these illegal offerings. He churned out bogus opinion letters predicated on the Promoters' alleged representations to him that they are buy-and-hold investors. In fact, Czarnik knew that they had no intention of holding the stock, but that they intended to nationally advertise the stock and quickly dump their shares into the public market for millions of dollars. Czarnik knew or was severely reckless in not knowing that the Promoters intended to distribute the stock to the public and that the transfer agent would rely on his letters and issue stock certificates without restrictive legends.

2

5.    Czarnik's participation and substantial assistance in the offerings was in violation of Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240 10b-5].

## DEFENDANT

6.    **Defendant Stephen A. Czarnik**, age 40, of New York, New York, is an attorney who, at all times relevant to this Complaint, was a partner at the New York-based law firm of Cohen & Czarnik, LLP.

## JURISDICTION AND VENUE

7.    The Commission brings this action pursuant to authority conferred upon it by Section 20(b) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78u (d)(1)].

8.    This Court has jurisdiction over this action under the provisions of Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

9.    Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

10.   Defendant Czarnik, directly and indirectly, has made use of the means of interstate commerce and the mails in connection with the acts, practices, and courses of business alleged herein in the Southern District of New York and elsewhere.

## FACTS

### Background

11.     Between June 2007 and January 2008, three penny stock companies, My Vintage Baby, Inc. ("MVBY"), Alchemy Creative, Inc. ("Alchemy") and Beverage Creations, Inc. ("BCI") (collectively, the "Issuers"), sold stock in unregistered offerings into the public market using the Promoters as intermediaries. At the time of their respective offerings, the Issuers were in severe financial distress.

12.     Each of the stock offerings followed a simple formula: (a) The Issuers sold shares to the Promoters for pennies per share; (b) the Promoters pumped up demand for the stock through, among other things, nationwide advertising campaigns and false market demand created by selling some of their shares to a tightly controlled group of friends and family; and (c) the Promoters immediately liquidated their holdings into the public market.

13.     Czarnik provided all of the legal services required for the offerings, including all of the legal work required to make it appear to the Issuers' transfer agent that the offerings were exempt from the registration provisions of federal securities law.

14.     Czarnik was introduced to each of the Issuers by one of the Promoters, and purportedly was counsel for each of the Issuers. Throughout his representation of the Issuers in connection with the Offerings, he took direction from one or more of the Promoters, and his fees were paid by one or more of the Promoters.

15.     Robert Feeback ("Feeback"), a managing partner of Summit Advisory Partners, LLC, and a purported "consultant" to the Issuers, served as a point of contact among Czarnik, the Promoters, and the Issuers.

4

16.    The Promoters sold their MVBY, Alchemy and BCI stock into the public market for approximately $20 million.

17.    At all times relevant to this Complaint, no registration statement was filed or in effect for any of the offerings by MVBY, Alchemy, or BCI.

18.    At all times relevant to this Complaint, no registration statement was filed or in effect for any resale of the stock of MVBY, Alchemy, or BCI by the Promoters to the investing public.

19.    At all times relevant to this complaint, the stock of MVBY, Alchemy, and BCI was "penny stock," as the companies' net tangible assets and average revenue were each below the thresholds established under Section 3(a)(51) of the Exchange Act [15 U.S.C. 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1], and the stock traded at a price under $5 per share at all relevant times.

20.    The Promoters were underwriters who distributed MVBY, Alchemy and BCI stock to the public without the disclosures and other safeguards required by the registration provisions of federal securities law. They underwrote public offerings for MVBY, Alchemy and BCI by purchasing shares with a view to offering and selling the shares to others in connection with the distribution of the company's shares to public investors.

**June 2007 – January 2008: Unregistered Offerings by My Vintage Baby, Inc.**

21.    MVBY – which makes children's clothing – has never earned a profit. MVBY lost hundreds of thousands of dollars in cach of the last three ycars.

22.    On or before June 1, 2007, Czarnik represented MVBY in its purchase of a dormant public shell company and the merger of that entity into the existing My Vintage Baby, Inc.

23.    From June 2007 through January 2008, MVBY issued stock to the public through the Promoters in at least five purportedly distinct offerings: on June 1, 2007, July 16, 2007, August 16, 2007, December 18, 2007 and January 7, 2008.

24.    Czarnik drafted three key documents for each of MVBY's stock offerings.

25.    First, Czarnik drafted letters from MVBY to himself (the "MVBY Management Representation Letters") requesting that Czarnik issue a legal opinion related to the issuance of unregistered stock. The MVBY Management Representation Letters stated that the Promoters and MVBY "will not use the shares in a distribution or violate any federal or state securities laws. [The Promoter] has not offered or sold any portion of the shares to others or with a view to reselling or otherwise disposing of any portion of the Shares." A true and accurate copy of a Management Representation Letter is attached as Exhibit A.

26.    Second, Czarnik drafted subscription agreements ("MVBY Subscription Agreements") providing that the Promoters would each purchase a quantity of shares of MVBY stock. The MVBY Subscription Agreements stated that each of the Promoters (1) "will not engage in any activity that will constitute a distribution of the Shares," and (2) "has not offered or sold any portion of the Shares to others or with a view to reselling or otherwise disposing of any portion of the Shares." A true and accurate copy of a MVBY Subscription Agreement is attached herein as Exhibit B.

27.    Third, Czarnik issued legal opinion letters ("MVBY Legal Opinions") to MVBY's transfer agent. The MVBY Opinion Letters state that Czarnik "without independent investigation" relied on the representations contained in a MVBY's Management Representation Letters. The MVBY Opinion Letters repeat the statement from the MVBY Management

6

Representation Letters: "each [Promoter] and/or the Company will not use the Common Stock in a distribution or violate any federal or state securities laws."

28.     The MVBY Opinion Letters state "[W]e are of the opinion that... the certificates representing the Common Stock are to be issued without legend." A true and accurate copy of an MVBY Legal Opinion is attached as Exhibit C.

29.     On or around the date of each MVBY offering, Czarnik emailed MVBY Subscription Agreements and MVBY Management Representation Letters, among other documents, to MVBY with instructions to review, sign and return to Czarnik by fax for delivery to MVBY's transfer agent.

30.     Czarnik provided the MVBY Subscription Agreements, MVBY Management Representation Letters, and MVBY Opinion Letters to MVBY's transfer agent. Upon receiving signed MVBY Opinion Letters from Czarnik, MVBY's transfer agent issued stock certificates to the Promoters without a restrictive legend.

### Czarnik's Knowledge or Reckless Disregard of the Distribution Plan for MVBY Stock

31.     The representations stated in paragraphs 25, 26 and 27 were false when made. The Promoters intended to sell their MVBY stock immediately in furtherance of a public offering to the general public.

32.     At the time of writing the MVBY Management Representation Letters, the MVBY Subscription Agreements and the MVBY Opinion Letters, Czarnik knew, or recklessly disregarded, that the Promoters had a plan to distribute MVBY stock.

33.     Prior to June 1, 2007, Czarnik counseled MVBY in obtaining a NASDAQ ticker symbol. Czarnik also helped draft and file rudimentary, unaudited financial disclosures sufficient

for MVBY to be quoted on the Pink Sheets operated by Pink OTC Markets, Inc. ("Pink Sheets"), an online stock exchange.

34.    On June 1, 2007, the first day that MVBY sold its stock to the Promoters, MVBY issued a press release announcing that MVBY had "formalized all necessary documentation... to initiate trading." The press release quoted MVBY's Chief Executive Officer stating, "we are truly excited to offer a stake in our remarkable organization to the general public."

35.    Between June and July 2007, MVBY was touted by a penny stock promotion website, www.thestockpic.com, then operated by Ryan Reynolds's sister. According to a disclaimer on TheStockPic.com website, the owner of TheStockPic.com received compensation for promoting MVBY stock.

36.    MVBY's stock price and trading volume experienced massive gains over its first five weeks of trading. During that time, MVBY's stock price rose from an intraday low of $.40 per share to an intraday high of $2.88 per share.

37.    On August 24, 2007, the Financial Industry Regulatory Authority ("FINRA"), a self-regulatory organization which oversees securities firms, contacted MVBY as part of a review (the "FINRA Review"). The FINRA Review focused on MVBY's unregistered stock offerings to the Promoters and MVBY's recent press releases.

38.    Czarnik represented MVBY in the FINRA Review. On August 28, 2007, Czarnik participated in a phone interview with FINRA. On September 19th, 20th, and 24th, 2007, Czarnik produced documents from MVBY to FINRA.

39.    By September 13, 2007, Czarnik learned that Pink Sheets had received numerous complaints about spam promoting MVBY's securities and therefore halted its quotations for MVBY stock.

40.    On September 26, 2007, the Commission sued two of the Promoters, Ryan Reynolds and his entity Bellatalia, alleging that they had engaged in the unregistered resale of penny stock to the public with respect to six companies. See SEC v. Offill et al., 07-cv-01643 (N.D. Tex)). The Commission alleged that Reynolds earned over $3.4 million in net profits by reselling unregistered stock to the public in those offerings.

41.    On October 10, 2007, Czarnik was notified that Pink Sheets placed a "skull and crossbones designation" on MVBY stock, a designation indicating "stocks that are the subject of unsolicited spam, questionable promotion, regulatory suspensions, disruptive corporate actions (including reverse mergers), or other public-interest concerns."

42.    On October 25, 2007, Czarnik received an email from MVBY's chief executive officer: "Stephen... our stock price has drastically dropped in the last week. I am getting numerous threatening faxes, emails and calls from very upset shareholders. They are accusing us that we must be doing something criminal... I am at a loss."

43.    On October 25, 2007, Czarnik urged the chief executive officer to issue press releases. Czarnik wrote "[t]he market has very limited information with respect to the Company... Press releases are generally used to disseminate material information regarding the company. If the stock price has fallen due to some information regarding the company that some have and the public does not, we must issue a release." That day, Czarnik reviewed and advised on an MVBY press release.

44.    Even after Pink Sheets placed a "skull and crossbones" on MVBY's stock, the SEC sued Reynolds, and investors accused MVBY of criminal activity, Czarnik continued to draft and execute legal opinions for MVBY for the purpose of selling MVBY shares to the public through the Promoters.

9

45.    On December 18, 2007 and January 7, 2008, Czarnik issued Legal Opinion Letters for MVBY.

46.    From June 2007 to January 2008, the Promoter Defendants and the Promoter Entity Defendants sold thousands of shares of MVBY stock in the public market within days of receiving their shares.

47.    The Promoters received and resold their purported 504 shares as follows:

| Issuer | Promoter Defendant (Recipient) | Date Stock Received from Issuer | Date of Resale to Public |
|--------|-------------------------------|--------------------------------|--------------------------|
| MVBY | Fleming | 6/13/07 | 6/19/07 |
| MVBY | Reynolds | 6/13/07 | 6/20/07 |
| MVBY | Fleming | 6/29/07 | 7/12/07 |
| MVBY | Reynolds | 6/29/07 | 7/05/07 |
| MVBY | Wynn | 6/29/07 | 7/12/07 |
| MVBY | Reynolds | 8/17/07 | 8/27/07 |
| MVBY | Wynn | 8/17/07 | 8/17/07 |
| MVBY | Fleming | 12/20/07 | 12/20/07 |
| MVBY | Reynolds | 12/20/07 | 12/20/07 |
| MVBY | Fleming | 1/10/08 | 1/10/08 |
| MVBY | Reynolds | 1/10/08 | 1/10/08 |

48.    The aggregate amount of these offerings exceeded $1 million.

49.    The Promoters sold over 20 million shares of MVBY stock in the public market for proceeds of more than $9 million.

50.    The misrepresentations stated in Paragraphs 25, 26 and 27 were material, because they enabled MVBY's transfer agent to issue MVBY shares to the Promoters without restrictive legends. In addition, Czarnik's false statements concerning the Promoters' intent to distribute the shares resulted in an illegal offering. Reasonable investors would have wanted to know that because they purchased MVBY shares in an illegal offering, the shares they purchased had a risk of losing their value and marketability should the illegal nature of the offering cause, among other

things, Pink Sheets to stop quotation of the stock or the Commission to suspend trading in the

stock. By his misrepresentations, Czarnik enabled the Promoters and the public to receive shares

from MVBY without the disclosures or other safeguards required by the registration provisions of

federal securities law.

### December 5, 2007: Unregistered Offering by Alchemy Creative, Inc.

51.     As of September 18, 2007, Alchemy – which purportedly created educational

DVDs and software – had $1.52 in the bank and hundreds of thousands of dollars in losses.

52.     In or around October 2007, Czarnik represented Alchemy in its purchase of a

dormant public shell company and its merger of that entity into the existing Alchemy Creative,

Inc.

53.     Between October 2007 and December 5, 2007, Czarnik counseled Alchemy in

obtaining a NASDAQ ticker symbol. Czarnik also helped draft and file rudimentary, unaudited

financial disclosures sufficient for ALMY to be quoted on the Pink Sheets.

54.     On December 5, 2007, Alchemy issued stock to the Promoters in an unregistered

offering pursuant to a purported Rule 504 exemption.

55.     Czarnik drafted three key documents for the December 5, 2007 Alchemy stock

offering.

56.     First, on or before December 3, 2007, Czarnik drafted a letter from Alchemy to

himself (the "Alchemy Management Representation Letter") requesting that Czarnik issue a legal

opinion related to the issuance of unregistered stock. The Alchemy Management Representation

Letter stated that the Promoters and Alchemy "will not use the shares in a distribution or violate

any federal or state securities laws. [The Promoter] has not offered or sold any portion of the

shares to others or with a view to reselling or otherwise disposing of any portion of the Shares."
A true and accurate copy of a Management Representation Letter is attached as Exhibit D.

57.    Second, on or before December 3, 2007, Czarnik drafted subscription agreements
("Alchemy Subscription Agreements") providing that the Promoters would each purchase a
quantity of Alchemy stock. The Alchemy Subscription Agreements stated that each of the
Promoters (1) "will not engage in any activity that will constitute a distribution of the Shares,"
and (2) "has not offered or sold any portion of the Shares to others or with a view to reselling or
otherwise disposing of any portion of the Shares." A true and accurate copy of an Alchemy
Subscription Agreement is attached as Exhibit E.

58.    Third, on or before December 3, 2007, Czarnik issued a legal opinion letter
("Alchemy Legal Opinion") to Alchemy's transfer agent. The Alchemy Opinion Letter states that
Czarnik "without independent investigation" relied on the representations contained in Alchemy's
Management Representation Letter. The Alchemy Opinion Letter repeats the statement from the
Alchemy Management Representation Letter: "each [Promoter] and/or the Company will not use
the Common Stock in a distribution or violate any federal or state securities laws."

59.    The Alchemy Opinion Letter states "[W]e are of the opinion that... the certificates
representing the Common Stock are to be issued without legend." A true and accurate copy of
the last two pages of the Alchemy Legal Opinion is attached as Exhibit F.

60.    On December 3, 2007, Czarnik emailed the Alchemy Subscription Agreements
and Alchemy Management Representation Letter, among other documents, to Alchemy with
instructions to review, sign and return to Czarnik by fax for delivery to Alchemy's transfer agent.

61.    Czarnik provided the Alchemy Subscription Agreements, Alchemy Management
Representation Letters, and Alchemy Opinion Letter to Alchemy's transfer agent. Upon receiving

the signed Alchemy Opinion Letter from Czarnik, Alchemy's transfer agent issued stock

certificates to the Promoters without a restrictive legend.

**Czarnik's Knowledge or Reckless Disregard of the Distribution Plan for Alchemy Stock**

62.     The representations identified in paragraphs 56, 57, and 58 were false when made.

The Promoters intended to sell their Alchemy stock immediately in furtherance of a public

offering.

63.     At the time of writing the Alchemy Management Representation Letter, the

Alchemy Subscription Agreements and the Alchemy Opinion Letter, Czarnik knew or recklessly

disregarded that the Promoters had a plan to distribute Alchemy stock.

64.     Having counseled MVBY on its offerings to the Promoters in June, July, and

August 2007, and knowing that the Promoters had previously engaged in a scheme to

immediately sell their MVBY stock, by December 3, 2007 Czarnik knew or recklessly

disregarded that the Promoters had a plan to distribute Alchemy stock.

65.     On October 1, 2007, Czarnik received an email from an Alchemy officer: "[W]e

are ready to sign and start trading."

66.     On November 14, 2007, Czarnik received an email from Feeback: "[Promoter]

Carl [Fleming] will set the date to begin trading. You want to go out on a Monday and I will

continue to coordinate the initial trading date with Carl and get back to you."

67.     On November 30, 2007, Czarnik received an email from Feeback: "Stephen...

Alchemy Creative – should start trading this Monday. Beverage Creations – I hope it starts

trading no later than Monday 12/10."

68.     On December 4, 2008, Alchemy announced in a press release that it had "initiated

trading." On December 5, 2007, Czarnik received an email from an Alchemy Director:

"Attached are six new press releases... We realize the need to have a new one for in the morning."

69.    To create market demand for stock for which little public information existed, the Promoters launched a multimedia promotional campaign designed to artificially stimulate Alchemy's stock price.

70.    In December 2007, the Promoters distributed millions of promotional mailers touting Alchemy stock. The mailers urged investors to "ACT NOW BEFORE THE WHOLE WORLD FINDS OUT ABOUT THIS STOCK!," rated Alchemy stock a "STRONG BUY," and predicted astronomical gains within the first year.

71.    The Promoters also touted Alchemy through www.thestockpic.com. In addition, the Promoters helped create multiple press releases for Alchemy to release during the first few weeks of public trading.

72.    The promotional scheme worked. In the first five weeks of trading, Alchemy's stock price soared almost 75% from an intraday low of $1.90 per share on December 5, 2007 to an intraday high of $3.32 per share on January 11, 2008.

73.    The misrepresentations identified in paragraphs 56, 57, and 58 were material, because they enabled Alchemy's transfer agent to issue Alchemy shares to the Promoters without restrictive legends. In addition, Czarnik's false statements concerning the Promoters' intent to distribute the shares resulted in an illegal offering. Reasonable investors would have wanted to know that because they purchased Alchemy shares in an illegal offering, the shares they purchased had a risk of losing their value and marketability should the illegal nature of the offering cause, among other things, Pink Sheets to stop quotation of the stock or the Commission to suspend trading in the stock. By his misrepresentations, Czarnik enabled the Promoters and the

14

public to receive shares from the Alchemy without the disclosures or other safeguards required by the registration provisions of federal securities law.

74.    The Promoters sold over 14 million shares of Alchemy stock to the public for profits of over $7 million.

### January 2008: Unregistered Offering by Beverage Creations, Inc.

75.    As of December 2007, BCI – a purported developer of a proprietary sports drink – had not manufactured any beverage product, had no production facilities, and had lost $43,760 in the preceding three months.

76.    In 2007, Czarnik represented BCI in its purchase of a dormant public shell company and its merger of that entity into the existing Beverage Creations, Inc.

77.    On January 30, 2008, BCI issued stock to the Promoters in an unregistered offering pursuant to a purported Rule 504 exemption.

78.    Czarnik drafted three key documents for the BCI stock offering.

79.    First, on or before December 17, 2007, Czarnik drafted a letter from BCI to himself (the "BCI Management Representation Letter") requesting that Czarnik issue a legal opinion related to the issuance of unregistered stock. The BCI Management Representation Letter stated that the Promoters and BCI "will not use the shares in a distribution or violate any federal or state securities laws. [The Promoter] has not offered or sold any portion of the shares to others or with a view to reselling or otherwise disposing of any portion of the Shares." A true and accurate copy of a Management Representation Letter is attached as Exhibit G.

80.    Second, on or before December 17, Czarnik drafted subscription agreements ("BCI Subscription Agreements") providing that the Promoters would each purchase 3,333,333 million shares of BCI stock. The BCI Subscription Agreements stated that each of the Promoters

15

(1) "will not engage in any activity that will constitute a distribution of the Shares," and (2) "has not offered or sold any portion of the Shares to others or with a view to reselling or otherwise disposing of any portion of the Shares." A true and accurate copy of a BCI Subscription Agreement is attached as Exhibit H.

81.     Third, on December 17, Czarnik issued a legal opinion letter ("BCI Legal Opinion") to BCI's transfer agent. The BCI Opinion Letter states that Czarnik "without independent investigation" relied on the representations contained in BCI's Management Representation Letter. The BCI Opinion Letter repeats the statement from the BCI Management Representation Letter: "each [Promoter] and/or the Company will not use the Common Stock in a distribution or violate any federal or state securities laws."

82.     The BCI Opinion Letter states "[W]e are of the opinion that... the certificates representing the Common Stock are to be issued without legend." A true and accurate copy of the BCI Legal Opinion is attached as Exhibit I.

83.     On December 17, 2007, Czarnik emailed the BCI Subscription Agreements and BCI Management Representation Letter, among other documents, to BCI with instructions to review, sign and return to Czarnik by fax for delivery to BCI's transfer agent.

84.     Czarnik provided the BCI Subscription Agreements, BCI Management Representation Letter, and BCI Opinion Letter to BCI's transfer agent. Upon receiving the signed BCI Opinion Letter from Czarnik on or around January 30, 2008, BCI's transfer agent issued share certificates to the Promoters without a restrictive legend.

**Czarnik's Knowledge or Reckless Disregard of the Distribution Plan for BCI Stock**

85.     The representations identified in paragraphs 79, 80 and 81 were false when made. The Promoters intended to sell their BCI stock immediately in furtherance of a public offering.

16

86.    At the time of writing the BCI Management Representation Letters, the BCI Subscription Agreements and the BCI Opinion Letter, Czarnik knew or recklessly disregarded that the Promoters had a plan to distribute BCI stock.

87.    Having counseled MVBY and Alchemy on their offerings to the Promoters, and knowing that the Promoters had previously engaged in a scheme to immediately sell their MVBY and Alchemy stock, by December 17, 2007 Czarnik knew or recklessly disregarded that the Promoters had a plan to distribute BCI stock.

88.    On October 11, 2007, Czarnik received an email from Feeback: "We need to get everything prepared to upload on Pink Sheets. The plan is to start trading [BCI] in two weeks... Make sure our website has all the necessary components to accommodate investor inquiries."

89.    On October 15, 2007, Czarnik received an email from Feeback: "Stephen, FYI, Beverage Creations is ready to post on Pink Sheets once they have their symbol."

90.    On November 29, 2007, Czarnik received an email from Feeback: "Stephen... Can we get Beverage Creations trading quickly?" Czarnik replied, "As we discussed numerous times, it is in the hands of NASDAQ and I have done everything that I can to speed this up."

91.    On December 5, 2007, Czarnik received an email from Feeback: "Stephen... Carl and I need to have a discussion with the BCI folks on the delays with getting them up and trading."

92.    January 15, 2008, Czarnik received an email from Promoter Fleming: "Stephen... I do agree with Rob's earlier email in your representations about when Beverage Creations would be completed so we could initiate advertising and marketing the company along with providing them additional much needed capital... I am going to move forward with some firm this week to ensure these companies become publicly traded."

17

93.     January 15, 2008, Czarnik received an email from Feeback: "Stephen... You need to call [a BCI officer] tomorrow and explain to him as to why they do not have a symbol... We told them last June that we would have them trading by August/September."

94.     Prior to January 30, 2008, Czarnik counseled BCI in obtaining a NASDAQ ticker symbol. Czarnik also helped draft and file a disclosure document sufficient to be quoted by Pink Sheets.

95.     On January 30, 2008, BCI issued a press release announcing that BCI had "initiated trading."

96.     On January 30, 2008, the Promoters sold over 2.3 million shares in the public market for profits of more than $3 million.

97.     From February 4, 2008 through March 6, 2008, one of the Promoters distributed over 1.75 million, full-color, promotional mailers nationwide touting BCI. The mailers boasted that "EARLY INVESTORS COULD MAKE A FORTUNE," rated BCI stock a "STRONG BUY," and predicted astronomical gains within the first year.

98.     From February, 2008 to March 2008, www.theStockPic.com promoted BCI on its website and through spam emails.

99.     The promotional scheme worked. In the three weeks after its January 30, 2008 debut – even as the Promoters dumped their shares on the public – BCI's stock price more than doubled from an intraday low of $.55 per share on January 30 to its February 21 close at $1.25 per share.

100.    On February 20, 2008, in reaction to the Promoters' promotional activity, Pink Sheets discontinued its quotation of BCI stock, and gave BCI its lowest rating of "Caveat Emptor."

101.    The misrepresentations identified in paragraphs 79, 80 and 81 were material, because they enabled BCI's transfer agent to issue BCI shares to the Promoters without restrictive legends. In addition, Czarnik's false statements concerning the Promoters' intent to distribute the shares resulted in an illegal offering. Reasonable investors would have wanted to know that because they purchased BCI shares in an illegal offering, the shares they purchased had a risk of losing their value and marketability should the illegal nature of the offering cause, among other things, Pink Sheets to stop quotation of the stock or the Commission to suspend trading in the stock. By his misrepresentations, Czarnik enabled the Promoters and the public to receive shares from BCI without the disclosures or other safeguards required by the registration provisions of federal securities law.

### Czarnik's Ongoing Conduct

102.    Czarnik continues to serve as a one-man "opinion-mill" for unregistered penny stock offerings.

103.    Since December 20, 2007 – in addition to the offerings for My Vintage Baby, Alchemy, and BCI – Czarnik has authored at least 111 opinion letters for offerings issued under a purported Rule 504 exemption. Those 111 offerings involved the transfer of over 2.5 billion shares to penny stock promoters by 43 issuers.

## COUNT I

### Violations of Sections 5(a) and 5(c) of the Securities Act

104.    Paragraphs 1 through 103 are realleged and incorporated by reference as part of this claim.

105.    The shares of MVBY, Alchemy, and BCI are "securities" as that term is defined in Section 2(a)(1) of the Securities Act.

106.    From June 2007 to the present, no registration statement was filed or in effect for the sale of MVBY, Alchemy or BCI stock, nor did any exemption from registration apply.

107.    By way of the conduct described in paragraphs 1 to 103, Czarnik was a "necessary participant" and a "substantial factor" in the illegal unregistered offerings of MVBY, Alchemy, and BCI.

108.    MVBY, Alchemy, BCI, and the Promoters each made use of the instrumentalities of interstate commerce to directly and indirectly effect the unregistered sale of their common stock to the public. Among other conduct, those individuals and entities executed subscription agreements using interstate faxes, and ordered trades using email and telephone.

109.    Czarnik made use of the instrumentalities of interstate commerce in providing necessary and substantial services to effect the unregistered sale of common stock by Alchemy, MVBY, and BCI to the public. In facilitating the scheme, Czarnik used emails, phone calls and letters to the Promoters, to the Issuers, and to the Issuers' transfer agent.

110.    By reason of the foregoing conduct, Czarnik violated and, unless restrained and enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

111.    Paragraphs 1 through 103 are realleged and incorporated by reference as part of this claim.

112.    As described in paragraphs 1 through 103, Czarnik, in connection with the purchase and sale of securities by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly made untrue statements of material fact, and has omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and has engaged in acts, practices and courses of business which operated and will operate as a fraud and deceit upon purchasers and sellers of such securities.

113.    As stated in paragraphs 1 through 103, Czarnik engaged in the acts alleged above knowingly or with a reckless disregard for the truth.

114.    By reason of foregoing, Czarnik has violated and is violating Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240 10b-5].

## COUNT III

### Violations of Section 17(a) of the Securities Act

115.    Paragraphs 1 through 103 are hereby realleged and incorporated by reference.

116.    As identified in paragraphs 1 through 103, Defendant Czarnik has, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of securities: (a) knowingly or recklessly employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the

21

light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of the securities offered or sold by these defendants.

117.    By reason of the foregoing, Czarnik violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## REQUEST FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Find that Defendant Czarnik committed the violations alleged.

### II.

Enter an Order of Permanent Injunction as to Defendant Czarnik, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, restraining and enjoining Czarnik from violating Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### III.

Enter an Order requiring Czarnik to disgorge all ill-gotten gains resulting from his participation in the conduct described above, including pre-judgment and post-judgment interest.

### IV.

Enter an Order requiring Czarnik to pay a civil penalty pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act [15 U.S.C. §§ 77t(d) and 78u(d)(3)].

### V.

Enter an Order barring Czarnik from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act and Section 21 of the Exchange Act [15 U.S.C. §§ 77t(g) and 78u(d)(6)].

## VI.

Enter an Order prohibiting Czarnik from providing legal services to any person in connection with the offer or sale of securities pursuant to, or claiming, an exemption under Regulation D, including without limitation, participating in the preparation or issuance of any opinion letter related to such offerings.

## VII.

Grant such other and further equitable relief as this Court deems appropriate and necessary.

## JURY DEMAND

The Commission hereby requests a trial by jury.

Dated: February 1, 2010

Respectfully submitted,

**THE UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

By: One of its Attorneys

Frank Goldman (FG3522)
Attorney for Plaintiff
Securities and Exchange Commission
175 West Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: 312-353-7390
Fax: 312 353-7398
GoldmanF@sec.gov