# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| *Plaintiff,* | ) |
| vs. | ) Civil Action No. 3:08-CV-0438-G |
| RYAN M. REYNOLDS; JASON WYNN; CARLTON FLEMING; BEVERAGE CREATIONS, INC.; BELLATALIA, LP; WYNN INDUSTRIES, LLC; and THOMAS WADE INVESTMENTS, LLC | ) |
| *Defendants.* | ) |

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S SUPPLEMENTAL APPENDIX IN SUPPORT OF ITS REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Harold R. Loftin, Jr.
   (Texas Bar No. 12487090)
SECURITIES AND EXCHANGE
COMMISSION
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
(817) 978-6450
(817) 978-4927 (fax)

Jonathan S. Polish (IL Id # 6237890)
John E. Birkenheier (IL Id # 6270993)
Tim Leiman (IL Id # 6270153)
Lori Vass (IL Id # 6293998)
SECURITIES AND EXCHANGE
COMMISSION
175 West Jackson Blvd., Suite 900
Chicago, IL 60604
(312) 353-7390
(312) 353-7398 (fax)

Dated: March 31, 2008

1

Stephen Czarnik  3/27/2008  9:00:00 AM

**Page 1**

```
1
2   IN THE UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF TEXAS
3   DALLAS DIVISION
    ------------------------X
4
    SECURITIES AND EXCHANGE
5   COMMISSION,
6           Plaintiff,
7      vs.          Civil Action No.
                    3:08-CV-0438-G
8   RYAN M. REYNOLDS; JASON WYNN;
    CARLTON FLEMING; BEVERAGE
9   CREATIONS, INC.; BELLATALIA,
    LP; WYNN INDUSTRIES, LLC; and
10  THOMAS WADE INVESTMENTS, LLC
11          Defendants.
    ------------------------X
12
13
14      DEPOSITION OF STEPHEN J. CZARNIK
15          New York, New York
16          Thursday, March 27, 2008
17
18
19
20
21
22
23
24  Reported by:
    JOAN WARNOCK
25  JOB NO. 202005
```

**Page 2**

```
1
2           March 27, 2008
3           10:45 a.m.
4
5
6       Deposition of STEPHEN J. CZARNIK,
7   held at the offices of Securities and
8   Exchange Commission, 3 World Financial
9   Center, New York, New York, before Joan
10  Warnock, a Notary Public of the State of
11  New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1
2   A P P E A R A N C E S:
3
4   UNITED STATES SECURITIES AND
5   EXCHANGE COMMISSION
6   Attorneys for Plaintiff
7       175 W. Jackson Blvd., Suite 900
8       Chicago, Illinois 60604
9   BY:  LINDA IELEJA GERSTMAN, ESQ.
10
11  ANDREWS KURTH LLP
12  Attorneys for Defendants Ryan Reynolds
13  and Bellatalia, LP
14      1717 Main Street, Suite 3700
15      Dallas, Texas 75201
16  BY:  KARA ALTENBAUMER-PRICE, ESQ.
17      (Via telephone)
18
19  PATTON BOGGS
20  Attorneys for Defendants Jason Wynn and
21  Wynn Industries, LLC
22      2001 Ross Avenue, Suite 3000
23      Dallas, Texas 75201
24  BY:  CHRIS RICHIE, ESQ.
25      (Via telephone)
```

**Page 4**

```
1
2   A P P E A R A N C E S: (Cont'd.)
3
4   RANDY HENDERSON, ESQ.
5   Co-Counsel for Defendants Jason Wynn and
6   Wynn Industries, LLC
7       7037 Highway 6 North, #107
8       Houston, Texas 77095
9       (Via telephone)
10
11  BRACEWELL & GIULIANI LLP
12  Attorneys for Carlton Fleming and Thomas
13  Wade Investments, LLC
14      1445 Ross Avenue, Suite 3800
15      Dallas, Texas 75202
16  BY:  PATRICK CRANE, ESQ.
17
18  BEVERAGE CREATIONS
19      1215 Executive Drive West
20      Suite 102
21      Richardson, Texas 75081
22  BY:  BOB FORRESTER, ESQ.
23      (Via telephone)
24
25
```

S.APP.2

Stephen Czarnik  3/27/2008  9:00:00 AM

5

1
2  A P P E A R A N C E S:  (Cont'd.)
3
4  DUANE MORRIS LLP
5     Attorneys for the Witness
6        1540 Broadway
7        New York, New York 10036-4086
8  BY:  JASON ROSS PICKHOLZ, ESQ.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

7

1              S. Czarnik
2  A.  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.
3  Q.  Your date of birth, please?
4  A.  11/15/67.
5      MS. ALTENBAUMER-PRICE:  Before we
6  get started, can we get an agreement
7  that one objection is good for all?
8      MS. GERSTMAN:  That's fine.
9  Anybody here have an objection?
10     MR. CRAINE:  No.  That's fine with
11  us.
12     MR. PICKHOLZ:  I guess one thing
13  that I would just like to say on the
14  record is I know there is going to be, I
15  assume, some attorney client privilege
16  objections from BCI and perhaps from
17  Fleming.  What our intention to do is
18  after each question, we'll pause and
19  wait to hear if one of you guys is going
20  to assert the attorney client privilege
21  for your client.  It's not our intention
22  to try to make our own independent
23  decision on that since it does -- the
24  privilege I think does belong to the
25  client.  We'll leave it for you guys to

6

1              S. Czarnik
2  STEPHEN CZARNIK, called as a
3  witness, having been duly sworn by a
4  Notary Public, was examined and
5  testified as follows:
6      COURT REPORTER:  Please state your
7  name and address for the record.
8      THE WITNESS:  Stephen Jacob
9  Czarnik, 17 State Street, 36th Floor,
10  New York, New York 10004.
11     MS. GERSTMAN:  This deposition is
12  being taken in the case of SEC versus
13  Ryan Reynolds, et al., in the Northern
14  District of Texas pursuant to the
15  Federal Rules of Civil Procedure and the
16  Federal Rules of Evidence.  I'm Linda
17  Ialeja Gerstman appearing on behalf of
18  the Commission.  I think we have all
19  counsel appearances so we will skip that
20  for now.
21  Q.  And, Mr. Czarnik, would you please
22  spell your name.
23  A.  Stephen, S-t-e-p-h-e-n, Jacob,
24  J-a-c-o-b, Czarnik, C-z-a-r-n-i-k.
25  Q.  And your Social Security number?

8

1              S. Czarnik
2  work out with the government or with a
3  judge or whatever.  But if we don't hear
4  an objection, then obviously we'll make
5  our own judgment call on that as to
6  whether or not we think it's privileged
7  or not and he can go ahead and testify
8  or not.  But we will give you guys the
9  opportunity to make that objection.
10     MS. GERSTMAN:  Also, before we go
11  further, I just wanted to note who is
12  here personally and who is here
13  telephonically, just so we have that on
14  the record.  So telephonically it's
15  Mr. Richie, Ms. Altenbaumer-Price,
16  Mr. Henderson, and Mr. Forrester.  Here
17  present is Mr. Craine, Mr. Pickholz, and
18  myself.
19     Would you mark that, please, as
20  Exhibit 6.
21     (Plaintiff's Exhibit 6, Subpoena,
22  marked for identification, as of this
23  date.)
24  Q.  Mr. Czarnik, you've been given what
25  has been marked as Exhibit 6.  Is this the

S.APP.3

Stephen Czarnik  3/27/2008  9:00:00 AM

9

1    S. Czarnik
2    subpoena pursuant to which you are appearing
3    today? And, actually, as a preface to that
4    question --
5         MR. PICKHOLZ: Just get the
6    clarification.
7    Q.  Yes, I will clarify.  This is the
8    original subpoena that was sent out to you on
9    or about March 17th, 2008.  An amended
10   subpoena was sent out to you that was
11   designed only to change the date to
12   correspond to a date that you were available.
13   So the only intended change was to change it
14   to today, March 27th, at 10:30.  The amended
15   subpoena, however, did have a different
16   attachment.  I've spoken to your counsel
17   about it, and I think we are all in agreement
18   that this is the subpoena that the Commission
19   intends to be operative and with the change
20   of today's date and time.
21        MR. PICKHOLZ: Right.  That was our
22   understanding.
23        MS. GERSTMAN: Okay.
24   Q.  So is this the subpoena, with that
25   caveat, that you're appearing pursuant to?

11

1    S. Czarnik
2    your email?
3    A.  No.
4    Q.  And is it possible that you have
5    emails that are responsive to the document
6    request here?
7    A.  There may be.
8    Q.  And what was the reason that you
9    didn't look at your emails?
10   A.  I just didn't have the time.
11        MS. GERSTMAN: Mr. Pickholz, we'll
12   ask that that be done.
13   Q.  Are there any other categories --
14        MR. PICKHOLZ: I just want to point
15   out that this is dated March 17th, and I
16   think we got it last week, so there
17   hasn't really been a lot of time, but we
18   will certainly review the emails and let
19   you know if we find anything.
20        MS. GERSTMAN: Okay.
21   Q.  Are there any other categories of
22   documents like the emails that you haven't
23   had a chance to look at?
24   A.  No.
25   Q.  And have you withheld any documents

10

1    S. Czarnik
2    A.  Yes.
3    Q.  And if you would look at the
4    documents requested, please, on Page 3.  Did
5    you produce all documents called for by the
6    subpoena?
7    A.  I believe I did.
8        MR. PICKHOLZ: I just want to make
9    a caveat.  I don't remember if I spoke
10   to you or one your colleagues, and I
11   mentioned that we hadn't produced
12   anything in response to number four, and
13   I was told that we could discuss that
14   either today or at some other point if
15   you still wanted the information.
16        MS. GERSTMAN: Okay.
17   Q.  So then with the exception of
18   number four, you've produced all other
19   responsive documents in your possession?
20   A.  I produced everything that -- I
21   mean there may be emails or things that I
22   haven't had a chance to go through in the
23   limited time, but I produced all the
24   documents that I had.
25   Q.  Did you have a chance to look at

12

1    S. Czarnik
2    that are responsive to this request on the
3    basis of attorney client privilege?
4    A.  I don't believe that I have.
5        MS. GERSTMAN: Could you mark this,
6    please as Exhibit 7.
7        (Plaintiff's Exhibit 7, Letter
8    dated March 25, 2008, to Jason Pickholz
9    from Stanley Morris, marked for
10   identification, as of this date.)
11   Q.  Mr. Czarnik, I've handed you what
12   has been marked as Exhibit 7.  Do you
13   recognize this document?
14   A.  Yes.
15   Q.  Can you identify it for the record,
16   please?
17   A.  It's a letter that was sent to me,
18   or it's addressed to Mr. Pickholz from Stan
19   Morris.
20        MS. GERSTMAN: Can you folks on the
21   phone silence that in any way?  Thank
22   you.
23   Q.  Go ahead, Mr. Czarnik.
24   A.  It's a letter from Mr. Morris.
25   Q.  To Mr. Pickholz?

beverage creations - deps

S.APP.4

Stephen Czarnik  3/27/2008  9:00:00 AM

13

```
1        S. Czarnik
2    A.  Yes.
3    Q.  And is it your understanding that
4    this sets forth the parameters of a waiver by
5    Beverage Creations, Inc., with respect to
6    your testimony here today?
7    A.  Yes, that's my understanding.
8    Q.  And are you testifying today in
9    accordance with the scope of the waiver set
10   forth herein?  It's your intention to?
11   A.  Yes.
12   Q.  A little bit about your education,
13   please.  Your college attendance and degree?
14   A.  I went to the University of Detroit
15   and got a bachelor's.  And then I went to law
16   school at University of Detroit, and I have a
17   LLM in taxation in Boston University.
18   Q.  What year was your bachelor's from
19   the University of Detroit?
20   A.  '89.
21   Q.  And your law school degree?
22   A.  '92.
23   Q.  And your LLM?
24   A.  '93.
25   Q.  Do you have any other post-college
```

14

```
1        S. Czarnik
2    education?
3    A.  No.
4    Q.  And the bars that you are admitted
5    to, could you tell us that?
6    A.  New York.
7    Q.  What year was that?
8    A.  I'm not sure if it was '93 or '94,
9    because I think technically you don't -- you
10   have to get sworn in, but I passed the bar
11   after law school, '92.
12   Q.  Are you admitted to any other bars?
13   A.  I was admitted to Illinois, but I
14   let that lapse because I never did any -- had
15   any affiliation or work in Illinois.
16   Q.  Are you admitted to practice law in
17   Texas?
18   A.  No.
19   MR. PICKHOLZ:  Were you referring
20   to federal bars as well or just ones
21   that he had to pass the bar exam for?
22   MS. GERSTMAN:  Well, not just ones
23   he had to pass a bar exam for, because
24   some states have reciprocity or will
25   waive you in, but I guess the Supreme
```

15

```
1        S. Czarnik
2    Court or the -- yeah, the Supreme Court,
3    the states, not federal bars.
4    MR. PICKHOLZ:  Okay.  You
5    understood that?
6    THE WITNESS:  Yeah, I understood.
7    A.  New York.
8    Q.  Have any disciplinary charges ever
9    been alleged against you?
10   A.  No, not that I'm aware of.
11   Q.  And if you could briefly describe
12   your job experience as a lawyer.
13   A.  Employment history?
14   Q.  Yes.
15   A.  I was an associate at a firm called
16   Giancarlo & Glieberman in New York.  And
17   after that that firm merged into a firm
18   called Brown Raisman Milstein Felder &
19   Steiner, where I was an associate.  And then
20   I left there to join Baer Marks & Upham in
21   New York, and I became a partner there.  And
22   then I left Baer Marks and started -- well,
23   actually, I left Baer Marks with a colleague
24   and we went to Rosen, Einbinder & Dunn.  And
25   then we ended up on our own, Cohen & Czarnik.
```

16

```
1        S. Czarnik
2    Q.  When did you start Cohen & Czarnik?
3    A.  I believe it was '93.  It may have
4    been '94.
5    Q.  And how many lawyers am with you
6    currently at Cohen & Czarnik?
7    A.  Two.
8    Q.  Yourself and your partner,
9    Mr. Cohen?
10   A.  Yes.
11   Q.  And could you describe your
12   practice at Cohen & Czarnik, please?
13   A.  We do general corporate practice
14   with some securities as well as, you know,
15   general merger and acquisition, a small
16   corporate shop.
17   MR. PICKHOLZ:  Did you say '93 for
18   the year you formed the firm, your own
19   firm?
20   THE WITNESS:  I said I think it was
21   '93, '93 or '94.  I'm sorry.  You're
22   right.  It's 2003 and 2004.
23   MR. PICKHOLZ:  Relax.
24   THE WITNESS:  Yeah.  I'm just
25   living in the past.
```

S.APP.5

Stephen Czarnik  3/27/2008  9:00:00 AM

17

```
1          S. Czarnik
2       Q.  Have you and Mr. Cohen been the
3   only partners there the whole time the firm
4   has been in place?
5       A.  Yes.
6       Q.  Could you describe your securities
7   law experience, please.
8       A.  Sure.  I worked on securities
9   matters for Brown Raisman as well as Baer
10  Marks throughout representing generally
11  reporting companies.
12      Q.  And more specifically, how about
13  your experience in Regulation D offerings?
14      A.  Regulation D offerings, sure,
15  throughout, throughout Brown Raisman and Baer
16  Marks and now.
17      Q.  And how about experience
18  particularly in offerings pursuant to
19  Rule 504 of Regulation D, what is your
20  familiarity and experience there?
21      A.  Within the past few years.
22      Q.  Can you be more specific?  How many
23  past years?
24      A.  Probably I would say two.
25      Q.  So prior to that you had no
```

19

```
1          S. Czarnik
2   isn't limited strictly to the companies who
3   are doing the offering?
4       A.  No.
5       Q.  Approximately how many opinion
6   letters have you issued within the last two
7   years based upon the exemption of Rule 504?
8       A.  I think I just answered that
9   question that I'm not -- ballpark was 50, and
10  I said I can't be sure.
11      Q.  I'm asking more specifically about
12  opinion letters, and it may be the same
13  answer.
14      A.  It would be the same answer.
15      Q.  And how many of those relied on
16  Texas law?
17      A.  I can't be sure.
18      Q.  Do you have a ballpark estimate?
19      A.  I can estimate -- I couldn't.  On a
20  percentage basis I couldn't even estimate.
21      Q.  Now, is Beverage Creations a client
22  of yours?
23      A.  Yes.
24      Q.  Since when?
25      A.  Since probably July of 2007.
```

18

```
1          S. Czarnik
2   experience in 504 offerings?
3       A.  Limited.
4       Q.  And so in the past two years
5   approximately how many have you been involved
6   in?
7       A.  How many 504 offerings?
8       Q.  Yes.
9       A.  I don't know.
10      Q.  Can you ballpark it?
11      A.  A number of them.
12      Q.  More than ten?
13      A.  More than ten.
14      Q.  More than 20?
15      A.  More than 20.
16      Q.  More than 50?
17      A.  I don't know.
18      Q.  And in connection with those
19  offerings, who is it that you represent?  Is
20  it the company or different participants?
21      A.  It would be different participants.
22  It depends on who I represent, who retained
23  me or who I'm working for, who I have the
24  relationship with.
25      Q.  Right.  So your representation
```

20

```
1          S. Czarnik
2       Q.  And is Beverage Creations a current
3   client of yours?
4       A.  I don't know how to answer that.  I
5   mean I don't know when a client relationship
6   ends.
7       Q.  Okay.  Has either side informed the
8   other that the client relationship has ended,
9   you've told that to BCI or they've told that
10  to you?
11      A.  No.
12      Q.  And how was it that BCI became a
13  client of yours?
14      A.  I was introduced to them through
15  Robert Feeback and Carl Fleming.
16      Q.  Who is Robert Feeback?
17      A.  Robert Feeback, he's a member of
18  the board, I believe, of Beverage Creations.
19      Q.  And how did you know Robert
20  Feeback?
21      A.  I know him -- he has a firm in
22  Texas.  I don't know if it's an investment
23  advisory firm or what kind of firm it is.
24  But he consults with public -- not-public,
25  but private companies.
```

S.APP.6

Stephen Czarnik  3/27/2008  9:00:00 AM

21

1        S. Czarnik
2        Q.  And how did you first make his
3    acquaintance?
4        A.  I imagine it was probably last
5    year.  A year ago around this time, maybe
6    less, just less than a year ago.
7        Q.  And what were the circumstances of
8    your meeting?
9        A.  Well, I never met with him
10   personally.
11       Q.  To this day you've never met him?
12       A.  No.
13       Q.  So how was it that you became
14   introduced to him?
15       A.  I believe he and Carl called me, or
16   I mean I can't -- I can't recall how it
17   actually happened, but someone reached out to
18   me.
19       Q.  And was that with respect to
20   retaining your services as an attorney?
21       A.  Yes.
22       Q.  And was that for a client other
23   than Beverage Creations?
24       A.  Yes.
25       Q.  And you mentioned Carl Fleming.

23

1        S. Czarnik
2        MR. CRAINE:  And just to make your
3    job easier, we have not provided a
4    letter like this waiving privilege all
5    over the place.  So if we're going to
6    assert privilege anywhere and
7    everywhere, I'm sure you'll be
8    respectful of that.
9        MS. GERSTMAN:  I'll ask my
10   questions and you'll make your
11   objections.
12       Q.  When did Mr. Fleming become a
13   client of yours?
14       A.  Probably about a year ago.
15       Q.  Is Mr. Fleming a current client of
16   yours?
17       A.  I don't know when -- I'm not sure
18   when a relationship ends except unless
19   someone tells the other, but no one has told
20   the other that, so...
21       Q.  Any entities with which Mr. Fleming
22   is involved, are any of those entities your
23   clients?
24       A.  My understanding would be no.
25       Q.  Do you have an engagement letter

22

1        S. Czarnik
2    How do you know him?
3        A.  I know Carl -- I think it was about
4    two years ago or maybe three years ago he was
5    introduced to me by someone else that I had
6    worked with.
7        Q.  Who is that?
8        A.  Scott Seik.
9        Q.  And what do you understand
10   Mr. Fleming's business to be?
11       A.  I understand Mr. Fleming's business
12   to be a number of things.  I know he's
13   involved in real estate.  I know he owns a
14   farm.  And I'm not -- he's an investor, and
15   I'm not sure what else there is.
16       Q.  How is it that you came to be
17   introduced to him by Mr. Seik?
18       A.  I was working with Mr. Seik on a
19   publicly reporting shell that was delinquent
20   that we were trying to make current.  And
21   Mr. Fleming was the sole officer and director
22   of that company at the time.  So we needed
23   his assistance with records.
24       Q.  Is Mr. Fleming a client of yours?
25       A.  Yes.

24

1        S. Czarnik
2    with Mr. Fleming?
3        A.  No.
4        Q.  Do you have an engagement letter
5    with BCI?
6        A.  No.
7        Q.  When I say BCI, do you understand
8    me to be talking about Beverage Creations?
9        A.  Right.
10       Q.  What were you retained to do for
11   BCI?
12       A.  I was retained to purchase a shell,
13   do a share exchange between the private
14   company and the shell, and then the offering.
15       Q.  And who was your primary contact at
16   BCI?
17       A.  I spoke mostly with Robert Feeback,
18   but I often spoke with Patrick Dado or Bob
19   Wieden.
20       Q.  How do you charge BCI for your
21   time?
22       A.  Well, it was a flat fee.
23       Q.  What was the amount of the fee?
24       A.  $10,000.
25       Q.  And that's for the three steps that

beverage creations - deps

Page  21 - 24

S.APP.7

Stephen Czarnik  3/27/2008  9:00:00 AM

25

```
 1          S. Czarnik
 2   you described, purchasing the shell, doing
 3   the share exchange, and doing the offering?
 4          MR. PICKHOLZ: Bob, I know he
 5   answered the first question, are you
 6   going to object at all to the questions
 7   and answers about the fees, or are you
 8   okay with that?
 9          MR. FORRESTER: We're okay with
10   that.
11          MR. PICKHOLZ: Okay.  Go ahead and
12   answer.
13      Q.  And have you been paid the flat fee
14   of $10,000?
15      A.  Yes?
16      Q.  Who paid that?
17      A.  Carl Fleming.  Or one of his
18   companies.  I don't ...
19      Q.  Do you have any evidence of that
20   payment?
21      A.  I don't know.  If it came in by
22   wire, I do.  But if it didn't, I wouldn't.
23          MS. GERSTMAN: Mr. Pickholz, we'll
24   ask you to see if you can find any
25   documents related to that payment.
```

27

```
 1          S. Czarnik
 2   raise funds for working capital.
 3      Q.  And whose idea was it to make the
 4   offering pursuant to Section 504 and the
 5   specific Texas administrative code
 6   provisions?
 7          MR. PICKHOLZ: Bob, by your silence
 8   does that mean that you don't have any
 9   objection?
10          MR. FORRESTER: No.
11          MR. PICKHOLZ: Okay.
12      A.  I don't recall who exactly
13   structured the transaction.
14      Q.  Was it your idea?
15      A.  No.
16      Q.  So it came to you already
17   structured as a Section 504 exemption?
18      A.  Yeah.  It came to me this is how
19   the deal is going to be, sure, yes.
20      Q.  And who presented it to you that
21   way?
22      A.  It was probably Mr. Fleming and/or
23   Mr. Feeback.
24      Q.  What is your understanding of
25   Mr. Fleming's relationship to BCI?
```

26

```
 1          S. Czarnik
 2   please.
 3          MR. PICKHOLZ: Can I ask you, just
 4   to make sure we don't miss anything when
 5   this is over, can you just send us a
 6   letter just to recap what it is that
 7   you're looking for.
 8          MS. GERSTMAN: Yes.
 9      Q.  Have you ever received any BCI
10   stock in exchange for your services?
11      A.  No.
12      Q.  Have you ever owned any BCI stock?
13      A.  No.
14      Q.  What was the purpose of BCI's stock
15   offering?
16      A.  Which -- I'm not sure what you're
17   referring to.
18      Q.  The offering that you referred to,
19   the one that --
20      A.  Oh, the offering.
21      Q.  -- was in December 2007.
22      A.  Oh.
23      Q.  Yes.  What was BCI -- what was the
24   purpose there of what it was doing?
25      A.  I believe their purpose was to
```

28

```
 1          S. Czarnik
 2      A.  I don't know what their
 3   relationship -- I mean I know they know each
 4   other.  I believe that they've met in person.
 5      Q.  Well, particularly at the time when
 6   this offering is being discussed, and if it
 7   was Mr. Fleming that presented it to you, and
 8   I know you said it was either Mr. Fleming or
 9   Mr. Feeback, so how is it that Mr. Fleming is
10   presenting to you how BCI is going to do its
11   offering?  Like what is the relationship of
12   Mr. Fleming that he is making these
13   representations to you?
14          MR. CRAINE:  And I'll object to the
15   question to the extent that it
16   mischaracterizes your previous answer.
17      A.  I don't -- I don't understand what
18   you're asking me.  I'm sorry.
19      Q.  Okay.  Let me try it this way.
20          MS. GERSTMAN:  We'll strike the
21   last question.
22      Q.  At this time, the time of the
23   offering, what do you understand
24   Mr. Fleming's relationship to be to BCI?
25          MR. PICKHOLZ:  Just be careful on
```

S.APP.8

Stephen Czarnik  3/27/2008  9:00:00 AM

29

```
1        S. Czarnik
2    that.  Objectively, you can answer it
3    if you learned of the nature of the
4    relationship through your attorney
5    client relationship with BCI, then we
6    should probably check with Bob and make
7    sure that that's okay first.  So
8    depending on what your answer is
9      A.  I knew him to be -- well, I know he
10   was an investor and I understood they went --
11   they've been to dinner and meetings and
12   things together
13     Q.  Do you know how the individuals at
14   BCI met Mr. Fleming?
15     A.  I don't.
16     Q.  How about Mr. Feeback, how BCI came
17   into contact with Mr. Feeback?
18     A.  I don't
19       MR. PICKHOLZ  For these types of
20   questions I'll give you the same
21   instruction  Just give me a chance
22   to --
23       THE WITNESS  I'm sorry
24       MS GERSTMAN  Would you mark this,
25   please, as Exhibit 8
```

30

```
1        S. Czarnik
2    (Plaintiff's Exhibit 8, Convertible
3    Note bearing production number SJC
4    00033-39, marked for identification, as
5    of this date.)
6       MS. GERSTMAN: And one more,
7    please, as Exhibit 9.
8    (Plaintiff's Exhibit 9, Convertible
9    Note bearing production number SJC
10   00040-46, marked for identification, as
11   of this date.)
12     Q.  Mr. Czarnik, I've handed you two
13   exhibits  I've marked them Exhibit 8 and
14   Exhibit 9.  Looking at Exhibit 8, have you
15   seen that before?
16     A.  Yes.
17       MR. PICKHOLZ  Just for the record,
18   I'll represent that the Bates number
19   with the SJC prefix looks like the Bates
20   number prefixes that we used in
21   producing.
22     Q.  And can you identify this document
23   for the record?
24     A.  It's a convertible note where the
25   maker is Beverage Creations.  The holder is
```

31

```
1        S. Czarnik
2    Thomas Wade Investments.
3      Q.  And the date is July 25th, 2007?
4      A.  That's correct.
5      Q.  For $75,000?
6      A.  Yes.
7      Q.  Did you participate in creating
8    this document?
9      A  Yes
10     Q.  When was it created?
11     A.  I don't recall, but it presumably
12   was created about the date of the note.
13     Q.  And just to be more specific, did
14   you draft this document?
15     A.  Yes.
16     Q.  Where did you get the information,
17   the terms that you put into this document?
18     A  I don't understand
19     Q.  What was the source of the
20   information that you put in here?
21       MR. PICKHOLZ: I'm sorry.  I don't
22   mean to be a pest in delaying this, Bob,
23   but I just need to be careful for
24   Mr. Czarnik  As I read it, this would
25   fall under either one or two in Stan's
```

32

```
1        S. Czarnik
2    letter to me  Are you guys objecting to
3    it, or is it okay for him to testify?
4      MR. FORRESTER  It's okay for him
5    to testify
6      MR. PICKHOLZ  Okay.  Thanks.
7      Q.  So who gave you the information to
8    put it into this note?
9      A  Either Mr. Fleming or Mr. Feeback
10   or someone else from the company
11     Q.  So by your answer is it fair to say
12   you don't recall specifically?
13     A.  Yeah.
14       MR. CRAINE: I appreciate that
15   Thank you
16     A  I'm sorry.  I don't recall who
17   specifically gave me the terms of this
18     Q.  And what was the purpose of this
19   note?
20     A  It was to evidence a debt
21     Q.  BCI was looking for funding, for
22   money at the time?
23     A.  That was my understanding.
24     Q.  Do you know what BCI intended to do
25   with the $75,000?
```

S.APP.9

Stephen Czarnik  3/27/2008  9:00:00 AM

33

1    S. Czarnik
2      A.  I'm not sure what they intended to
3  do with this particular $75,000.
4      Q.  Do you know what they did with this
5  money?
6      A.  No.
7      Q.  And just to be clear, if says for
8  value received.  Is the value received
9  $75,000?
10     MR. PICKHOLZ:  Objection.  Do you
11  mean does he know?
12     MS. GERSTMAN:  I can rephrase it.
13     Q.  Did Beverage Creations, Inc., get
14  $75,000 in exchange for this note?
15     A.  I don't know.
16     Q.  If you would look at paragraph two,
17  please, titled "Conversion of Notes" at the
18  bottom of Page 1.  Read it, let me know, you
19  can read it to yourself, and I'll ask you a
20  question about it.
21     A.  Okay.
22     Q.  It references here that the company
23  will enter into an agreement with another
24  company which has shares traded on the Pink
25  Sheets electronic quotation system.  Is this

34

1    S. Czarnik
2  the purchasing of the shell and the share
3  exchange that you referenced in your earlier
4  answer?
5      A.  That would be, yes.
6      Q.  And what is the name of the company
7  here that's involved?
8      MR. PICKHOLZ:  Objection.  There's
9  a bunch of companies —
10     Q.  I'm sorry.  The company traded on
11  the Pink Sheets.
12     A.  What the name of it is?
13     Q.  Yes.
14     A.  Now?
15     Q.  Then.
16     MR. PICKHOLZ:  Yeah, I guess that's
17  my other objection.  Do you mean when —
18     MS. GERSTMAN:  I can withdraw it.
19     Q.  The agreement and transaction
20  referenced in paragraph two, is that the
21  subsequent stock purchase agreement that was
22  entered into between BCI and Belmont Partners
23  for the shares of Granite Golf Group?
24     A.  Yes.
25     Q.  To ask it a little more

35

1    S. Czarnik
2  specifically, then, do you know whether the
3  proceeds of this note were used for that
4  transaction as set forth on the top of
5  Page 2?
6      A.  My understanding was that there are
7  two notes in July and two notes in August.
8  And I'm not sure which went for what.  But my
9  understanding was that $50,000 went to
10  purchase the shell directly from BC —
11  Beverage Creations and then Carl Fleming paid
12  for the 150.
13     Q.  I'm sorry.  Carl Fleming paid for
14  the 150.  What is that in reference to?
15     A.  I mean Carl or someone — these
16  notes represent as well part of that, the
17  remaining 150 that needed to be paid for the
18  shell.
19     Q.  What was the shell price?
20     A.  200.
21     Q.  And the two notes, then, the other
22  note you were referring to is what I've
23  marked as Exhibit 9.  Let's go ahead and
24  identify that for the record, if we could.
25     A.  This is a note dated July 25th,

36

1    S. Czarnik
2  2007, between Beverage Creations as the maker
3  and Belatalia as the holder.
4      Q.  Again, for $75,000?
5      A.  That's correct.
6      Q.  July 25th, 2007?
7      A.  That's correct.
8      Q.  And are these notes identical save
9  for the different holders?
10     A.  I think so.
11     Q.  And you drafted Exhibit 9 as well?
12     A.  Yes.
13     Q.  So if I understand your testimony,
14  this was $150,000 coming into the company,
15  50,000 of that went to Belmont for the shell?
16     A.  Well, no, because there's two
17  different sets of notes.  I think they each
18  total 150, so I'm not sure if 50 — which was
19  for the shell purchase and which went to the
20  company.
21     Q.  Now, are you referring to the
22  August 1st, 2007, notes?
23     A.  I'm not sure of the date, but yes,
24  the other notes.
25     MS. GERSTMAN:  Please mark this as

S.APP.10

Stephen Czarnik  3/27/2008  9:00:00 AM

37

1          S. Czarnik
2    Exhibit 10.
3          (Plaintiff's Exhibit 10,
4    Convertible Note bearing production
5    number SJC 00047-53, marked for
6    identification, as of this date.)
7          MR. PICKHOLZ:  Just as long as
8    we're marking documents, just to keep it
9    clear on the record, these notes that
10   we're asking about, these four
11   documents, my reading is that
12   it falls within the letter that Stan
13   sent with the attorney client privilege
14   waiver.  I just want to make sure if
15   you're going to make an attorney client
16   objection or not to the line of
17   questioning related to them.
18         MR. FORRESTER:  I will not.
19         MS. GERSTMAN:  And Exhibit 11,
20   please.
21         (Plaintiff's Exhibit 11,
22   Convertible Note bearing production
23   number SJC 00054-61, marked for
24   identification, as of this date.)
25   Q.  Mr. Czarnik, once you've had a

38

1          S. Czarnik
2    chance to look at those, if you could
3    identify Exhibits 10 and 11 for the record,
4    please.
5    A.  Ten is a convertible note made by
6    Beverage Creations in favor of Thomas Wade
7    Investments dated August 1st, 2007.
8    Q.  For $75,000?
9    A.  Yes.
10   Q.  And Exhibit 11?
11   A.  Exhibit 11 is a note in favor of --
12   I'm sorry, made by Beverage Creations in
13   favor of Bellatalia for $75,000.
14   Q.  Did you draft each of Exhibit 10
15   and 11?
16   A.  Yes.
17   Q.  And did you draft it on or around
18   the date it bears?
19   A.  That would be my practice, yes.
20   Q.  And did another $150,000 come into
21   Beverage Creations then as a result of these
22   notes?
23   A.  As I mentioned earlier, I'm not
24   sure which -- what notes, the August 1st
25   notes or the July 25th notes, which went to

39

1          S. Czarnik
2    the company and which went to Belmont to pay
3    for the shell.  And I'm not sure if -- they
4    may have both went to Belmont and they paid
5    for the shell or -- do you know what I mean.
6    I don't know.
7    Q.  So these notes reflect an influx of
8    $300,000 to BCI.  Is it your understanding
9    that 200,000 paid for the shell and a hundred
10   thousand went to the company, regardless of
11   which note it's attributable to?
12   A.  Yes.
13   Q.  Now, with respect to the July 25th
14   notes that's Exhibit 8 and Exhibit 9, were
15   these notes converted?
16   A.  I think the August 1st notes were
17   converted.
18   Q.  So what is the status of these
19   July 25th notes?
20   A.  My understanding is they're not
21   converted.
22   Q.  So there has been no demand, they
23   have not reached maturity?
24   A.  There has been no demand, to my
25   understanding.

40

1          S. Czarnik
2    Q.  So do these reflect current
3    obligations of BCI?
4    A.  Yes.
5          MR. PICKHOLZ:  Wait.
6    A.  Let me say yes, to my understanding
7    it's current obligations, but they may have
8    been paid or there may have been some other
9    arrangements with the holders.
10   Q.  Looking at the second set of notes,
11   the August 1st notes, which is Exhibit 10 and
12   Exhibit 11, how did those notes come about?
13   A.  I don't understand.
14   Q.  What were the circumstances around
15   your drafting these notes?  What did BCI tell
16   you?
17   A.  Someone gave me the terms of the
18   note.
19   Q.  Did you understand that BCI needed
20   cash for something specific?
21   A.  My understanding was that they were
22   -- they have some technology with respect to
23   beverages that they were trying to move
24   forward.
25   Q.  Now, these notes, again, if you

beverage creations - deps                          Page 37 - 40

S.APP.11

Stephen Czarnik  3/27/2008  9:00:00 AM

41

```
 1        S. Czarnik
 2   look at the bottom of Page 1 and the top of
 3   Page 2, these notes also indicate that the
 4   proceeds of this note are to be used for the
 5   transaction with the public company.  Was
 6   that done, to your knowledge?
 7     A.  I don't understand what -- I don't
 8   believe that it says that.
 9     Q.  I'm looking at language on
10   Exhibit 10, top of Page 2, and I'm quoting,
11   "The proceeds of this note are to be used for
12   the transaction with the public company."
13     A.  That's correct.  It does say that.
14     Q.  And was that done, to the best of
15   your knowledge?
16     A.  I don't know.
17     Q.  So, again, somebody came to you
18   with these terms and you were a scribner and
19   put them down on paper to reflect the
20   parties' agreement; is that correct?
21     A.  I drafted the documents, yes.
22     Q.  And based on the terms that were
23   given to you?
24     A.  That's correct.
25     Q.  And with respect to these notes, do
```

42

```
 1        S. Czarnik
 2   you recall who it was that gave you the
 3   terms?
 4     A.  No, I can't recall who gave me the
 5   terms.
 6     Q.  Are the possibilities, again,
 7   Mr. Fleming, Mr. Feeback, Mr. --
 8     A.  Dado.
 9     Q.  Dado or Mr. Wieden?
10     A.  Mr. Wieden.  Um-hmm.
11     Q.  That's the full pool of
12   possibilities?
13     A.  That's correct.
14     Q.  Were these notes converted?
15     A.  I'm not sure.  Two of the four
16   notes were converted.  I'm not sure of what's
17   in front of me which two.
18     Q.  And what were the circumstances of
19   the two notes being converted, as you knew
20   them?
21     A.  I was told that they were being
22   converted.
23     Q.  Who told you that?
24     A.  I'm not sure if it was Mr. Fleming
25   or Mr. Feeback.
```

43

```
 1        S. Czarnik
 2     Q.  Were you told why they were being
 3   converted?
 4     A.  No.
 5     Q.  When were you told that they were
 6   being converted?
 7     A.  Probably shortly before the time
 8   that they were converted.
 9     Q.  If you would look at Exhibit 11,
10   please, the last page  Was this page part of
11   the original note?
12     A.  I'm not certain.
13     Q.  Was this page added at the time
14   that the note was converted?
15     A.  I think it's a separate document,
16   but I believe that a blank conversion notice
17   is maybe attached, but it has no information
18   on it.
19     Q.  Okay.  This is the way it was
20   produced to me by your office by
21   Mr. Pickholz.  I'll represent that to you.
22   Can you tell me what is reflected on this
23   Page 8?
24     A.  That this note was converted.
25     Q.  On what date?
```

44

```
 1        S. Czarnik
 2     A.  12/17/07.
 3     Q.  And is that the date on which it
 4   was actually converted?
 5     A.  Yes.
 6     Q.  And it indicates a conversion
 7   amount of 75,000 and a conversion price.  Do
 8   you know how that price was determined?
 9     A.  I believe it was set forth in the
10   note.
11     Q.  And then your understanding is that
12   conversion results in five million shares to
13   be issued?
14     A.  That's correct.
15     Q.  Who advised you of the assignment
16   that's reflected in the second paragraph at
17   the top where the holder, who in this case is
18   Bellatalia, is assigning 25,000 of the note
19   to Wynn Industries?
20     A.  Mr. Fleming.
21     Q.  What is Mr. Fleming's relationship
22   to Bellatalia?
23     A.  I don't know.
24     Q.  Did you have any role in getting
25   this executed by Mr. Reynolds?
```

S.APP.12

Stephen Czarnik   3/27/2008  9:00:00 AM

45

S. Czarnik

1  A. No.
2  Q. Who did that?
3  A. I don't know.
4  Q. Have you seen a conversion
5  confirmation from the company with respect to
6  this conversion?
7  A. A conversion confirmation? What is
8  that?
9  Q. Okay. I'll direct your attention
10 to paragraph two, 2(E), sub(2), there is a
11 reference there to conversion confirmation.
12 A. Um-hmm.
13 Q. Have you seen one from the company
14 with respect to conversion of this note that
15 we've marked as Exhibit -- I'm sorry. Which
16 one are we looking at? We're looking at 11.
17 A. I would just have to say that I
18 would take the conversion confirmation to be
19 the executed subscription agreement, which
20 were also executed in connection with the
21 conversion.
22 Q. Those are executed the same day as
23 the conversion on 12/17?
24 A. On or about 12/17.

47

S. Czarnik

1  going to have attorney client objections
2  to this line of questioning.
3  MR. FORRESTER: We will not.
4  MR. PICKHOLZ: Okay. Thanks.
5  MS. GERSTMAN: If you could mark
6  that, please, as Exhibit 12.
7  (Plaintiff's Exhibit 12, Conversion
8  Notice bearing production number SJC
9  00083-89, marked for identification, as
10 of this date.)
11 Q. Mr. Czarnik, have you had a chance
12 to look at Exhibit 12?
13 A. Yes.
14 Q. And this is how I believe it was
15 produced to me by your office. If I've
16 appended the top page to something that
17 doesn't belong to it -- I mean do you believe
18 this top page is a document standing on its
19 own, or does it belong --
20 A. I mean it's probably a document
21 standing on its own, but it's definitely
22 related to the subscription agreement.
23 Q. Can you identify this first page
24 for me, please.

46

S. Czarnik

1  Q. And do you know did BCI issue
2  3,333,333 shares of common stock to
3  Bellatalia?
4  A. Yes.
5  Q. And did BCI issue 1,666,667 shares
6  of common stock to Wynn Industries?
7  A. Let me go back to your last
8  question. That's my understanding that those
9  were issued, but I don't have confirmation
10 that they were ever issued.
11 Q. Were the shares that were issued in
12 connection with this conversion notice, were
13 those shares restricted?
14 A. No.
15 Q. They were unrestricted, then?
16 A. Correct.
17 Q. And do you know what the basis was
18 for not having those shares be restricted?
19 A. Rule 504(B).
20 MR. PICKHOLZ: Again, Bob, just to
21 make sure we're extra careful on the
22 record here, I think this still falls
23 within the letter from Stan, but I just
24 want to make sure whether you guys are

48

S. Czarnik

1  A. It's a conversion notice dated
2  12/17/07.
3  Q. And like the last one we looked at,
4  this converts the note to shares of stock?
5  A. Yes.
6  Q. And who advised you of the holder's
7  assignment of 25,000 to Wynn Industries?
8  A. Carl Fleming.
9  Q. And is it your understanding that
10 pursuant to the conversion, BCI issued
11 3,333,333 shares of stock to Thomas Wade
12 Investments?
13 A. I believe that they had been, but I
14 have no confirmation.
15 Q. And same thing for the amount shown
16 to Wynn Industries, 1,666,667 shares?
17 A. That's correct.
18 Q. And were those shares unrestricted?
19 A. Correct.
20 MS. GERSTMAN: If you could mark
21 that, please, as Exhibit 13.
22 (Plaintiff's Exhibit 13,
23 Convertible Note bearing production
24 number SJC 00062-68, marked for

S.APP.13

Stephen Czarnik  3/27/2008  9:00:00 AM

49

```
1        S. Czarnik
2    Identification, as of this date.)
3    Q.  Have you seen Exhibit 13 before?
4    A.  Yes.
5    Q.  Can you identify it, please?
6    A.  It's a note dated December 7th,
7    2007, made by Beverage Creations in favor of
8    Thomas Wade Investments.
9    Q.  For $50,000?
10   A.  Yes.
11   Q.  Did you draft this note?
12   A.  Yes.
13   Q.  And from whom did you get the
14   information that you put into the note?
15   A.  I'm not sure.
16   Q.  Is this identical to the earlier
17   notes we looked at save for the amount, the
18   date, and the holder changing specific to
19   this particular note?
20   A.  It's probably fairly consistent.
21   Q.  Do you know why BCI entered into
22   this note?
23   A.  My understanding was that Thomas
24   Wade gave them $50,000.
25   Q.  Do you know why?
```

50

```
1        S. Czarnik
2    A.  I don't know why.
3    Q.  Were you a participant in any of
4    the negotiations over amount or terms?
5    A.  No.
6    Q.  Do you know what the proceeds of
7    this note were used for by BCI?
8    A.  No.
9    Q.  Was this note converted into stock?
10   A.  Not to my knowledge.
11   Q.  Do you know whether any portion of
12   this note has been assigned?
13   A.  Not to my knowledge.
14       MS. GERSTMAN:  Mark that, please,
15   as Exhibit 14.
16       (Plaintiff's Exhibit 14,
17   Convertible Note bearing production
18   number SJC 00069-75, marked for
19   identification, as of this date.)
20       MS. GERSTMAN:  And this, please, as
21   Exhibit 15.
22       (Plaintiff's Exhibit 15.
23   Convertible Note bearing production
24   number SJC 00076-82, marked for
25   identification, as of this date.)
```

51

```
1        S. Czarnik
2    Q.  Mr. Czarnik, I've handed you what
3    has been marked as Exhibit 14 and Exhibit 15.
4    Have you seen these before?
5    A.  Yes.
6    Q.  Can you identify them, please?
7    A.  Note made by Beverage Creations in
8    favor of Thomas Wade, February 25th, 2008.
9    Q.  For $105,000?
10   A.  Yes.
11   Q.  That's Exhibit 14.  And Exhibit 15?
12   A.  Note dated February 25th, 2008,
13   made by Beverage Creations in favor of
14   Befiatalia.
15   Q.  For $105,000?
16   A.  Yes.
17   Q.  And did you draft these?
18   A.  Yes.
19   Q.  When did you draft them?
20   A.  Probably right around the date.
21   Q.  And who asked you to draft them?
22   A.  I'm not sure who asked me to draft
23   it.
24   Q.  Again, it would be one of
25   Mr. Fleming --
```

52

```
1        S. Czarnik
2    A.  One of the --
3    Q.  -- Mr. Feeback?
4    A.  Or Bob Wieden or Patrick Dado, one
5    of the four.
6        MR. PICKHOLZ:  Let her finish the
7    question, because now I'm not clear
8    which one you gave the answer as to who
9    would have given you instruction.
10       THE WITNESS:  I'm sorry.
11   Q.  Okay.  We can go back and make sure
12   the record is clear.  Can you tell me the
13   four individuals, one of whom or more of whom
14   may have given you instructions to draft
15   these convertible notes?
16   A.  Carl Fleming, Robert Feeback,
17   Patrick Dado, Bob Wieden.
18       MR. PICKHOLZ:  Just let her finish
19   the question before you answer.
20       THE WITNESS:  Sorry.
21   Q.  And were you part of any of the
22   negotiations of the terms of these notes?
23   A.  No.
24   Q.  So the terms were provided to you?
25   A.  Yes.
```

S.APP.14

Stephen Czarnik   3/27/2008   9:00:00 AM

53

1    S. Czarnik
2    Q.   What was the intention of these
3    notes?  Do you know why BCI was entering into
4    these notes?
5    A.   I was told that each of these
6    parties gave the company 105,000.
7    Q.   Do you know why?
8    A.   I don't.  I assume -- I can't -- I
9    don't know.
10    Q.   Did you know whether Beverage
11    Creations had a particular need for funds at
12    the time of these notes?
13    A.   I believe that they always needed
14    money.  I mean I don't know if at this
15    particular time they were in need of money.
16    Q.   Have you ever met Mr. Weeden?
17    A.   No.
18    Q.   Have you ever met Mr. Dado?
19    A.   No.
20    Q.   How many times have you spoken on
21    the phone to Mr. Weeden?
22    A.   Several.  Numerous.
23    Q.   How about Mr. Dado?
24    A.   Generally, they both get on the
25    phone at the same time.  I'm not sure if they

54

1    S. Czarnik
2    share an office, but when you talk to one of
3    them, generally the other one is on as well.
4    Q.   Have you ever visited their company
5    in Minneapolis?
6    A.   No.
7    Q.   Again, I'll direct your attention
8    to the same language that is on the top of
9    Page 2.  I quote, "The proceeds of this note
10    are to be used for the transaction with the
11    public company."  Do you see where I'm
12    referring?
13    A.   I do.
14    Q.   Do you know whether that was done?
15    A.   I don't -- I'm not sure what was
16    done, but I know that the transaction already
17    happened.
18    Q.   Right.  What was the date of the
19    transaction with the public company?
20    A.   I don't know.  I don't have the...
21    MS. GERSTMAN:  I can go ahead and
22    mark it as 16.
23    (Plaintiff's Exhibit 16, Common
24    Stock Purchase Agreement bearing
25    production number 00001-B, marked for

55

1    S. Czarnik
2    identification, as of this date.)
3    Q.   Have you seen Exhibit 16 before?
4    A.   Yes.
5    Q.   And can you tell me what that is?
6    A.   This is the agreement between
7    Beverage Creations and Belmont Partners to
8    purchase the controlling interest in Granite
9    Golf.
10    Q.   Did you draft this document?
11    A.   No.
12    Q.   Do you know who did?
13    A.   No.
14    Q.   Did you participate in the
15    negotiations of this transaction?
16    A.   No.
17    Q.   Were you BCI's counsel with respect
18    to this transaction?
19    A.   Yes.
20    Q.   Did BCI have another lawyer
21    involved in the negotiations of this
22    transaction?
23    A.   The terms were non-negotiable.
24    Q.   Do you know who presented the terms
25    to BCI?

56

1    S. Czarnik
2    A.   No.
3    Q.   Did you read this document and have
4    an opportunity to counsel BCI before it
5    executed, Mr. Weden executed this document?
6    MR. PICKHOLZ:  I guess first I have
7    an objection, I'm not sure you've laid a
8    foundation that he was retained -- let
9    me withdraw it.
10    MS. GERSTMAN:  Okay.
11    A.   Yes.
12    Q.   And did you indeed provide counsel
13    to BCI in connection with this agreement?
14    A.   Yes.
15    Q.   The date on this is -- it shows an
16    effective date of August 30th, 2007; is that
17    correct?
18    A.   I believe so.
19    Q.   And that's the date this was
20    signed?
21    A.   I'm not sure what date it was
22    signed.
23    Q.   It indicates it was executed as of
24    the date first written above, which would be
25    the 30th of August?

S.APP.15

Stephen Czarnik  3/27/2008  9:00:00 AM

57

```
1         S. Czarnik
2    A.  Correct.
3    Q.  Was there a different date on which
4   this transaction was closed, when it became
5   actually effectuated?
6    A.  No.  I think the full purchase
7   price had to be paid, was paid by then.
8    Q.  And the shares were transferred?
9    A.  Yeah.
10    Q.  So in light of the fact that this
11   transaction was completed August 30th, 2007,
12   does this reference in the February 25th,
13   2008, note, both of the notes, Exhibit 14 and
14   Exhibit 15, make any sense to you?
15    A.  No.
16    Q.  And that's not referring to any
17   other transaction with a public company?
18    A.  Not that I'm aware of.
19    Q.  If you would look at the last page
20   of each of these exhibits, 14 and 15, I have
21   provided you with unexecuted copies.  These
22   are the way they were provided to me by your
23   counsel.  Were these notes executed?
24    A.  I believe that they were.
25    Q.  And do you have any knowledge as to
```

59

```
1         S. Czarnik
2   about whether he's going to convert this note
3   we've marked as Exhibit 14?
4    A.  No.
5    Q.  How about anyone on behalf of
6   Bellstalia with respect to Exhibit 15?
7    A.  No.
8    Q.  Has anyone from the company
9   discussed with you anything with respect to
10   the conversion of these notes?
11    A.  No.
12    Q.  To your knowledge, is Beverage
13   Creations, Inc., planning any more stock
14   offerings?
15    MR. PICKHOLZ:  Bob, are you going
16   to object to that?
17    MR. FORRESTER:  No.
18    MR. PICKHOLZ:  Okay.  So you're not
19   asserting attorney client privilege?
20    MR. FORRESTER:  No.
21    MR. PICKHOLZ:  Okay.  Go ahead.
22    A.  I have no knowledge.
23    Q.  You have not been retained to
24   counsel BCI with respect to any more stock
25   offerings, as you sit here today?
```

58

```
1         S. Czarnik
2   whether BCI then received $210,000 as a
3   result of these two notes?
4    A.  I was told that they had received
5   the money.
6    Q.  Do you know what they did with it?
7    A.  I do not know.
8    Q.  Do you have executed copies in your
9   files?
10    A.  I had thought I did.  In looking at
11   this, if this is what we provided, it's not
12   signed.  I'm surprised.
13    MS. GERSTMAN:  Mr. Pickholz, that
14   will be another request that I ask that
15   you just double check and see whether
16   you have executed copies in
17   Mr. Czarnik's files.
18    MR. PICKHOLZ:  Okay.
19    Q.  Have these notes, Exhibits 14 and
20   15, been converted?
21    A.  Not to my knowledge.
22    Q.  Do you know whether the holders
23   have any intention of converting them?
24    A.  I have no knowledge.
25    Q.  Have you ever talked to Mr. Fleming
```

60

```
1         S. Czarnik
2    A.  No.
3    MS. GERSTMAN:  Could you mark this,
4   please, as Exhibit 17.
5    (Plaintiff's Exhibit 17, Entity
6   Subscription Agreement bearing
7   production number APP 0047-52, marked
8   for identification, as of this date.)
9    MS. GERSTMAN:  Exhibit 18, please.
10    (Plaintiff's Exhibit 18, Entity
11   Subscription Agreement bearing
12   production number SJC 00021-26, marked
13   for identification, as of this date.)
14    MS. GERSTMAN:  And Exhibit 19,
15   please.
16    (Plaintiff's Exhibit 19, Entity
17   Subscription Agreement bearing
18   production number SJC 00027-32, marked
19   for identification, as of this date.)
20    Q.  Mr. Czarnik, I've handed you
21   Exhibits 17, 18, and 19.  Have you seen these
22   before?
23    A.  Yes.
24    Q.  And can you identify them, please.
25    A.  Exhibit 17 is a subscription
```

S.APP.16

Stephen Czarnik  3/27/2008  9:00:00 AM

61

1        S. Czarnik
2     agreement, Wynn Industries subscribing for
3     3,333,333 shares of Beverage Creations.
4        Q.   And this is dated December 17th,
5     2007?
6        A.   Correct.
7        Q.   Okay.  Exhibit 18?
8        A.   Exhibit 18 is a subscription
9     agreement as well with Bellatalie for
10    3,333,333 shares of Beverage Creations.
11       Q.   And this is in connection with the
12    same offering and bearing the same date as
13    17?
14       A.   Yes.
15       Q.   And if you could identify
16    Exhibit 19, please.
17       A.   Exhibit 19 is a subscription
18    agreement, Thomas Wade for 3,333,333 shares
19    of Beverage Creations.
20       Q.   Dated December 17th, 2007; correct?
21       A.   Correct.
22       Q.   And have you seen these before?
23    I'm sorry.  I think I asked you that already.
24    Okay.  Did you draft these documents?
25       A.   Yes.

62

1        S. Czarnik
2        Q.   When did you draft these?
3        A.   Probably shortly before
4     December 17th.
5        Q.   And in drafting these, did you
6     follow a form or a format that you've used
7     before?
8        A.   Yeah.  Sure.
9        Q.   Where did you get the particular
10    information that you put into these
11    subscription agreements, for example, the
12    amount of shares?
13       A.   From the instructions, the
14    conversion instructions.
15       Q.   From those documents or did
16    somebody speak to you about that?
17       A.   No.  I spoke with Mr. Fleming about
18    that.
19       MS. GERSTMAN:  Off the record.
20       (Discussion off the record.)
21       Q.   Mr. Czarnik, looking at Exhibits
22    17, 18, and 19, did you anything to verify
23    the representations in those subscription
24    agreements?
25       A.   Yes.  I had a discussion with

63

1        S. Czarnik
2     Mr. Fleming.
3        Q.   And when did you have that
4     discussion with Mr. Fleming?
5        A.   Prior to me sending these documents
6     out for signature.
7        Q.   So sometime in mid-December?
8        A.   If not prior to.
9        Q.   And what did you and Mr. Fleming
10    discuss?
11       A.   We discussed the way these
12    offerings -- how they work and the technical
13    aspects of the offering.
14       Q.   What did you discuss with
15    Mr. Fleming about the way they work?
16       A.   I told him that 504 offerings are
17    very technical and they're often misused, but
18    they can be done if you follow the rules.
19    And the rules are under 504(B) that if you
20    fall within any of the Romanesque state
21    exemption categories, 502 kicks in, and then
22    you're exempt from the resale provisions of
23    502 Regulation D, and thus the shares can be
24    issued without legend.
25           In addition, I told him that

64

1        S. Czarnik
2     pursuant to 144, which is the
3     anti-distribution section, that Rule 504(B)
4     securities are specifically exempt from the
5     definition of restricted securities.
6           I also told him about Texas law and
7     pointed him to a memorandum that's on the
8     Securities Commission page in Texas by
9     Ms. Crawford, State Securities Commissioner,
10    wherein it describes these types of offerings
11    and how they can be done and what are the
12    requirements and what are the parameters.
13    And then there was an updated memorandum as
14    well that I directed him to.
15       Q.   Did you discuss anything else with
16    Mr. Fleming about the way these offerings
17    work?
18       A.   My understanding was he was
19    familiar with them, but I don't know what
20    he's done in the past, so I had to tell him
21    how -- and direct him to read things on how
22    they need to be done.
23       Q.   The memo that you referred to by
24    Ms. Crawford, where does that appear?
25       A.   On the Texas State Securities

S.APP.17

Stephen Czarnik  3/27/2008  9:00:00 AM

65

S. Czarnik

1      S. Czarnik
2      Commission web page.
3          Q.   And what about the updated memo you
4      referred to?
5          A.   It's there as well.
6          Q.   Do you know whether Mr. Fleming
7      went to look at any of the source material
8      that you advised him about?
9          A.   I'm not certain.
10         Q.   Did you provide him with those
11     memos or direct him where he could find them?
12         A.   You know, I didn't provide him with
13     those memos, but I did provide him with some
14     information regarding these offerings,
15     specifically the proposed rule changes to 504
16     and how the proposed rule changes actually
17     specifically indicate that these offerings --
18     shares can be issued without resale
19     limitations pursuant to a proper 504(B)
20     offering.
21         Q.   That's a proposed rule change?
22         A.   Correct. The comment to the
23     proposed rule. Well, it's in the proposed
24     rule. It's a whole -- when they deal -- they
25     talk about changing 504 or proposing to

67

S. Czarnik

1      S. Czarnik
2          A.   No.
3          Q.   Did you know whether he had
4      previously participated in any offerings made
5      pursuant to Rule 504?
6          A.   No.
7          Q.   Did he describe his familiarity to
8      you in any more detail?
9          A.   No, not that I recall.
10         Q.   You said you also discussed the
11     technical aspects of the offering. Is that
12     something different than what you've already
13     described to me?
14         A.   No. I mean I think there's
15     technical aspects from the fact that it has
16     to be -- it would have to be an entity that's
17     engaged in the offering that's actually the
18     subscriber, wherein all the owners of that
19     entity are accredited investors And the
20     Texas rules provide for two ways to show
21     accredited status pursuant to I think it's
22     1094. One is that you're an accredited
23     entity investor pursuant to the 501 rules,
24     that is, an entity where all its owners are
25     accredited investors pursuant to the federal

66

S. Czarnik

1      S. Czarnik
2      change 504 asking for comments as well as I
3      believe they want to institute a 507.
4          Q.   And you actually provided
5      Mr. Fleming with a hard copy of the comment
6      to the proposed rule?
7          A.   I don't believe I -- I probably
8      just told him where to go to find it, because
9      I've never -- I've never like sent him
10     anything, nor been -- sent him any mail, nor
11     have I met him in person. So I wouldn't have
12     been able to hand him anything.
13         Q.   So, then, this conversation, this
14     discussion you had with Mr. Fleming was over
15     the telephone; is that correct?
16         A.   Yes.
17         Q.   You mentioned that he was familiar
18     with these kinds of offerings. What is the
19     basis for your statement there?
20         A.   That my recollection is that he
21     told me he was familiar with these kinds of
22     offerings.
23         Q.   Did he tell you anything else about
24     his familiarity with these kinds of
25     offerings?

68

S. Czarnik

1      S. Czarnik
2      rule, or an entity that has five million
3      dollars of assets.
4          Q.   And this is information that you
5      gave to Mr. Fleming, that you discussed with
6      him?
7          A.   Yes.
8          Q.   And what did he tell you in this
9      conversation?
10         A.   Okay. I mean I don't recall
11     whether he -- what his reaction was, but it
12     wasn't -- it wasn't anything that would make
13     me recall it. Do you know what I mean. It
14     wasn't anything outlandish.
15         Q.   Did he ask you any questions about
16     the information you gave him?
17         A.   Not that I recall.
18         Q.   Did you say anything else or did he
19     say anything else in this discussion other
20     than what you've already told me?
21         A.   I don't know -- I've had several
22     discussions with Mr. Fleming, so I don't know
23     -- I don't know what -- I can't differentiate
24     really in my memory.
25         Q.   How long did this discussion last,

beverage creations - deps                                    Page 65 - 68

S.APP.18

69

1          S. Czarnik
2   the one you had prior to the execution of the
3   subscription agreements?
4      A.   The discussion I had with respect
5   to the technical aspects of 504 happened
6   different times throughout my relationship
7   with Mr. Fleming.
8          MR. CRAINE:  And one place I want
9   to interject here, as it relates to BCI,
10  my understanding is you represent BCI
11  and weren't representing Fleming; is
12  that correct?
13         THE WITNESS:  Right.
14         MR. CRAINE:  So I've been letting
15  you answer regarding discussions with
16  Mr. Fleming related to BCI's business.
17  If any of these discussions are not
18  related to BCI's business or the
19  transactions involving BCI, Mr. Fleming
20  and TWI have no intention to waive
21  privilege, so I just caution you there.
22         MR. PICKHOLZ:  Do you understand?
23  I guess I'll put an instruction on.  The
24  objection is that any communications you
25  had with Fleming in the context of the

70

1          S. Czarnik
2   attorney client relationship with
3   Fleming, they're asserting the privilege
4   to.  So if the conversations are
5   blurred, we should probably err on the
6   side of caution and let them take it up
7   either with each other or the judge,
8   okay.  If you're convinced it was in
9   connection with these particular
10  documents or these transactions here and
11  BCI, then they're not waiving the
12  privilege and you can discuss your
13  conversations with Fleming.  Do you
14  understand the distinction or do you
15  need to take a break for a minute?
16         THE WITNESS:  No, but I've already
17  discussed it.
18         MR. PICKHOLZ:  I understand.
19  That's water under the bridge.  But
20  going forward.
21         THE WITNESS:  Okay.
22         MR. PICKHOLZ:  And we'll let them
23  make the objection.
24         MR. CRAINE:  And when you're
25  talking about the subscription

71

1          S. Czarnik
2   agreements and that specific discussion,
3   you know, that's related to the BCI
4   documents and that's separate.  But if
5   you're getting to a point where I had a
6   long series of conversation and you're
7   not sure if they're related to this or
8   to something else, then that's where we
9   need to stop and take a breath.
10         THE WITNESS:  I understand.
11         MR. PICKHOLZ:  Why don't we give
12  him a minute after her question so he
13  can either make an objection, and then
14  if you're not clear on which
15  conversation, why don't you mention that
16  and then we'll see if he has an
17  objection or not and take it from there.
18         THE WITNESS:  Okay.
19      Q.   Approximately how many discussions
20  did you have with Mr. Fleming related to the
21  BCI offering?
22      A.   Several.  Numerous.
23      Q.   Can you be any more specific than
24  that?
25      A.   No.

72

1          S. Czarnik
2      Q.   Would your time records reflect how
3   many conversations you had or at least give
4   us some indication?  Is that something your
5   time records might show?
6      A.   Fortunately, I don't keep time
7   records.
8      Q.   You don't keep time records?
9      A.   No.
10     Q.   Okay.
11         MR. CRAINE:  Some of us here are
12  quite jealous about that.
13     A.   Which is the reason why I left the
14  firm, you know, the bigger firms.
15     Q.   Do you keep any notes or make any
16  notations with respect to how you spent your
17  time on this matter representing BCI?
18     A.   Do you mean with respect to how
19  much time things took?
20     Q.   Yeah.  Let's start with that.
21     A.   No.
22     Q.   Do you have a calendar that you
23  keep that would have notations in it that
24  would reflect communications with people in
25  connection with the BCI offering?

S.APP.19

Stephen Czarnik  3/27/2008  9:00:00 AM

73

```
1          S. Czarnik
2     A.  No, I don't keep a calendar like
3    that.
4     Q.  Any other documents in the course
5    of your provision of professional services
6    that you keep that would indicate who you
7    talked to when or for how long?
8     A.  Do you know -- I believe they're
9    called like lab books. They're black lab
10   books. They're smaller than regular paper.
11   I generally, when someone calls me, I
12   generally write it down. I'm not that
13   accurate and consistent with it. Certainly
14   if I have messages, I write it down.
15    Q.  And the lab books that you kept
16   during this period of time, that would be
17   December 2007 and I guess forward --
18   actually, let me amend that and say the time
19   during which you represented BCI for the
20   transaction we've been talking about today,
21   do you have those lab books then?
22    A.  I do.
23    MS. GERSTMAN:  Mr. Pickholz, a
24   redaction task coming. I will request
25   that you provide us with those lab books
```

74

```
1          S. Czarnik
2    to the extent that they reflect data
3    relevant to this litigation. And I,
4    again, will get a request to you.
5     MR. PICKHOLZ:  Okay. And can we
6    discuss, obviously once we've taken a
7    look at it, whether you need the whole
8    book or just the entries?
9     MS. GERSTMAN:  Yes.
10    Q.  In the course of your discussions
11   with Mr. Fleming related to the BCI offering,
12   did you have any conversations with him
13   specifically related to whether the stock
14   should be restricted? And I'm talking about
15   in addition to what you've already told me.
16    A.  No.
17    Q.  Any conversations with Mr. Fleming
18   in connection with the BCI offering regarding
19   whether there should be a legend on the BCI
20   stock other than what you've already told me?
21    A.  No.
22    Q.  Did you have any discussions with
23   Mr. Fleming in connection with the BCI
24   offering with respect to what he or Thomas
25   Wade Investments was going to do with its BCI
```

75

```
1          S. Czarnik
2    stock?
3     A.  No.
4     Q.  Can you specifically recall any
5    other discussions that you had with
6    Mr. Fleming related to the way these
7    transactions work and the technical aspects
8    of the BCI offering?
9     MR. PICKHOLZ:  Again, on this
10   one --
11    MR. CRAINE:  I think the answer is
12   going to be no, so.
13    MR. PICKHOLZ:  If it's in
14   connection with the BCI or these
15   documents or this set of circumstances,
16   you can go ahead and talk about it. If
17   it's not, let's give them a chance to
18   object, just because she worded the
19   question somewhat generally.
20    A.  Can you repeat the question.
21    Q.  Sure. Do you recall any other
22   specific conversations that you had with
23   Mr. Fleming related to the BCI offering, the
24   way it works, and the technical aspects of
25   the offering other than what you've already
```

76

```
1          S. Czarnik
2    told me?
3     A.  The content of those
4    conversations --
5     Q.  Yes.
6     A.  -- other than what I've already
7    told you?
8     Q.  Yes.
9     A.  Not that I recall.
10    Q.  Did you do any other due diligence
11   to determine whether the representations made
12   in Exhibit 17, 18, and 19 were true and
13   accurate?
14    A.  Just the discussion with
15   Mr. Fleming and Mr. Feeback.
16    Q.  How many discussions did you have
17   with Mr. Feeback in connection with the due
18   diligence that you were doing on the BCI
19   transaction?
20    A.  Several. I mean I know that he --
21   it's my understanding that Mr. Fleming and
22   Mr. Feeback met with the folks from Beverage
23   Creations in person several times, so they
24   would be a good -- they would be a good
25   source.
```

S.APP.20

Stephen Czarnik  3/27/2008  9:00:00 AM

77

```
 1        S. Czarnik
 2      Q.  And when you were speaking to
 3   Mr. Feeback in connection with this
 4   transaction, what capacity was Mr. Feeback
 5   acting in?
 6      A.  My understanding was that he was a
 7   board member of Beverage Creations.
 8      Q.  And was he providing you with
 9   information as a board member of Beverage
10   Creations?
11      A.  He was providing me with -- my
12   understanding was yes.
13      Q.  Did you have any understanding that
14   Mr. Feeback and his entity, Summit Advisory
15   Partners I believe it is, had a relationship
16   with Beverage Creations?
17      A.  My understanding was that they did
18   have a relationship.
19      Q.  And what did you understand about
20   the scope of that relationship?
21      A.  I didn't understand it at all.
22      Q.  How did you know that Mr. Feeback
23   was talking to you as a director as opposed
24   to an outside consultant to Beverage
25   Creations?
```

78

```
 1        S. Czarnik
 2      A.  If he was speaking of Beverage
 3   Creations, speaking about Beverage Creations
 4   to me, I believe that it was about in his --
 5   I would assume it was in his capacity as a
 6   director of Beverage Creations.  I don't know
 7   -- that's my assumption.
 8      Q.  And anything else underlying that
 9   assumption that you can tell me about today,
10   any other basis for your assumption?  Let me
11   rephrase.  Any basis for your assumption?
12      A.  Other than the fact that he was a
13   director?
14      Q.  Correct.
15      A.  Yeah, I mean I wasn't certain and
16   I'm not certain if Beverage Creations and
17   Summit ever had a contractual relationship
18   together.  And that being so, the only way I
19   would be talking with him about it would be
20   as a director.
21      Q.  But you know that there was some
22   relationship with Summit?
23      A.  I knew there was some relationship
24   with Summit, but I didn't -- no one has ever
25   -- I've never seen a contract, for example,
```

79

```
 1        S. Czarnik
 2   between the two.
 3      Q.  Did you ever ask Mr. Feeback in
 4   what capacity he was speaking to you?
 5      A.  I don't know that I did.
 6      Q.  And what did you discuss with
 7   Mr. Feeback with respect to the due diligence
 8   you did in connection with the
 9   representations made in Exhibit 17 through
10   19?
11      A.  Again, I spoke with Mr. Feeback
12   about the offerings and the nature of the
13   offerings and the technical aspects of the
14   offerings and certainly would have updated
15   Mr. Feeback with the proposed rule changes to
16   the Rule 504 as well as the Texas
17   intricacies.
18      Q.  Did you ever have any discussions
19   with Mr. Feeback in connection with your due
20   diligence relating to whether the shares
21   should be restricted?
22      A.  No.
23      Q.  Whether the shares should have a
24   legend on them?
25      A.  Not to my knowledge.
```

80

```
 1        S. Czarnik
 2      Q.  Did you talk to Mr. Feeback about
 3   the representations that the company BCI was
 4   making?
 5      A.  Yes.
 6      Q.  And what did you talk to him about
 7   in that regard?
 8      A.  The same regard that we had just
 9   spoke of, which is the technical aspects of
10   the rule and what is required in order for me
11   to be able to deliver a legal opinion.
12      Q.  And did you do anything to verify
13   the representations made in the subscription
14   agreements, 17, 18, and 19, the specific
15   factual representations in there?
16      A.  Specific factual representations.
17   Other than what we just went through?
18      Q.  Right.
19      A.  No, not to my knowledge.
20      Q.  And correct me, I mean I hear you
21   talking about Rule 504 and 502 and 144 in
22   some -- and I don't mean to characterize your
23   testimony, but what I would like to do is get
24   into the specifics, if there are specifics,
25   that you told Mr. Feeback and Mr. Fleming.
```

S.APP.21

Stephen Czarnik  3/27/2008  9:00:00 AM

81

```
 1        S. Czarnik
 2   Is there anything more specific that you told
 3   them?
 4      A.  I don't have anything specific.  I
 5   don't recall anything specific other than the
 6   general nature of those discussions.
 7      Q.  If you would look at Exhibit 17,
 8   and if it's okay with you and your counsel
 9   and everybody involved, I'm going to put
10   Exhibit 17 in front of you and ask these
11   questions with respect to 17.  My review, and
12   you can do your own independent review, is
13   that 18 and 19 are the same in these respects
14   that I'm going to ask you about.  So I'm
15   asking you with respect to all three
16   agreements and I'm hoping to truncate the
17   proceedings a little bit.  If you want to
18   answer them separately or if counsel suggests
19   we proceed that way, I'm glad to do it, too.
20   But I'm asking with respect to all three of
21   these exhibits and you tell me if that poses
22   a problem.
23      MR. PICKHOLZ:  Unless other counsel
24   has an objection, why don't we just say
25   we'll take your representation on it,
```

82

```
 1        S. Czarnik
 2   and to the extent that they're the same,
 3   unless you tell us there should be a
 4   difference for some reason, you know,
 5   we'll just take it that way, and if at
 6   the end of the day it turns out that
 7   there is difference in the text or
 8   something, then I guess the answers
 9   won't apply.
10      MS. GERSTMAN:  Okay.
11      MR. PICKHOLZ:  Is that okay?
12      MS. GERSTMAN:  Sure.
13      Q.  So looking at Exhibit 17, paragraph
14   five, "Representations, Warranties, and
15   Covenants of the Undersigned.  5.1, General."
16   And I direct your attention to sub(b) on the
17   top of the second page of this document.
18   "The undersigned is an entity formed pursuant
19   to the laws of Texas and maintains its
20   principal place of business within the State
21   of Texas.  The undersigned was not formed to
22   evade and is not in connection with this
23   investment evading the registration
24   requirements of the Securities Act of 1933 as
25   amended."
```

83

```
 1        S. Czarnik
 2      Q.  Did you do anything to verify the
 3   representation made by Wynn Industries,
 4   Bellatalia, and Thomas Wade Investments?
 5      A.  I don't recall, but my general rule
 6   would be I would check the State of Texas and
 7   see if they were a Texas formed entity and
 8   what their registered address was.
 9      Q.  Did you do that in this case?
10      A.  I'm not certain that I did, but I
11   believe that I did.
12      Q.  And is that something that you
13   would have kept in your files that you had
14   done it?
15      A.  No, because I would have just
16   pulled it up on the web site and verified it.
17      Q.  Anything else that you did in
18   connection with checking the representation
19   in 5.1(b)?
20      A.  I would also -- I had a discussion
21   with Mr. Fleming, I'm certain, about -- which
22   is probably how I found out about his other
23   investments, his farm and things of that
24   nature, that it wasn't -- his entity wasn't
25   merely formed to participate in this
```

84

```
 1        S. Czarnik
 2   offering.
 3      Q.  So you asked Mr. Fleming on behalf
 4   of Thomas Wade Investments the facts
 5   underlying this representation in (b)?
 6      A.  Yes.
 7      Q.  And he gave you satisfactory
 8   answers?
 9      A.  He gave me satisfactory answers
10   about with respect to him, or, I'm sorry, not
11   him, but Thomas Wade and the other two as
12   well.
13      Q.  So what did he tell you about
14   Thomas Wade with respect to sub(b)?
15      A.  That they had other business
16   operations within it, non-securities related.
17      Q.  And which point under (b) does that
18   go to?
19      A.  I think it would go towards the
20   second sentence, that it was not formed to
21   evade and is not in connection with his
22   investment evading.
23      Q.  And Mr. Fleming made
24   representations to you on behalf of
25   Bellatalia as well?
```

beverage creations - deps

Page  81 - 84

S.APP.22

Stephen Czarnik  3/27/2008  9:00:00 AM

85

```
1          S. Czarnik
2      A.  I asked him about Bellatalia,
3   because I had never -- I hadn't spoken with
4   Ryan Reynolds and I hadn't spoken with Jason
5   Wynn.
6      Q.  Did you understand that Mr. Fleming
7   was authorized to or able to make
8   representations on behalf of Bellatalia and
9   Wynn Industries?
10     A.  No, but at some point I had to rely
11  on people's word, and when they signed this
12  document, they're making a representation to
13  me, and it specifically says in here that I
14  can rely on it.
15     Q.  Did you do anything else to confirm
16  sub(b), the representation here that we've
17  been talking about, 5.1 sub(b)?
18     A.  No.  I verified that it was signed.
19     Q.  How about 5.1 sub (c), and I will
20  spare reading it into the record.  But what
21  did you do, if anything, with respect to
22  verifying that representation?
23     A.  I relied on the representation
24  given.
25     Q.  Did you do anything to get behind
```

87

```
1          S. Czarnik
2      A.  What kind of net worth that he and
3   his partners had and were the -- I say
4   partners just because -- the two other
5   companies.  And he said that the accredited
6   investor isn't an issue at all whatsoever.
7      Q.  Did he say anything else to you?
8      A.  I think he mentioned that
9   Mr. Reynolds has seats on the floor next to
10  some billionaire at the Dallas Mavericks game
11  and that Jason and he are fairly wealthy.
12     Q.  Did Mr. Fleming say anything else
13  with respect to the accredited status of
14  Thomas Wade, Bellatalia, or Wynn Industries?
15     A.  I'm not certain.
16     Q.  Looking at sub(d), "The undersigned
17  will not engage in any activity that will
18  constitute a distribution of the shares and
19  will not violate Regulation M or any other
20  federal or state securities laws.  The
21  undersigned is experienced in such matters
22  and understands the applicable laws and
23  regulations."
24          Did you take any steps to verify
25  the representation contained in 5.1 sub(d)?
```

86

```
1          S. Czarnik
2   that representation to check it in any way?
3      A.  I didn't need to get behind it.
4   They did.
5      Q.  Who is "they"?
6      A.  Whoever signed the document.  They
7   made the representation.
8      Q.  Did you ask anybody any questions,
9   Mr. Fleming or anybody else, any questions
10  about Thomas Wade's or Wynn Industries' or
11  Bellatalia's status as an accredited
12  investor?
13     A.  I probably did.  Mr. Fleming.
14     Q.  Do you actually recall doing that?
15     A.  I believe I did in connection with
16  the discussion we had with respect to the
17  representation in the earlier question.
18     Q.  With respect to sub(b)?
19     A.  Yes.
20     Q.  So this was the same conversation
21  you asked him about sub(c)?
22     A.  Um-hmm.
23     Q.  That's a yes, for the record?
24     A.  Yes, it is.  Sorry.
25     Q.  And what did you ask him?
```

88

```
1          S. Czarnik
2      A.  I think the discussions I had with
3   Mr. Fleming with respect to 504 and relying
4   on the representations of the people who
5   signed the documents are the steps that I
6   took.
7      Q.  Did you ask Mr. Fleming whether he
8   had investment intent with respect to the BCI
9   shares he was going to take in the offering?
10     A.  No.
11     Q.  I'm sorry.  Did you ask Mr. Fleming
12  with respect to Thomas Wade Investments
13  whether Thomas Wade had investment intent
14  with respect to the BCI shares?
15     A.  No.
16     Q.  Did you discuss with him whether he
17  or Thomas Wade had any plan to sell the
18  shares?
19     A.  No.
20     Q.  To distribute the shares?
21     A.  (Indicating).
22     Q.  Did you ask him that?
23          MR. CRAINE:  You need to answer
24  audibly.
25          THE WITNESS:  I'm sorry.
```

S.APP.23

Stephen Czarnik  3/27/2008  9:00:00 AM

89

```
1          S. Czarnik
2     MR. CRAINE: That head shake she
3  can't get.
4     A. Well, I'm not certain that
5  investment intent pursuant to Texas law is
6  required with respect to 109, Rule 109.
7     Q. You don't think investment intent
8  is required?
9     A. I'm not certain that it is.
10    Q. Do you have an opinion one way or
11 the other?
12    MR. PICKHOLZ: Are asking generally
13 or under Rule 109?
14    MS. GERSTMAN: Rule 109.
15    A. I'm not certain that it is.
16    Q. Was investment intent something
17 that factored into your opinion that was
18 ultimately issued, I haven't introduced it
19 yet as an exhibit, but did investment intent
20 play into your opinion with respect to this
21 offering?
22    A. It was a factor because I wasn't
23 certain whether or not it applies to 109.
24    Q. So did you make any inquiry as of
25 any of the potential shareholders, any of the
```

90

```
1          S. Czarnik
2  takers in the 504 offering as to their
3  investment intent?
4     A. No.
5     Q. Did you make any inquiry to any of
6  the shareholders whether they had any
7  intention of selling the shares?
8     A. No. I relied on the document, and
9  there's provisions in the document with
10 respect to investment intent and whether or
11 not they had a view to distribution and view
12 to sale.
13    Q. Did you do anything else along the
14 lines of due diligence to confirm the
15 representation here in 5.1(d)?
16    A. No. Not that I recall.
17    Q. Have you ever talked to Ryan
18 Reynolds?
19    A. I've talked to him I believe twice.
20    Q. Have you ever met him?
21    A. No.
22    Q. When did you first learn of a
23 person named Ryan Reynolds in this
24 connection?
25    A. I only really -- I only really knew
```

91

```
1          S. Czarnik
2  of him as Ryan. And I didn't -- I've only
3  spoken with him twice, and once was within
4  the last two months. And each of the times
5  it was Mr. Fleming who just basically handed
6  the phone to him. So I became aware of
7  Mr. Reynolds probably the beginning of
8  February.
9     Q. February '08?
10    A. Yes.
11    Q. But you prepared a subscription
12 agreement in December '07 for Bellatalia.
13 Did you not connect Mr. Reynolds, Ryan
14 Reynolds, with Bellatalia?
15    A. I didn't really know -- no, I
16 didn't really connect Ryan Reynolds with
17 Bellatalia. I didn't -- the only thing I did
18 know is his name was Ryan. I didn't -- I
19 don't believe, actually, that I even
20 completed the signature page, because I
21 didn't know who Bellatalia, who the person
22 behind it was.
23    Q. Who got the subscription
24 agreements, Exhibits 17, 18, and 19, signed,
25 executed?
```

92

```
1          S. Czarnik
2     A. It was either the company or
3  Mr. Fleming.
4     Q. As of the time you prepared the
5  subscription agreement for Bellatalia,
6  Exhibit 18, what did you know about
7  Bellatalia?
8     A. Nothing.
9     Q. So both the conversations you've
10 had with Mr. Reynolds have been subsequent to
11 February '08?
12    A. No. One conversation was
13 subsequent to February '08.
14    Q. And when was the first
15 conversation?
16    A. I don't recall when it was. It was
17 -- it could have been December. It could
18 have been September. Do you know what I
19 mean, it was a very, very short
20 conversation. I was having a discussion with
21 Mr. Fleming, and he put Mr. Reynolds on the
22 phone.
23    Q. Was this discussion with
24 Mr. Reynolds and Mr. Fleming in connection
25 with BCI, this one in fall -- I'll say it's
```

S.APP.24

Stephen Czarnik  3/27/2008  9:00:00 AM

93

```
1           S. Czarnik
2    fall '07 because it sounds like that's about
3    as specific as you can put it right now, fall
4    or winter '07?
5        A.  Yes, I believe it probably was.
6        Q.  And what did you discuss with
7    Mr. Fleming and Mr. Reynolds on that
8    conversation?
9        A.  Mr. Fleming said you've got to talk
10   to Ryan, just, you know, not matter of
11   factly, but just talk to Ryan because he
12   thinks that when he gets 504 stock, he can
13   just pass it out to people.  And then he put
14   him on the phone, and I said this is Stephen
15   Czarnik, absolutely not, you can't do that,
16   and you need to talk to your lawyer, do you
17   have a lawyer?  He said yeah.  I said you've
18   got to talk to him about this because that
19   can't be done.  I don't believe that you can
20   just hand stock and just -- hand stock out to
21   people.  And that was that discussion.
22       Q.  Was Mr. Fleming any more specific
23   or Mr. Reynolds any more specific in
24   describing this passing out the stock to
25   people?  What did that mean?
```

94

```
1           S. Czarnik
2        A.  Like give stock out.  Receive the
3    stock and then give it out to a number of
4    people.
5        Q.  Did you understand him to mean
6    somewhat contemporaneously with receiving the
7    stock?
8        A.  Yes.
9        Q.  Did you tell him anything else in
10   this conversation?
11       A.  No.
12       Q.  Did Mr. Reynolds or Mr. Fleming say
13   anything else in this conversation?
14       A.  That was it.
15       Q.  Did Mr. Reynolds identify his
16   attorney to you in this conversation?
17       A.  I don't believe it was that
18   conversation where he did.
19       Q.  He did in a different one?
20       A.  Yes.
21       Q.  And was that the conversation
22   subsequent to 2/06, February '06?
23       A.  Yes.
24       Q.  What was that conversation about?
25       A.  That conversation was about
```

95

```
1           S. Czarnik
2    something that I had learned, that he was
3    named in an action with the Commission
4    against him, and other defendants were
5    attorneys Stocker and Offill.  And basically,
6    excuse me, but what the hell is going on
7    here.  And I told him I needed his lawyer's
8    information, I need to talk to him
9    immediately.
10       Q.  Did you call him?
11       A.  No.
12       Q.  No.  I'm sorry.  Did you call
13   Mr. Reynolds?
14       A.  I don't have his number.
15       Q.  Well, how did you end up --
16       A.  I told Carl to get him on the
17   phone.
18       MR. PICKHOLZ:  Let her finish the
19   question because she's got to take it
20   down.
21       THE WITNESS:  I'm sorry.
22       Q.  Just to make sure we have a clear
23   record, so you learned of we'll call it the
24   Stocker action by the SEC.  How did that come
25   to your attention?
```

96

```
1           S. Czarnik
2        A.  It came to my attention -- the
3    actual action?
4        Q.  Yes.
5        A.  The action came to my attention
6    when it was released in September.
7        Q.  I'll represant to you that the
8    filing date was September 26th, 2007.
9        A.  Okay.
10       Q.  Did you learn of it then, around
11   that time?
12       A.  Shortly thereafter when it was
13   posted.
14       Q.  And how did you learn of it?
15       A.  It was posted on the Commission's
16   web site.
17       Q.  So you saw it on the westbound?
18       A.  Probably.
19       Q.  You were just looking yourself and
20   you happened to see it?
21       A.  I'm not sure if that was the fact
22   or someone like called me and said that
23   there's two lawyers that are involved in an
24   action.
25       Q.  And at that time when you learned
```

S.APP.25

Stephen Czarnik  3/27/2008  9:00:00 AM

97

1          S. Czarnik
2    about it sometime in September '07; did you
3    do anything about it? Did you do anything?
4       A.  I didn't know -- I didn't identify
5    any of these people's involvements in it. I
6    only saw Stocker and Offill and read the
7    allegations and...
8          MS. GERSTMAN:  Let me go ahead and
9    mark this as Exhibit 20.
10         (Plaintiff's Exhibit 20, Complaint,
11    marked for identification, as of this
12    date.)
13      Q.  At the time this action came to
14    your attention did you read the complaint?
15      A.  I went through it, yeah.
16      Q.  Did you note Ryan M. Reynolds as a
17    defendant?
18      A.  No, I didn't.
19      Q.  Did that name mean anything to you
20    as of September 2007?
21      A.  I don't believe that it -- it's not
22    that it didn't mean anything or it did mean
23    anything, but I didn't recognize the name
24    Ryan M. Reynolds here as being the same
25    Ryan M. Reynolds that Mr. Fleming was

98

1          S. Czarnik
2    involved with in his offer.
3       Q.  How about relief defendants there?
4    You can see Bellatalia LP is named as a
5    relief defendant.  Did that come to your
6    attention in September?
7       A.  No.
8       Q.  When you reviewed the complaint?
9       A.  It didn't.
10      Q.  Were you aware of Bellatalia in
11    September '07?
12      A.  I was aware because they executed a
13    couple of notes.
14      Q.  Who had the Bellatalia notes
15    executed?  Who actually got the signatures on
16    those notes?  You know what, let me strike
17    that question because there's no --
18      A.  There's no counter-signature.
19      Q.  Right, there's no
20    counter-signature.  Okay.  Then what
21    precipitated your phone call -- or I'm sorry.
22    It wasn't necessarily your phone call.
23         What precipitated you getting in
24    touch with Mr. Reynolds in February of '08?
25    Do I have that right?

99

1          S. Czarnik
2       A.  Right.
3       Q.  So what precipitated that?
4       A.  Because I was on vacation with my
5    family, and I had gotten a call telling me
6    that there is a real issue with Beverage
7    Creations, that the stock is -- there's no
8    current public information up and the stock
9    has traded enormously.  So I called
10    Mr. Fleming, I called Mr. Feeback, and was
11    fairly upset and told Mr. Feeback that we
12    need to get the Pink Sheet disclosure
13    document posted immediately to have some sort
14    of public information up.  And I asked Carl
15    basically what the hell is going on here.
16      Q.  When was this that you received
17    this call that you first described informing
18    you of a real issue with BCI?
19      A.  First full week of February.
20      Q.  And who called you?
21      A.  Joseph Meuse.
22      Q.  Can you spell that, please, his
23    last name?
24      A.  M-u-s-e.
25      Q.  Who is Joseph Meuse?

100

1          S. Czarnik
2          MR. PICKHOLZ:  It's M-e-u-s-e.
3       A.  He is the owner of Belmont.
4       Q.  Did he tell you anything else in
5    this phone call other than what you already
6    have testified to?
7          MS. ALTENBAUMER-PRICE:  We didn't
8    hear that last question or two.  Can you
9    repeat that.
10         MS. GERSTMAN:  Sure.
11      Q.  What else did Mr. Meuse tell you in
12    this conversation other than what you've
13    already testified to?
14      A.  No.  That was about it.  He told me
15    that -- what had been going on.
16      Q.  So what did you understand he was
17    telling you was the issue?  What was the
18    problem?
19      A.  The problem was there was volume in
20    a stock that should have -- has no
21    information about.  So it doesn't make sense.
22    And when things don't make sense like that,
23    there's generally an issue.
24      Q.  So you then called Mr. Fleming and
25    Mr. Feeback?

S.APP.26

Stephen Czarnik  3/27/2008  9:00:00 AM

101

```
 1              S. Czarnik
 2     A.  Correct.
 3     Q.  And what did they say when you said
 4  we need the Pink Sheets disclosure posted
 5  immediately?
 6     A.  Absolutely.
 7     Q.  They agreed with you?
 8     A.  Absolutely.
 9     Q.  And both of them were on the phone
10  at this time?
11     A.  No.  Separate times.
12     Q.  So tell me what you said to
13  Mr. Fleming when you got him on the phone.
14         MR. CRAINE:  And at that point are
15  you representing him personally?
16         THE WITNESS:  I certainly wasn't
17  giving him any advice.  So I don't know
18  that I was representing him.  Do you
19  understand what I mean?  My discussion
20  with him wasn't any sort of legal
21  advice.  It was pinpointing an issue.
22     Q.  You called him in respect to the
23  BCI trading; is that correct?
24     A.  Correct.
25     Q.  And what did you tell Mr. Fleming
```

102

```
 1              S. Czarnik
 2  specifically and what did he tell you?
 3     A.  I told him what I had heard, and
 4  he's like -- he was -- I don't want to say
 5  surprised, but he was -- he basically
 6  confirmed, he goes, I know, it doesn't make
 7  sense.  And so I said, well, you find out,
 8  you call your, you know -- I called them
 9  partners, and you find out what happened.
10  And then I called Feeback and told him we got
11  to get this disclosure statement up
12  immediately.
13     Q.  And Feeback agreed?
14     A.  Yes.
15     Q.  Did it get put up immediately?
16     A.  Not immediately, but shortly
17  thereafter.
18     Q.  Do you know how much time elapsed
19  before the Pink Sheets information was up?
20     A.  I don't.
21     Q.  Did Mr. Fleming get back to you?
22  You asked him to find out what was going on.
23     A.  Yeah.
24     Q.  Did he call you?
25     A.  He called me.
```

103

```
 1              S. Czarnik
 2     Q.  When?
 3     A.  Same day.
 4     Q.  What did he say?
 5     A.  I believe it was the same day.  He
 6  said he couldn't find anything out.
 7     Q.  Do you recall what sort of volume
 8  was going on?
 9     A.  No.  It wouldn't -- I mean -- no.
10  I have no idea.
11     Q.  And Mr. Fleming called back and
12  said, I can't find anything out?
13     A.  Yes.
14     Q.  And he provided you with no
15  explanation for the volume in the stock?
16     A.  Right.
17     Q.  And this, again, is sometime the
18  first full week of February?
19     A.  Yes.
20     Q.  Did you have any further
21  conversations with Mr. Fleming about this?
22     A.  About that particular incident?
23     Q.  Yes.
24         MR. CRAINE:  And would you be
25  providing legal advice, again, is
```

104

```
 1              S. Czarnik
 2  something you need to think about before
 3  you answer it.
 4     A.  I'm certain that I had discussions
 5  with him.  But there was never any sort of
 6  explanation that was offered.
 7     Q.  How about Mr. Feeback, any further
 8  conversations with Mr. Feeback about this?
 9         MR. CRAINE:  No, because we have a
10  real -- you know, you need to think
11  about whether you're providing legal
12  advice to someone who is your client
13  before you answer it.  And if you give
14  me a minute to object, I would
15  appreciate it.
16         THE WITNESS:  I will.
17         MR. CRAINE:  All right.
18         MR. PICKHOLZ:  Why don't we do
19  this.  In connection with any of the
20  calls with Feeback, why don't we hear
21  the question --
22         THE WITNESS:  With Fleming.
23         MR. CRAINE:  Yeah.  If both of them
24  were on the phone, it's not an issue to
25  me, okay.  And if you're certain both of
```

S.APP.27

Stephen Czarnik  3/27/2008  9:00:00 AM

105

```
1         S. Czarnik
2    them were on the phone, then, you know,
3    that's a different situation.  But if
4    you're on the phone just with Carl, and
5    he is your client, which you've already
6    told us here, then you need to think
7    about what kind of legal advice you're
8    giving him and what you're telling him
9    and whether that's something you should
10   waive after we've requested you don't
11   waive it.  So that's just a warning I
12   want to give you.  I just want you to
13   think and stop, and if you think, you
14   know, in my opinion sitting here right
15   now I don't think this is legal advice
16   and I'm just going to say it and waive
17   it when I've told you not to, that's a
18   problem.  And if you've got a concern, I
19   would rather we stop for a minute and
20   think about it before it's out and
21   there's nothing that can be done.
22       MR. PICKHOLZ:  I need to comment on
23   that.  Is Fleming's position that
24   Stephen was representing him in
25   connection with his role as investor in
```

106

```
1         S. Czarnik
2    BCI?
3        MS. GERSTMAN:  And let me clarify
4    that, too, because the investor is
5    Thomas Wade Investments.
6        MR. CRAINE:  Right.
7        MS. GERSTMAN:  Which he has
8    testified is not his client.
9        MR. CRAINE:  And I've tried to give
10   him some leeway to kind of make this
11   easier, because he's in a different
12   situation, and I understand it, and I
13   don't envy it.  You know, what I want to
14   make sure is that we have a chance to
15   stop it before it comes out.  And, you
16   know, I'm not criticizing any of your
17   answers or giving you a hard time.  I
18   just want to make sure we stop and pause
19   before it comes out and you think about
20   kind of what your relationship was with
21   my client at that time and what your
22   obligations are to him before it comes
23   out.  And if it's something you think is
24   directly related to BCI and has nothing
25   to do with you representing Carl, then I
```

107

```
1         S. Czarnik
2    don't have an issue with it.  But you
3    know that better than I do as we sit
4    here.
5        MR. PICKHOLZ:  I think what we have
6    is -- I mean you can have an attorney
7    client relation with someone in one
8    capacity but not for another purpose.
9    And I guess what we have here is, my
10   understanding, and correct me if I'm
11   wrong, is that there was an attorney
12   client relation with Fleming in
13   connection with other matters.  But in
14   connection with Fleming's investment
15   with BCI and these notes that we're
16   talking about and this conversion,
17   Stephen had an attorney client
18   relationship with BCI but not your
19   client in this context.
20       MR. CRAINE:  Right, and so --
21       MR. PICKHOLZ:  Is that accurate?
22       MR. CRAINE:  No, I think that's
23   fair and I think that's accurate.  My
24   concern is where we get into an area of
25   general legal advice, you know, we
```

108

```
1         S. Czarnik
2    talked about things that you all
3    generally talked about.  And when you
4    get to kind of the general, even though
5    it may relate to a BCI event, that's
6    where we get in an area where it's more
7    difficult to tell and it's probably more
8    difficult for you.
9        MR. PICKHOLZ:  Can I take two
10   seconds, take a break with my client?
11       MS. GERSTMAN:  Yes.  Off the
12   record.
13       (Recess taken from 1:04 p.m. to
14   1:10 p.m.)
15       MR. PICKHOLZ:  It's my
16   understanding that in connection with
17   BCI and these notes, Mr. Czarnik was
18   acting as BCI's counsel.  However, there
19   was an attorney client relationship with
20   Mr. Fleming, and that was, in my
21   understanding, it was more -- in our
22   understanding it was more than just for
23   a particular transaction.  There may
24   have been sort of a general advice
25   component to that.  So to that extent,
```

S.APP.28

Stephen Czarnik 3/27/2008 9:00:00 AM

109

| | |
|---|---|
| 1 | S. Czarnik |
| 2 | if he was speaking with Fleming on |
| 3 | behalf of BCI and that was clear that |
| 4 | was his role, then I guess, unless BCI |
| 5 | has an objection, I think it falls under |
| 6 | the waiver. If there is an ambiguity |
| 7 | there, I don't mean to cause problems, |
| 8 | but I think at that point we're going to |
| 9 | have to defer to Mr. Fleming's lawyer's |
| 10 | attorney client objection and let you |
| 11 | guys either work it out or get a judge |
| 12 | to tell us, you know, what we need to |
| 13 | answer. So I guess we'll take it |
| 14 | question by question. |
| 15 | MR. CRAINE: That's great. I |
| 16 | appreciate it. |
| 17 | MR. PICKHOLZ: So make sure you |
| 18 | give a pause and give him enough time. |
| 19 | MS. GERSTMAN: Did we have a |
| 20 | pending question? |
| 21 | (The following question was read:) |
| 22 | "QUESTION: How about Mr. Feeback, |
| 23 | any further conversations with |
| 24 | Mr. Feeback about this?" |
| 25 | A. Yes. |

110

| | |
|---|---|
| 1 | S. Czarnik |
| 2 | Q. Well, how many did you have? |
| 3 | A. Several. |
| 4 | Q. Can you be any more specific than |
| 5 | several? |
| 6 | A. No. |
| 7 | Q. More than five? |
| 8 | A. I'm not sure. |
| 9 | Q. And what did you say to Mr. Feeback |
| 10 | and what did he say to you in these |
| 11 | conversations? |
| 12 | A. We were just talking and going |
| 13 | through making sure the information statement |
| 14 | was getting done and getting posted. |
| 15 | Q. You're talking about the |
| 16 | information on Pink Sheets? |
| 17 | A. Yes. |
| 18 | Q. Did you discuss anything else with |
| 19 | Mr. Feeback during this time with respect to |
| 20 | your call that you got from Mr. Mouse in the |
| 21 | first full week of February, that resulted |
| 22 | from that call and the subsequent |
| 23 | communications? |
| 24 | A. Yeah. I probably told him that we |
| 25 | got real problems. |

111

| | |
|---|---|
| 1 | S. Czarnik |
| 2 | Q. What did you mean by that? |
| 3 | A. That I think there's things going |
| 4 | on here. |
| 5 | Q. What did you mean by that? |
| 6 | A. It doesn't make sense. Things just |
| 7 | like this don't happen in a vacuum. I mean |
| 8 | there's something else at work. |
| 9 | Q. And specifically you're talking |
| 10 | about the fact of high volume trading in the |
| 11 | stock when there was a lack of Pink Sheets |
| 12 | information? |
| 13 | A. I don't think there was any |
| 14 | information. |
| 15 | Q. So that's the problem you're |
| 16 | talking about? |
| 17 | A. Yes. |
| 18 | Q. The fact that there was high volume |
| 19 | trading in the stock where there was a lack |
| 20 | of public information? |
| 21 | A. Correct. |
| 22 | Q. And did Mr. Feeback or Mr. Fleming |
| 23 | ever give you an answer to why that was |
| 24 | happening? |
| 25 | MR. PICKHOLZ: Again, can we break |

112

| | |
|---|---|
| 1 | S. Czarnik |
| 2 | it out if we need an objection -- |
| 3 | MS. GERSTMAN: Sure. |
| 4 | Q. Did Mr. Feeback ever give you an |
| 5 | answer as to why that was happening? |
| 6 | A. No. |
| 7 | Q. Did Mr. Fleming ever give you an |
| 8 | answer as to why that was happening? |
| 9 | MR. CRAINE: You're fine to answer |
| 10 | that one. |
| 11 | A. No. |
| 12 | Q. So for you what was the resolution |
| 13 | of this issue that you observed, this trading |
| 14 | with no public information in the |
| 15 | marketplace, how did it resolve for you? |
| 16 | A. We got -- we had to get that |
| 17 | disclosure statement up. That's the only |
| 18 | thing the company could have done to protect |
| 19 | itself. And they did. |
| 20 | Q. Did you or the company take any |
| 21 | other steps as a result of this disparity? |
| 22 | A. I'm not sure what the timing of |
| 23 | everything was, but certainly we got our arms |
| 24 | around the fact that Jason Wynn or Wynn |
| 25 | Industries or whoever was sending out |

S.APP.29

Stephen Czarnik  3/27/2008  9:00:00 AM

113

```
 1        S. Czarnik
 2   matters.
 3        Q.   When did that come to your
 4   attention?
 5        A.   I don't recall.  February perhaps.
 6        Q.   How did it come to your attention?
 7        A.   There was a newspaper article.
 8        Q.   What article are you referring to?
 9        A.   I believe it was from a Dow Jones
10   reporter.
11        Q.   And who brought that news article
12   to your attention?
13        A.   I'm not certain if it was
14   Mr. Feeback or Mr. Christmas, Anthony
15   Christmas.
16        Q.   And who is Anthony Christmas?
17        A.   I believe he was the IR, investor
18   relations person for the company.
19        Q.   And what did you do as a result of
20   reading this news article?
21        A.   Prepared a cease and desist letter
22   for the company to send to Mr. Wynn.
23        MS. GERSTMAN:  Can you mark this
24   please as Exhibit 21.
25        (Plaintiff's Exhibit 21, Letter
```

114

```
 1        S. Czarnik
 2   dated February 19, 2008, to Jason Wynn
 3   from Bob Wieden, marked for
 4   identification, as of this date.)
 5        Q.   I've handed you, Mr. Czarnik, what
 6   is marked as Exhibit 21.  Is this the letter
 7   you're talking about?
 8        A.   Yes.
 9        Q.   And who drafted this?
10        A.   I believe I did the first draft,
11   and then this came back from the company to
12   me.
13        Q.   And so the one that ultimately was
14   sent out was the one with company revisions
15   to it?
16        A.   Correct.
17        Q.   You approved it and said it was
18   okay to go?
19        A.   No.
20        Q.   No?  They sent it out without
21   having you look at it again?
22        A.   I'm not sure that they sent it out.
23        Q.   Oh.  This Exhibit 21, do you know
24   whether this was sent out to Mr. Wynn?
25        A.   No.  I was -- I don't know that I
```

115

```
 1        S. Czarnik
 2   was even told that.  Let me try and think. .
 3   When we were finished with -- when I sent
 4   them the draft and they sent me this, I was
 5   under the impression that they had sent it,
 6   but I don't know that as fact.
 7        Q.   What gave you that impression that
 8   they had sent it?
 9        A.   They told me they were going to
10   send it out.
11        Q.   Did you ever see an executed copy?
12        A.   No.
13        Q.   Do you know of any reason why they
14   wouldn't send it?
15        A.   No.  Well -- why they wouldn't send
16   it.
17        MR. PICKHOLZ:  Don't speculate.
18        A.   No.  Then no.
19        Q.   The first sentence of paragraph two
20   reads, "Please be advised that you and your
21   firm are not and never have been under
22   contract or agreement with Beverage
23   Creations, Inc., to conduct these services."
24   Who wrote that sentence?
25        A.   I don't remember if that was part
```

116

```
 1        S. Czarnik
 2   of my draft or an iteration of or pieces of.
 3        Q.   Do you know that to be true?
 4        A.   My understanding is that they've
 5   never contracted with Mr. Wynn or any of his
 6   companies to engage in promotional activity.
 7   That's my understanding.
 8        Q.   I think I need to go back to your
 9   second conversation with Mr. Reynolds,
10   because I think we did not exhaust that, but
11   correct me if I'm wrong.
12        MR. PICKHOLZ:  If you can, which
13   conversation?
14        MS. GERSTMAN:  Yes.  Let me try to
15   orient.
16        Q.   Well, you had two with him, and
17   this is the second one that I believe you
18   lied to learning that he was named in this
19   action; is that correct?
20        A.   (Indicating).
21        Q.   That's a yes, for the record?
22        A.   Yes.  Sorry.
23        Q.   Can you tell me how you got in
24   touch with Mr. Reynolds?
25        A.   I told Carl I wanted to speak with
```

Stephen Czarnik  3/27/2008  9:00:00 AM

117

```
1        S. Czarnik
2    Mr. Reynolds.
3        Q.   And how was it that you now tied
4    the Ryan Reynolds in this action and the
5    Bellatalia in this action to the Ryan
6    Reynolds involved in BCI?
7        A.   Because something was dramatically
8    wrong in the transaction, so there had to be
9    a reason, and you look for a reason.
10       Q.   So this is after you've learned
11   about the stock trading with no information?
12       A.   No.
13       Q.   Okay.  What was wrong with the --
14       A.   Oh, not the stock trading but the
15   high volume.
16       Q.   Yes.
17       A.   With no information.
18       Q.   Yes.
19       A.   Correct.
20       Q.   Okay.  So in connection with that,
21   one of the things that you did was connect
22   this action to the Ryan Reynolds and BCI?
23       A.   Um-hmm.
24       Q.   That's a yes?
25       A.   Yes.
```

118

```
1        S. Czarnik
2        Q.   So you called Mr. Fleming, said I
3    went to speak to Mr. Reynolds, and then what
4    happened?
5        A.   Then I spoke with Mr. Reynolds, and
6    we had a discussion, and I asked him, you
7    know, basically what's going on, why didn't
8    you mention this at all, this action.  He's
9    like it's -- he basically said that they went
10   the lawyers, the lawyers are really bad guys.
11   And then I want -- I actually didn't
12   want to be on the phone with him.  I just
13   wanted to talk to his lawyer at that point.
14   So I said can you give me your lawyer's
15   number.
16       Q.   And what did he say?
17       A.   Yeah, sure.
18       Q.   And did he subsequently give you
19   that name and number?
20       A.   I got it shortly thereafter.
21       Q.   What did he tell you?  What name
22   and number did he give you?
23       A.   Randy Henderson.
24       Q.   In any of your conversations with
25   Mr. Reynolds, did you discuss the allegations
```

119

```
1        S. Czarnik
2    in this action that we've marked as
3    Exhibit 20?
4        A.   No.
5        Q.   And did you get in touch with
6    Mr. Henderson?
7        A.   No.  We never connected.
8        Q.   Did you try?
9        A.   I'm not sure if I called him and
10   did he call me back or -- I don't recall what
11   -- something between us happened or he
12   reached out to me or I reached out to him or
13   something happened, but we never connected.
14       Q.   And then did you drop your efforts
15   at that point to talk to Mr. Henderson?
16       A.   I did, because I didn't know what
17   -- I really didn't know what good it was
18   going to do.  It didn't really -- it didn't
19   -- the only thing we could do was make sure,
20   from the company's perspective, that the
21   information was up there, and obviously they
22   ceased to do business with, you know, those
23   folks.
24       Q.   I'm sorry.  What folks, Bellatalia
25   and Ryan Reynolds?
```

120

```
1        S. Czarnik
2        A.   Yes.
3        Q.   And did the company also cease
4    business with Wynn Industries and -- well, I
5    guess there wasn't -- well, let me strike the
6    question.
7        A.   Yeah.
8        Q.   Let me strike it.  Did you talk to
9    anybody else with respect to the allegations
10   against Ryan Reynolds in this complaint?
11       MS. ALTENBAUMER-PRICE:  We're going
12   to object to any further questions on
13   SEC versus Offill, because that case is
14   in the process of being stayed, and
15   discovery is not happening.  So we would
16   object to any discovery going on in this
17   matter as to that matter.
18       MS. GERSTMAN:  Okay.  I mean I'm
19   asking if Mr. Czarnik talked to anybody
20   with respect to the allegations in
21   there.  I'm not sure how that is
22   discovery in the Offill matter.
23       MS. ALTENBAUMER-PRICE:  Well, you
24   represent the SEC, which is a party in
25   the Offill matter, so we're going to
```

S.APP.31

Stephen Czarnik  3/27/2008  9:00:00 AM

121

```
1          S. Czarnik
2      object to any further questions on SEC
3      versus Offill.
4          MS. GERSTMAN:  Okay.  Your
5      objection is noted.
6      Q.  Mr. Czarnik, did you speak to
7      anybody else with respect to the allegations
8      in the complaint against Mr. Reynolds?
9          THE WITNESS:  I don't understand.
10     If there's an objection, what happens?
11         MR. PICKHOLZ:  When a party makes
12     an objection, that's making an objection
13     for the record and for the SEC's
14     counsel.  If she wants to ask her
15     question, though, then you can answer
16     it.  I mean that's something they'll
17     take up with the judge later.  It's on
18     the record.
19         THE WITNESS:  Okay.
20     A.  I'm sorry.
21     Q.  Did you speak to anybody else about
22     the allegations against Mr. Reynolds that you
23     saw in this complaint SEC versus Offill?
24     A.  Yes.
25     Q.  With whom did you speak?
```

122

```
1          S. Czarnik
2      A.  Mr. Fleming.
3      Q.  And when was that?
4      A.  Late February, early March.
5          MR. PICKHOLZ:  I'm going to make an
6      instruction.  If we get into content of
7      that conversation, we should, first of
8      all, let Mr. Fleming's lawyer have the
9      chance if he wants to object, and then
10     if there's any doubt in your mind as to
11     what context you were communicating in,
12     we should just assert the attorney
13     client privilege and let them go ahead
14     and figure it out.  Okay?  If you're
15     clear that it was on behalf of BCI and
16     it wasn't an attorney client relation,
17     then you can answer the question.  And
18     if you need to, we can go outside and
19     you can ask me about the privilege
20     issue.
21         THE WITNESS:  Okay.  Thanks.
22         MS. ALTENBAUMER-PRICE:  We want to
23     make sure to get on the record that
24     we're going to continue to object to
25     every question as to that, as to SEC
```

123

```
1          S. Czarnik
2      versus Offill.
3      Q.  Did you call Mr. Fleming?
4      A.  Yes.
5      Q.  And what did you say and what did
6      he say?
7          MR. CRAINE:  We'll object as
8      privileged to that conversation
9      Q.  And, Mr. Czarnik, you are going to
10     decline to answer the question based on
11     Mr. Craine's objection?
12         MR. PICKHOLZ:  I think we're going
13     to -- we don't want to slow this up.
14     We'll obviously have to come back again
15     if that's what we're ordered to do, but
16     I think we need to err on the side of
17     caution here and let you guys get it
18     figured out or get an order from the
19     judge.
20         MS. GERSTMAN:  That's fine.  I'm
21     not going to push it.  I'm just
22     clarifying for the record.
23     Q.  Is that true, Mr. Czarnik, you're
24     going to decline to answer the question?
25     A.  Yes.
```

124

```
1          S. Czarnik
2      Q.  Did you speak with anybody else
3      with respect to the allegations that you read
4      in the complaint against Mr. Reynolds?
5      A.  No.
6      Q.  Any other conversations with
7      Mr. Reynolds other than what we've gone
8      through?
9      A.  No.  Not to my knowledge or
10     recollection.
11     Q.  Do you know how Mr. Fleming knows
12     Mr. Reynolds and Bellatalia?
13     A.  I have no --
14         MR. CRAINE:  Okay.  Go ahead.
15     A.  I have no idea.
16     Q.  Did you know at any time that
17     Mr. Reynolds had trading authority over Wynn
18     Industries' and Thomas Wede Investments'
19     brokerage accounts?
20         MR. CRAINE:  Again, to the extent
21     that your answer would rely on anything
22     that my client told you just when the
23     two of you were speaking, we'll object
24     as privileged.
25         MS. GERSTMAN:  But, again, just to
```

S.APP.32

Stephen Czarnik  3/27/2008  9:00:00 AM

125

1       S. Czarnik
2    be clear, I'm asking as to Thomas Wade.
3       MR. CRAINE:  Right.
4       MR. PICKHOLZ:  In other words, if
5    you learned the information from someone
6    other than Fleming, then you can go
7    ahead and answer it.  If you learned it
8    from Fleming, then there is the attorney
9    client objection, and, again, I'll
10   instruct you we will just defer and let
11   them get an order from the judge or work
12   it out.
13      MS. GERSTMAN:  Well, I'm not sure
14   he's objecting.  Clarify me if I'm
15   wrong.  I think you're saying if it's --
16      MR. CRAINE:  I'm trying to help him
17   and let him know, look, if it came from
18   someone other than my client, go ahead
19   and answer the question.  If there were
20   discussions with my client specifically,
21   then we're going to raise the privilege.
22   Again, I want to give you the warning
23   before you answer.
24   A.   Then I can't answer that question.
25      MR. PICKHOLZ:  Okay.  So then I'll

127

1       S. Czarnik
2    questions about your communications with
3    Reynolds in connection with the My
4    Vintage Baby transaction where you
5    represented him, that would be attorney
6    client privilege.
7       THE WITNESS:  I never represented
8    Reynolds.  You mean Fleming?
9       MR. PICKHOLZ:  Who did you say you
10   represented in -- can we go off the
11   record for a minute.
12      MS. GERSTMAN:  Off the record.
13      (Discussion off the record.)
14   Q.   What did you know about Ryan
15   Reynolds' participation in the My Vintage
16   Baby offering?
17   A.   As I recall, I think he invested
18   money in the company and received stock.
19   Q.   Were you ever aware of any trading
20   activity by Mr. Reynolds in My Vintage Baby
21   stock?
22   A.   No.
23   Q.   Do you know of any other private
24   offerings of penny stocks that Mr. Reynolds
25   has been involved in other than what you've

128

1       S. Czarnik
2    give you the instruction as well so it's
3    on the record.
4       THE WITNESS:  Okay.
5    Q.   Did you ever have any information
6    or knowledge that Bellatalia had a plan or
7    intent to sell its BCI shares shortly after
8    receiving them?
9    A.   No.
10   Q.   Do you know anything about
11   Reynolds' or Bellatalia's or any other
12   Reynolds entities' prior participation in any
13   private offerings of penny stocks?  And I'm
14   going to exclude what we've talked about with
15   respect to the Offill complaint.
16   A.   Yes.
17   Q.   And what do you know?
18   A.   He participated, as I recall, in a
19   transaction entitled -- the name of the
20   company was My Vintage Baby.
21   Q.   How did you learn that?
22   A.   Because I delivered the opinion in
23   that case.
24      MR. PICKHOLZ:  Again, with regard
25   to that, if there are further follow-up

128

1       S. Czarnik
2    already talked about?
3    A.   Yes.
4    Q.   What is that?
5    A.   A company called Alchemy Creative.
6    Q.   And how do you know about
7    Mr. Reynolds' participation in the Alchemy
8    Creative offering?
9    A.   Because I wrote the opinion for
10   that.
11   Q.   And what do you know about
12   Mr. Reynolds' participation there?
13   A.   My understanding is that he
14   invested money in the company.
15   Q.   Did he buy stock in the company?
16   Did he get stock through a private offering?
17   A.   He did get stock through a private
18   offering, but I don't know if -- to my
19   recollection, yes.
20   Q.   And do you know anything about his
21   trading activity in Alchemy Creative stock?
22   A.   None whatsoever.
23   Q.   Were you ever made aware of a
24   situation in either My Vintage Baby or
25   Alchemy Creative similar to the one that you

S.APP.33

Stephen Czarnik  3/27/2008  9:00:00 AM

129

1          S. Czarnik
2    described here with respect to BCI where you
3    saw trading activity when there was a lack of
4    public information?
5          A.  No.
6          MS. GERSTMAN:  You know what, I'm
7    going to ask this question.  I think --
8    I'll ask it and you tell me if you have
9    any -- because I asked a question about
10   trading authority.  What I don't think I
11   did was break it out.  So let me ask it.
12         Q.  Do you know anything about the
13   trading authority Ryan Reynolds had over any
14   Wynn accounts?
15         MR. PICKHOLZ:  It's a yes, no.  You
16   can give that answer, and then we'll see
17   if there is follow-up.
18         THE WITNESS:  I can give it.
19         MR. PICKHOLZ:  If you can give a
20   yes or no answer, go ahead.
21         A.  Okay.  Yes.
22         Q.  And what do you know about that?
23         MR. CRAINE:  And the one place I'll
24   caution you is if the only place you
25   know it is from a conversation with my

130

1          S. Czarnik
2    client where you may have been giving
3    him legal advice, then I'm going to
4    raise the privilege again, and you and
5    your lawyer can talk about whether
6    you're going to answer it.
7          MR. PICKHOLZ:  The same
8    instruction.  If you learned of it from
9    Fleming, communication with him, and in
10   your mind it's not clear that you were
11   -- that conversation was you
12   representing BCI and not giving him any
13   kind of legal advice, you can talk about
14   it.  If it was a conversation where
15   you're not sure or a conversation where
16   you may have been representing Fleming
17   or acting as his lawyer or giving him
18   some advice, then they've asserted the
19   attorney client privilege, and we'll
20   respect that and decline to answer.
21         A.  I'm not sure.  I don't know.
22         MR. PICKHOLZ:  So in that case I'm
23   going to instruct the witness not to
24   answer and we'll just defer to
25   Mr. Fleming's counsel's attorney client

131

1          S. Czarnik
2    privilege objection.
3          Q.  And, again, you're going to follow
4    the advice of your counsel and not answer
5    that question?
6          A.  Yes.
7          Q.  Has Ryan Reynolds ever referred any
8    clients to you?
9          A.  No.
10         Q.  Did you have any further
11   conversations with anybody with respect to
12   the conversation you had with Mr. Reynolds
13   where you and he were talking about him
14   passing out stock?
15         A.  I don't understand the question.
16         Q.  Any other conversations aside from
17   that one that you've already told me about
18   where you had Mr. Reynolds and Mr. Fleming on
19   the phone and you were talking about Reynolds
20   passing out stock?
21         A.  None.
22         Q.  Do you have any information or
23   knowledge that Ryan Reynolds or Bellatalia
24   had arrangements or agreements to sell BCI
25   stock to various friends and family?

132

1          S. Czarnik
2          A.  No.
3          Q.  Do you know John Mabry?
4          A.  No.
5          Q.  Robert Magness?
6          A.  No.
7          Q.  Altin Kore?
8          A.  No.
9          Q.  Shelley Buhner?
10         A.  No.
11         Q.  Stephanie Tubbs?
12         A.  Yes.
13         Q.  Who is Stephanie Tubbs?
14         A.  I believe she is the secretary for
15   Ryan Reynolds.
16         Q.  How do you know that?
17         A.  She emailed me asking me for
18   documents shortly after the stop trading
19   order.
20         Q.  After the suspension?
21         A.  Yes.
22         Q.  What did she ask you for?
23         A.  Copy of the subscription documents.
24         Q.  Anything else?
25         A.  And the legal opinion.

S.APP.34

Stephen Czarnik  3/27/2008  9:00:00 AM

133

```
 1          S. Czarnik
 2     Q.  Did you send that to her?
 3     A.  I did.
 4     Q.  Any other communications that
 5  you've had with Stephanie Tubbs?
 6     A.  No.  Not to my knowledge.  Not to
 7  my recollection.
 8     Q.  Do you know Edward Speihu?
 9     A.  No.
10     Q.  Do you know Mark Reynolds?
11     A.  No.
12     Q.  Do you know Regan Reynolds?
13     A.  No.
14     Q.  Or Regan Roland?
15     A.  No.
16     Q.  Are you familiar with the
17  Stockpick.com?
18     A.  No.
19     Q.  Did you know at any time that the
20  504 recipients were going to sell or sold
21  their stock, a chunk of their stock on
22  January 30th, 2008?
23     A.  Are you saying that the stock was
24  sold on January 30th?
25     Q.  Did anyone ever tell you that or
```

134

```
 1          S. Czarnik
 2  did it come to your attention that that
 3  happened?
 4     A.  This is the first I've heard.
 5     Q.  Do you know what percentage of free
 6  trading shares the shares issued in the 504
 7  offering were for BCI?
 8     A.  Not off the top of my head.
 9     Q.  Do you know generally?
10     A.  No.
11     MS. GERSTMAN:  Let's go off the
12  record.
13     (Discussion off the record.)
14     (Lunch recess taken from 1:37 p.m.
15  to 2:15 p.m.)
16     AFTERNOON SESSION
17  EXAMINATION (Cont'd.)
18  BY MS. GERSTMAN:
19     Q.  Mr. Czarnik, are you familiar with
20  Wynn Industries?
21     A.  Yes.
22     Q.  How are you familiar with Wynn
23  Industries?
24     A.  Initially -- well, they were one of
25  the -- they were the company where some of
```

135

```
 1          S. Czarnik
 2  the convertible debt was assigned in the
 3  conversions.
 4     Q.  Is that the first time you became
 5  aware of Wynn Industries?
 6     A.  No.
 7     Q.  How did you know Wynn Industries
 8  before?
 9     A.  I think they were involved in two
10  other deals that I was involved in.
11     Q.  My Vintage Baby and Alchemy?
12     A.  Yes.
13     Q.  And have you ever met Jason Wynn?
14     A.  No.
15     Q.  Talked to him?
16     A.  No.
17     Q.  How about Joseph Kim, do you know
18  who that is?
19     A.  No idea.
20     Q.  Are you familiar with an entity
21  called Wynn Holdings?
22     A.  I don't know if I -- not in any
23  real sense, but the name, obviously, Wynn I'm
24  familiar, you know, now I'm familiar with
25  Wynn.
```

136

```
 1          S. Czarnik
 2     Q.  And what is the extent of your
 3  knowledge of Wynn Industries' participation
 4  in Alchemy and My Vintage Baby?
 5     A.  I believe they -- I believe, my
 6  recollection, Wynn Industries was an
 7  investor.
 8     Q.  Do you have any knowledge of Wynn
 9  Industries' trading activity in either of
10  those two stocks?
11     A.  None whatsoever.
12     Q.  Did you have any information or
13  knowledge that Wynn Industries had a plan or
14  intent to sell its BCI shares shortly after
15  receiving them?
16     A.  No.
17     Q.  Did you ever talk to anybody about
18  that?
19     A.  Talk to a third-party about whether
20  or not they were going to sell their shares?
21     Q.  Yes.
22     A.  No.
23     MS. GERSTMAN:  Let's mark this,
24  please, as the next exhibit.
25     (Plaintiff's Exhibit 22, Letter
```

S.APP.35

Stephen Czarnik  3/27/2008  9:00:00 AM

137

1       S. Czarnik
2   dated December 17, 2007, bearing
3   production number SJC 00101-103, marked
4   for identification, as of this date.)
5       Q.  Mr. Czarnik, I've handed you what
6   has been marked as Exhibit 22.  Do you
7   recognize that document?
8       A.  I do.
9       Q.  Can you identify it?
10      A.  It's a letter from Beverage
11  Creations to my law firm, attention to me, to
12  my attention.
13      Q.  And did you receive it on or about
14  December 17th, '07?
15      A.  Yes.
16      Q.  Do you know who drafted this?
17      A.  I did.
18      Q.  And when did you begin drafting
19  this letter?
20      A.  Probably shortly before the date of
21  it.
22      Q.  And where did you get the
23  information that is reflected in Exhibit 22?
24      A.  What specific information?
25      Q.  The representations made by the

138

1       S. Czarnik
2   company.
3       A.  Where did I get the information --
4   I don't understand.
5       Q.  For example, let's just go to
6   sub(1), where did you get that information?
7       A.  Because that's what I was told that
8   had happened.
9       Q.  Who told you that?
10      A.  Beverage Creations.
11      Q.  Who at Beverage Creations?
12      A.  I'm not sure.
13      Q.  Was it either --
14      A.  Either of the three.
15      Q.  Oh, the third would be -- so it's
16  either Weden, Dado or --
17      A.  Feeback.
18      Q.  Feeback.  And is that true of all
19  the representations in here on behalf of the
20  company?
21      A.  That I received them from someone
22  else?
23      Q.  From one of those three people?
24      A.  Well, I received them from -- I
25  mean I received the actual representations

139

1       S. Czarnik
2   from Mr. Weden because he signed it.
3       Q.  So these are the representations?
4       A.  These are the representations, yes.
5       Q.  What is Exhibit A?  This was
6   produced to us without an Exhibit A attached.
7       A.  Exhibit A is a letter to the
8   transfer agent that directs the transfer
9   agent to issue the shares.
10      MS. GERSTMAN:  Mark, this, please,
11  as Exhibit 23.
12      (Plaintiff's Exhibit 23, Document
13  dated December 17, 2007, bearing
14  production number APP 0068-69, marked
15  for identification, as of this date.)
16      Q.  Mr. Czarnik, I've handed you what
17  has been marked as Exhibit 23.  Is this the
18  Exhibit A to Exhibit 22?
19      A.  Yes.
20      Q.  And can you identify 23 for the
21  record, please?
22      A.  It's a letter from Beverage
23  Creations to PacWest Transfer.
24      Q.  And who drafted this?
25      A.  I did.

140

1       S. Czarnik
2       Q.  Now, this is an executed copy that
3   I've marked as Exhibit 23.  Is this the one,
4   is this a copy of what went out to PacWest,
5   because it is missing the letterhead on the
6   top?
7       A.  I believe so.  I'm not sure.
8       Q.  Back to Exhibit 22, subparagraph
9   four there at the bottom, in your drafting
10  this letter, where did you get that
11  information?
12      A.  Well, it's in the subscription
13  agreement that the shareholders won't engage
14  in that.  So the company relies on the reps
15  in the subscription agreement, but I'm not a
16  party to the subscription agreement.  My firm
17  isn't.  So I needed to rely -- I want to rely
18  on their reps, the shareholder reps.  The
19  only way I can do it is to have this rep
20  letter.
21      Q.  So this rep letter comes out of the
22  representations made in the subscription
23  agreements?
24      A.  As well as others from the company.
25      Q.  Is there any basis for that

S.APP.36

Stephen Czarnik  3/27/2008  9:00:00 AM

141

```
 1            S. Czarnik
 2    assertion in sub(4) other than what we've
 3    already talked about today?
 4        A.  Well, I can't -- you mean basis as
 5    in -- explain "basis."
 6        Q.  Let me ask it differently.  Did you
 7    do anything to attest the accuracy or
 8    veracity of this statement from the company
 9    to you in sub(4)?
10        A.  I don't think it's possible to do
11    so, because the representation is they're not
12    going to do anything in the future.
13        Q.  And then the second sentence says,
14    "Each shareholder has not offered or sold any
15    portion of the shares to others or with a
16    view to reselling or otherwise disposing of
17    any portion of the shares."
18            Did you do anything to confirm that
19    representation in this Exhibit 22?
20        A.  Well, yes.  I spoke with people,
21    and we talked about those discussions, and
22    that was what I did.  And I relied on their
23    representation, their word and their
24    signature.
25        Q.  And those are conversations that
```

142

```
 1            S. Czarnik
 2    we've already gone through today; is that
 3    correct?
 4        A.  Absolutely.
 5        MS. GERSTMAN:  Could we mark this,
 6    please, as Exhibit 24.
 7        (Plaintiff's Exhibit 24, Letter
 8    dated December 17, 2007, bearing
 9    production number SJC 00090-92, marked
10    for identification, as of this date.)
11        Q.  Mr. Czarnik, you have in front of
12    you what has been marked as Exhibit 24.  Have
13    you seen this before?
14        A.  Yes.
15        Q.  And can you identify it, please?
16        A.  It's a letter from me to the
17    transfer agent dated December 17th.
18        Q.  Is that your signature on the last
19    page?
20        A.  It is.
21        Q.  And did you draft this?
22        A.  Yes.
23        Q.  When?
24        A.  Probably shortly before
25    December 17th.
```

143

```
 1            S. Czarnik
 2        Q.  How much time did you spend in
 3    drafting this letter and preparing for it?
 4        A.  I can't be sure.
 5        Q.  How did you prepare for it?  What
 6    did you do in connection with drafting this
 7    letter?
 8        A.  I went through the documents, the
 9    notes, whatever else was entailed, as well as
10    the opinion certificate and make sure no
11    changes were made to it and...
12        Q.  I'm sorry.  What is the opinion
13    certificate?  Is that Exhibit 22?
14        A.  I'm sorry.  The rep letter.  The
15    rep letter, yes, Exhibit 22.  And did what I
16    said in the letter, reviewed the Texas
17    Securities Act and the Securities Act of 1933
18    and the regulations promulgated thereunder.
19        Q.  And did you take an independent
20    review of the Securities Act and the Texas
21    Securities Act in connection with this
22    opinion letter?
23        A.  I generally take a look to make
24    sure nothing has changed.
25        Q.  Have you written opinion letters
```

144

```
 1            S. Czarnik
 2    like this before?
 3        A.  Yes.
 4        Q.  Do you use prior samples as a
 5    template going forward?
 6        A.  Most oftentimes.
 7        Q.  In the first line what does
 8    "special counsel" mean, as you wrote it
 9    there?
10        A.  Special counsel means that -- well,
11    I take it to mean in my mind that I'm not
12    general counsel to Beverage Creations.  I was
13    engaged for a very limited purpose, the shell
14    transaction, the share exchange, and the
15    offering.
16        Q.  Is this the first opinion letter
17    you've written that relies on these
18    provisions of the Texas Securities Act?
19        A.  No.
20        Q.  How many others have you written?
21        A.  I'm not certain.
22        Q.  Do you remember for which issuers?
23        A.  Well, I'm fairly certain that
24    Alchemy and My Vintage Baby.
25        Q.  Relied on these same Texas
```

S.APP.37

Stephen Czarnik  3/27/2008  9:00:00 AM

145

```
1         S. Czarnik
2    provisions?
3         A.   Yes.
4         Q.   Any others that come to mind?
5         A.   Not as I sit here.
6         Q.   Now, it's on the basis of this
7    opinion letter that the shares issued in the
8    504 offering were issued as unrestricted with
9    no legend?
10        A.   I believe that's correct.
11        Q.   And is it your opinion that the
12   shares in the 504 offering are exempt from
13   registration and need no restrictive legend?
14        A.   As of December 17th or as of today?
15        Q.   Let me ask it first as of
16   December 17th.
17        A.   Based on the information that I had
18   at the time, yes.
19        Q.   And today?
20        A.   I'm not sure.
21        Q.   What changes your answer for today?
22        A.   Because of the allegations that
23   I've been -- I've read in the -- the
24   complaint?
25             MR. PICKHOLZ:   Complaint.
```

146

```
1         S. Czarnik
2         Q.   Anything else that affects your
3    answer as to whether your opinion would be
4    different today?
5         A.   And things we've discussed already,
6    the volume, the promotion, and as well as the
7    exhibit to the subpoena that I'm not here
8    under, which was the emails and promotional
9    materials.
10             MR. PICKHOLZ:   Can we go off for a
11   minute.
12             (Discussion off the record.)
13        Q.   And Exhibit 24, your opinion
14   letter, was that sent to PacWest Transfer?
15        A.   Yes.   My understanding is that it
16   was.
17             MS. GERSTMAN:   Can we mark this,
18   please, as Exhibit 25.
19             (Plaintiff's Exhibit 25, Document
20   dated December 17, 2007, bearing
21   production number APP 0070-72, marked
22   for identification, as of this date.)
23        Q.   Mr. Czarnik, do you recognize
24   Exhibit 25?
25        A.   Yes.
```

147

```
1         S. Czarnik
2         Q.   What is it?
3         A.   It's a letter from the company
4    Beverage Creations to -- one is to Wynn.
5    There's three letters.   One is to Wynn, one
6    is to Bellatalia, and one is to Thomas Wade.
7         Q.   And did you participate in the
8    creation of this document?
9         A.   Yes.
10        Q.   Did you draft it?
11        A.   Yes.
12        Q.   Why?
13        A.   This letter was drafted because --
14   it's basically what I'll call -- we call it a
15   verification letter, which basically says
16   that, listen, the cert was paid for, and
17   since it was paid for, the company, you know,
18   holds the investor harmless if they try and
19   say that it wasn't paid for or stop transfer
20   or things of that nature.
21        Q.   So this is a standard document in
22   these kinds of offerings?
23        A.   I don't know that it's standard,
24   but I've definitely seen it before.
25        Q.   And when you say the cert was paid
```

148

```
1         S. Czarnik
2    for, what are you referring to?   What is the
3    cert?
4         A.   Oh, the stock, the common stock.
5         Q.   Oh, the actual certificates
6    themselves?
7         A.   Yeah.   Common stock, yeah.   This is
8    -- as I recall, I think this was based upon
9    -- this was drafted for basically the broker
10   dealer benefit.   I don't remember, actually.
11        Q.   Did somebody ask BCI to provide a
12   letter like this?
13        A.   No.   No.
14        Q.   You don't recall that any of the
15   504 recipients asked BCI to provide a letter
16   like this?
17        A.   I don't recall.   But I wouldn't
18   have just drafted it.
19        Q.   Do you know whether these pages,
20   respectively, were given to Wynn Industries,
21   Bellatalia, and Thomas Wade Investments?
22        A.   That I don't know.
23        Q.   Do you know whether these letters
24   have subsequently been provided to anybody,
25   either by those individuals or by the
```

Stephen Czarnik  3/27/2008  9:00:00 AM

149

1          S. Czarnik
2    company?
3          A.   I don't know.
4          Q.   Did you provide any advice to BCI
5    with respect to whether it should provide the
6    indemnity in the next to last sentence?
7          A.   We went through the documents, so
8    I'm fairly certain that I did.
9          Q.   And it was your advice that it was
10   okay to make this indemnity?
11         A.   I think it was one of those
12   situations – well, I don't really recall why
13   this is here, so I can't really say why –
14   what my advice to them was at the time
15   because I don't remember why we did this.
16         Q.   Well, do you have any –
17         A.   Why I did this or I drafted it and
18   they signed it.
19         Q.   Do you have any recollection that
20   you gave the company advice that they should
21   not enter into the indemnification?
22         A.   No.
23         MS. GERSTMAN:   Let me mark
24   Exhibit 26, please.
25         (Plaintiff's Exhibit 26, Document

150

1          S. Czarnik
2    bearing production number SJC 00093-99,
3    marked for identification, as of this
4    date.)
5          Q.   Mr. Czarnik, you've been handed
6    Exhibit 26. Do you recognize this document?
7          A.   It's a shareholder list of Beverage
8    Creations.
9          Q.   And it was produced out of your
10   files, I'll represent to you, by the Bates
11   stamp on the bottom. You can confirm that.
12   Have you seen this before, then?
13         A.   Yes.
14         Q.   And when did you first see it?
15         A.   I don't recall, but sometime after
16   it was issued, which was June – I mean, I'm
17   sorry, January 29th, 2008.
18         Q.   So this is a shareholding listing
19   as of January 29th, 2008?
20         A.   Correct.
21         Q.   And how did this come to be in your
22   files?
23         A.   I don't – I don't recall the
24   specific circumstances why I requested a
25   list, if I requested a list from PacWest or

151

1          S. Czarnik
2    they just sent me one.
3          Q.   Were you trying to confirm the
4    receipt of the shares by the 504 recipients?
5          A.   No.
6          Q.   Did you review this when you
7    received it?
8          A.   Probably not.
9          Q.   Did you ever request or receive any
10   subsequent shareholder listings for BCI?
11         A.   I'm not certain. I doubt it, but
12   I'm not sure.
13         Q.   Do you see there about, I don't
14   know, about eight listings down, "Issued
15   1/25/08," and you see a series of three
16   issuances to Bellatalia?
17         A.   Yes.
18         Q.   And is that the 3,333,333 shares
19   that they took in the 504 offering?
20         A.   I presume that it is.
21         Q.   And if you'll look two pages from
22   there on SJC 00095, about two-thirds of the
23   way down, 1/25/2008, the receipt by Thomas is
24   all it says of, again, of 3,333,333 shares.
25   Is that the receipt by Thomas Wade

152

1          S. Czarnik
2    Investments –
3          A.   Yes.
4          Q.   – of the 504 shares?
5          A.   Correct.
6          Q.   And at the bottom you see the same
7    thing for Wynn with the same date, 1/25/2008.
8    Is that the Wynn Industries shares it
9    received pursuant to the 504 offering?
10         A.   Yes.
11         MS. GERSTMAN:   Please mark this as
12   Exhibit 27
13         (Plaintiff's Exhibit 27, Document
14   bearing production number APP 0179-181,
15   marked for identification, as of this
16   date.)
17         Q.   Do you recognize this document,
18   Mr. Czarnik, Exhibit 27?
19         A.   No.
20         Q.   I'll represent to you that it is a
21   press release for Beverage Creations issued
22   on January 30th, 2008. Have you ever seen
23   this in any form?
24         A.   I don't know that I have.
25         Q.   And if you'll read the first

S.APP.39

Stephen Czarnik   3/27/2008   9:00:00 AM

153

1          S. Czarnik
2      paragraph there, it says, "Beverage
3      Creations, a hydration technologies
4      corporation based in Minneapolis, Minnesota,
5      announced today that it has initiated trading
6      under symbol BVRG.PK as it introduces the
7      patented water oxygen product to the
8      multi-billion-dollar sports drink industry."
9          Did you know that Beverage
10     Creations initiated trading on January 30th,
11     2008?
12     A.   I would have known when it did
13     initiate trading. I'm not sure if that was
14     the date or not.
15     Q.   How would you know that it
16     initiated trading?
17     A.   I presume someone would have called
18     me.
19         MR. PICKHOLZ:  Don't presume or
20     guess.
21         THE WITNESS:  Oh.  Sorry.
22     Q.   Did anybody do that?
23         MR. PICKHOLZ:  If there is a basis
24     for memory or you're just not clear, you
25     can say that, but don't presume or

154

1          S. Czarnik
2      guess, okay.
3      A.   I don't -- what was the question?
4      I'm sorry.
5      Q.   Let's try it this way.  Do you
6      recall knowing, even if you don't know the
7      exact date, do you recall knowing or finding
8      out that Beverage Creations initiated
9      trading?
10     A.   Yes.
11     Q.   And do you know when you found that
12     out?
13     A.   Late January.
14     Q.   And who advised you of that?  Or
15     how did it come to your attention?
16     A.   I'm not sure if -- I believe I was
17     forwarded an email from FINRA or NASDAQ.
18     Q.   Back to this press release, did you
19     ever see a draft of something like this?
20     A.   I never reviewed any of the
21     company's press releases, including this one.
22     Q.   Did you have any information prior
23     to January 30th, 2008, that Bellatalla, Wynn
24     Industries, and/or Thomas Wade Investments
25     were going to or intended to sell their BCI

155

1          S. Czarnik
2      stock?
3      A.   I'm sorry to make you repeat that,
4      but can you.
5      Q.   Did you have any information prior
6      to January 30th, 2008, that Bellatalla, Wynn
7      Industries, or Thomas Wade Investments were
8      going to or intended to sell BCI stock?
9      A.   In what time frame?  When the
10     offering happened?
11     Q.   Any time prior to January 30th,
12     '08.
13     A.   I didn't -- no one told me nor did
14     I have any information from any one of the
15     three participants that they intended to sell
16     their stock.
17     Q.   Or from anybody.  Did anyone tell
18     you that they intended to sell their stock?
19     A.   No one told me that they intended
20     to sell their stock.
21     Q.   I will represent to you that on
22     January 30th, 2008, Bellatalla, Wynn
23     Industries, and Thomas Wade Investments
24     accounts each sold 1.33 million shares of
25     BCI.  Did you know that?

156

1          S. Czarnik
2      A.   No.
3      Q.   Is this the first time you're
4      hearing that?
5      A.   Yes.
6          MS. GERSTMAN:  Let's mark this,
7      please, as Exhibit 28.
8          (Plaintiff's Exhibit 28, Three-page
9          document bearing production number
10         Reynolds 000115-117, marked for
11         identification, as of this date.)
12     Q.   I've given you what has been marked
13     as Exhibit 28.  It's a series of emails, some
14     of which I believe you are a recipient of or
15     initiator of and some of which you're not.
16     I'm going to direct your attention to the
17     first page, the second entry down.  It says,
18     From SCzarnik@cclip.com."  Is that you, your
19     email address?
20     A.   Um-hmm.
21     Q.   That's a yes?
22     A.   Yes.
23     Q.   And is this an email that you sent
24     to the Lynn Thomas Group, Carlton Fleming,
25     and Robert Feeback?

Stephen Czarnik  3/27/2008  9:00:00 AM

157

```
 1        S. Czarnik
 2    A.  Yes.
 3    Q.  On February 25th, 2008?
 4    A.  Yes.
 5    Q.  What does that email refer to?
 6  What are you trying to do there?
 7    A.  It refers to two things.  One is we
 8  had a call with FINRA, Beverage Creations,
 9  and I was on the call with them.  And they
10  requested documents.  And there was two
11  documents that I didn't have.  The notes, the
12  August 1st notes I had, but I didn't have
13  signed copies, so I asked the company for
14  signed copies, and they said they couldn't
15  find them.  And then the conversion
16  documents.  So I resent them out to get
17  executed.
18        Also, if we go back, if you go to
19  the earlier emails, there is an instruction
20  that they were going to lend the company
21  $210,000 or more money, and they wanted notes
22  for that.  So I sent them those notes as
23  well.
24    Q.  What is the reference in that
25  second entry to executing -- are you asking
```

159

```
 1        S. Czarnik
 2  document bearing production number
 3  Reynolds 000071, marked for
 4  identification, as of this date.)
 5    Q.  Mr. Czarnik, you're looking at what
 6  has been marked as Exhibit 29.  Do you
 7  recognize this document?
 8    A.  No.
 9    Q.  You've never seen it before?
10    A.  No.
11    Q.  Let me direct your attention to the
12  fourth entry down along the top, it says,
13  "Czarnik 20,000."
14    A.  Yes.
15    Q.  Does that mean anything to you?
16    A.  Yeah.  I received 20,000 from -- I
17  don't know if it was Lynn Thomas Group or
18  Carl Fleming or.  My firm did.  Not me
19  personally.
20    Q.  And what was that for?
21    A.  That was 10,000 of which was for
22  Beverage Creations.
23    Q.  What was the other 10,000 for?
24    A.  Alchemy Creative.
25        MS. ALTENBAUMER-PRICE:  Can you
```

158

```
 1        S. Czarnik
 2  them to execute the conversion of those
 3  August 1st, 2007, notes?
 4    A.  Yeah, because no one had a copy.
 5    Q.  No one had a copy.
 6    A.  No.
 7    Q.  Is this the first time the
 8  conversion was exercised?
 9    A.  No, no, no, no.  It was exercised
10  before.
11    Q.  So did you receive back the
12  conversion documents?
13    A.  Yes.
14    Q.  And they were executed?
15    A.  Yes.
16    Q.  And were they backdated to
17  December 17th, '07?
18    A.  No.  They were dated as of when the
19  conversion occurred, and they were just
20  confirming when it occurred.
21    Q.  And that was what date?
22    A.  December 17th.
23        MS. GERSTMAN:  Let's mark this,
24  please, as Exhibit 29.
25        (Plaintiff's Exhibit 29, One-page
```

160

```
 1        S. Czarnik
 2  identify the documents for us and those
 3  that Mr. Czarnik can't identify just so
 4  that we have an idea what you're talking
 5  about?
 6        MS. GERSTMAN:  Exhibit 29 is
 7  Reynolds 000071.
 8        MS. ALTENBAUMER-PRICE:  Okay.  If
 9  I'm just sitting here looking at
10  nothing, can you give me an idea as to
11  what you're talking about.  0071 doesn't
12  help me sitting in this conference room.
13        MS. GERSTMAN:  Okay.
14        MR. HENDERSON:  Just a brief
15  description of what the document is.
16        MS. ALTENBAUMER-PRICE:  A letter,
17  an email?  What are we looking at?
18        MS. GERSTMAN:  It is a one-page
19  document with a fax header legend on it
20  that actually says Page 2, and there are
21  five rows of entries with dollar
22  figures.  And then it says "Total."  And
23  then there is, you know, some more
24  writing on it, but it's not -- I don't
25  know what it is, and I'm not going to
```

S.APP.41

Stephen Czarnik  3/27/2008  9:00:00 AM

161

```
1         S. Czarnik
2    testify about it, but that's what I see.
3         MR. HENDERSON: Does it say where
4    the fax -- is the fax cover sheet
5    identifiable?
6         MS. GERSTMAN: There is no fax
7    cover sheet. It's a single-page
8    document.
9         MR. CRAINE: It's got 972-731-4338,
10   December 10, 2007, 1:13 p.m. on the fax
11   top, and then it's Bates labeled
12   Reynolds 71
13        MR. HENDERSON: Could you also
14   describe the five entries on that
15   document?
16        MR. CRAINE: Do you want me to read
17   this for you, Randy?
18        MR. HENDERSON: Yes, please,
19   Patrick.
20        MR. CRAINE: Shell STS, $150,000.
21   STS bridge loan, $175,000. Beverage
22   Creations loan, $50,000. Czarnik,
23   $20,000. ALMY funding, $210,000.
24   Total, $605,000. 201,656/EA. Each
25   needs to write a check for $70,000 to
```

162

```
1         S. Czarnik
2    Alchemy Creative, Inc. Both Wynn
3    Industries and Battistella each need to
4    write a check to Thomas Wade
5    Investments, LLC, for $131,666.
6         MS. ALTENBAUMER-PRICE: Thank you,
7    Patrick. Now I know what document
8    you're talking about.
9         Q. Mr. Czarnik, do any of these other
10   entries on this document mean anything to
11   you?
12        A. STS means something to me.
13        Q. What is STS?
14        A. STS is a private company that they
15   wanted to do a transaction with.
16        Q. Is that Strategic Tracking
17   Solutions?
18        A. That's correct.
19        Q. And who wanted to do a private
20   transaction?
21        A. Carl.
22        Q. Anybody else?
23        A. I don't know.
24        Q. Was that transaction done?
25        A. No.
```

163

```
1         S. Czarnik
2         Q. Is that something pending, in the
3    works?
4         A. No. I don't know from their
5    perspective. From mine, no.
6         Q. Are you familiar with a stock by
7    the name of Connect A Jet?
8         A. I am.
9         Q. How are you familiar with Connect A
10   Jet?
11        A. I saw an article regarding Jason
12   Wynn and Connect A Jet.
13        Q. When did you see that?
14        A. Probably January.
15        Q. What was the -- I'm sorry. Did I
16   cut you off? I'm sorry.
17        A. Yeah. And I saw a commercial on
18   MSNBC for it as well.
19        Q. What did the article say about
20   Jason Wynn?
21        A. That he was a stock promoter that
22   was involved in Connect A Jet.
23        Q. Was it a favorable or unfavorable
24   article?
25        A. I would say it was fairly
```

164

```
1         S. Czarnik
2    unfavorable.
3         Q. How did that come to your
4    attention, that article?
5         A. Someone had sent it to me, but I
6    don't recall who sent it to me. It could
7    have been -- we talked about this before. It
8    could have been Anthony Christmas or Robert
9    Feeback.
10        Q. And that was in January of '08?
11        A. Yeah.
12        Q. Were you aware that the SEC
13   suspended trading in the securities of
14   Connect A Jet on October 1st, 2007?
15        A. I don't know that I was aware of
16   it. I'm certainly aware of it now. I was
17   probably aware of it in January, but I don't
18   know if I was aware of it when it -- if it
19   happened that long ago.
20        Q. Did you know that Jason Wynn
21   through Wynn Holdings and Ryan Reynolds
22   through another one of his entities were 504
23   recipients of Connect A Jet stock?
24        A. No.
25        Q. Did you ever know that?
```

S.APP.42

Stephen Czarnik  3/27/2008  9:00:00 AM

165

```
1           S. Czarnik
2    A.  No.  Not until now.
3    Q.  Is Summit Capital Partners a
4  client?
5    A.  No.
6    Q.  Has it ever been?
7    A.  No.
8    Q.  Have you ever received any money or
9  stock from Summit?
10   A.  No.
11   Q.  Is Lynn Thomas Group a client?
12   A.  I mean Carl Fleming I would
13  consider a client, and that's his -- a
14  company that I believe is wholly owned by
15  him, so I don't know how that works.  I
16  mean...
17       MR. PICKHOLZ:  Take a break?
18       MS. GERSTMAN:  Off the record.
19       (Recess taken from 2:52 p.m. to
20  2:54 p.m.)
21       MR. PICKHOLZ:  Our understanding is
22  that Stephen represented Fleming but not
23  his company, the Lynn Thomas Group or
24  whatever.  Is that your understanding?
25  My understanding is that Stephen
```

166

```
1           S. Czarnik
2  represented Fleming but not the company,
3  this Lynn Thomas Group that was in his
4  last answer, but I just want to find out
5  from Fleming's counsel if that's their
6  understanding.
7       MR. CRAINE:  My understanding was
8  that he represented both, and I would be
9  willing to sit and talk about that
10  later, but just in the conversations
11  I've had, my understanding before coming
12  here was that he had given advice to
13  both.
14       MR. PICKHOLZ:  Okay.  Are you going
15  to assert attorney client --
16       MR. CRAINE:  I will on an abundance
17  of caution and we can --
18       MR. PICKHOLZ:  Okay.  In that case
19  we'll do it the same way we did before
20  where if the conversation was you were
21  representing BCI and getting information
22  from him and you weren't acting as his
23  attorney or attorney for I guess a
24  company of his, then you can answer the
25  question substantively.  If you're
```

167

```
1           S. Czarnik
2  acting as his lawyer or I guess his
3  counsel will mention it if it's one of
4  the companies, then you can assert an
5  attorney client privilege objection, in
6  which case we will honor the objection
7  and let you guys fight it out and then
8  tell us what the judge says.
9       THE WITNESS:  I mean the company.
10  if it's one --
11       MR. PICKHOLZ:  Don't ask me a
12  question.  I'm not being deposed here to
13  ask questions.
14       THE WITNESS:  Okay.  I'm sorry.
15   Q.  What did the Lynn Thomas Group do,
16  if anything, in connection with this BCI
17  offering?
18   A.  I think that --
19       MR. CRAINE:  And this is where
20  we're getting -- I'm trying to figure
21  out a way for you to get what you want
22  without stepping into bounds where we're
23  outside of it.  If you can restrict it
24  just to BCI, kind of what actions it
25  took, we'll let do you that.
```

168

```
1           S. Czarnik
2    A.  From my understanding, it paid
3  money to the company as well as the -- my
4  understanding is they paid for the shell as
5  well, at least partial.
6    Q.  When you say paid money to the
7  company, what do you mean?
8    A.  I believe that actual money went in
9  the company for the notes.
10   Q.  That Lynn Thomas Group funded the
11  notes that --
12   A.  Oh, I'm sorry.  My mistake.  The
13  notes are Thomas Wade.  Then my answer is I
14  don't think Lynn Thomas did anything.
15       MR. CRAINE:  That's more what I
16  expected.
17       THE WITNESS:  Yeah.  Sorry.
18       MR. CRAINE:  No problem.
19   Q.  And not that they paid for the
20  shell then either, that was not --
21   A.  No.  They did absolutely nothing.
22  I was confusing Thomas Wade with Lynn Thomas.
23   Q.  Okay.  So let me ask it again just
24  to be clear.  What did Lynn Thomas Group do
25  in connection with the BCI offering?
```

S.APP.43

Stephen Czarnik  3/27/2008  9:00:00 AM

169

1      S. Czarnik
2      A.  My understanding is nothing.
3      Q.  Have you ever received any
4  compensation or payments or anything of value
5  from Ryan Reynolds?
6      A.  Nothing.
7      Q.  Bellatalia?
8      A.  No.
9      Q.  Jason Wynn?
10     A.  No.
11     Q.  Wynn Industries?
12     A.  No.
13     Q.  Thomas Wade?
14     A.  I'm not sure who paid me the funds,
15  whether it came from Mr. Fleming, Thomas
16  Wade, Lynn Thomas, or whoever else.  But
17  otherwise no.
18     Q.  So aside from the $10,000, or the
19  20,000 as we saw represented on Exhibit 29,
20  any other payments or items of value,
21  anything of value from Thomas Wade or Carlton
22  Fleming?
23     A.  Yeah.  There was other things we
24  worked on that I was paid for, but with
25  respect to this transaction, no.

170

1      S. Czarnik
2      Q.  And any payments you received from
3  Thomas Wade and Carlton Fleming, were those
4  in exchange for legal services?
5      A.  Yes.
6      Q.  Do you have any knowledge that
7  these notes, knowledge or information that
8  these notes and the 504 offering was part of
9  a plan to take BCI public?
10     A.  I don't really understand the
11  question.
12     Q.  Did anything ever come to your
13  attention from the time you were retained by
14  BCI going forward that the series of
15  transactions that we've looked at, the notes,
16  the 504 offering, was all part of a larger
17  plan to get into the public market to
18  have a public float for BCI?
19     MR. PICKHOLZ:  Do you understand
20  the question?
21     THE WITNESS:  No, I don't.
22     MR. PICKHOLZ:  Do you need her to
23  break it down or rephrase it, or do you
24  understand it?
25     A.  I don't really understand it.  I

171

1      S. Czarnik
2  don't understand -- I'm sorry.  I don't
3  understand it.
4      Q.  Okay.  We've been looking at a
5  private transaction, the 504 private stock
6  transaction.  Do you have any information or
7  knowledge whatsoever that that was part of a
8  larger plan, one step or, you know, some
9  smaller part of a larger plan to take BCI
10  public, to make it a public company with a
11  public float, to get these shares, these 504
12  shares into the public?  Let me put it that
13  way.  Maybe that's better.  Do you have any
14  knowledge or information about a larger plan
15  to get these 504 shares into the public
16  market?
17     A.  No, other than doing a shell
18  transaction in and of itself makes it a
19  public company.  So that -- it was the plan.
20  It's a public company now once the
21  transaction was consummated.
22     Q.  And the shares were --
23     MR. CRAINE:  And I'll object as
24  non-responsive there.  You can go ahead.
25     Q.  And the shares were freely tradable

172

1      S. Czarnik
2  from the 504 offering?
3      A.  The shares were freely tradable
4  from the 504 offering.
5      Q.  Ever know anyone to refer to this
6  process, this series of transactions, again
7  I'm talking about what you know and saw and
8  did with respect to BCI, ever know anyone to
9  refer to this process as taking a company
10  public?
11     MR. PICKHOLZ:  Can I have the
12  question read back.
13     (Record read.)
14     MR. PICKHOLZ:  I have to object.  I
15  don't know what you mean by this process
16  and all these -- it's just unclear to me
17  what you're referring to.  You mentioned
18  a bunch of things in the question.
19     MS. GERSTMAN:  Okay.  I'll try to
20  rephrase it.
21     Q.  With respect to the 504 offering
22  and what you know to have happened with
23  respect to BCI stock, in connection with
24  that, have you ever heard anyone referring to
25  what they were doing with BCI stock as taking

S.APP.44

Stephen Czarnik  3/27/2008  9:00:00 AM

173

1        S. Czarnik
2    BCI public?
3        A.  You mean --
4        MR. PICKHOLZ:  Are you referring to
5    the series of activities that he
6    undertook himself, or are you expanding
7    that to include some of these other
8    things that we're now learning some
9    other people have engaged in that are in
10   the complaint?  I mean are you
11   encompassing everything here or just --
12       MS. GERSTMAN:  No?
13       MR. PICKHOLZ:  -- what he did?
14       MS. GERSTMAN:  No.
15       MR. PICKHOLZ:  That's what's
16   confusing.
17       Q.  I'm talking about the 504 offering,
18   okay, and the issuance of unrestricted stock.
19   Did you ever hear anybody talk about that as
20   a process of taking BCI public?
21       A.  I'm not sure if I have or not.
22       Q.  Did you know that Mr. Fleming had
23   spent around $800,000 in prepaid marketing
24   expenses for BCI?
25       A.  Pardon?

174

1        S. Czarnik
2        Q.  Do you know whether Mr. Fleming had
3    spent around $800,000 in prepaid marketing
4    expenses for BCI?
5        A.  No idea.
6        Q.  Have you ever had any
7    communications with anybody at Belmont
8    Partners?
9        A.  Yes.
10       Q.  What communications have you had
11   with Belmont Partners?
12       A.  Several.  I mean I know Joe Meuse
13   there.
14       Q.  Okay.  You've testified to one, so
15   let's put that aside.  Aside from that.  And
16   let's say subsequent to the closing to the
17   August 30th, '07, transaction, what
18   communications did you have with Belmont
19   Partners?
20       A.  With respect to BCI?
21       Q.  Yes.
22       A.  My recollection is only the one
23   call about the volume.
24       Q.  You don't remember any other calls
25   with anyone at Belmont Partners?

175

1        S. Czarnik
2        A.  Not with respect to BCI.  I don't
3    recall any.  I mean I'm not sure, but I don't
4    recall.
5        Q.  Have your services to BCI at all
6    involved filing Registration A statements?
7        A.  It was talked about that we would
8    do a Reg A offering.
9        Q.  Who talked about that?
10       A.  Me.
11       Q.  With whom?
12       A.  With Robert Feeback, Patrick Dado,
13   and Bob Weden.
14       Q.  When did you have those
15   discussions?
16       A.  I'm not sure.  January, February.
17       Q.  After the 504 offering that we've
18   been talking about?
19       A.  It may have been before.  It may
20   have been in December.  But I don't recall
21   the exact timing of it.
22       Q.  Was this related to a separate
23   offering by BCI?
24       A.  Yes.
25       MS. GERSTMAN:  You want to just

176

1        S. Czarnik
2    give me a minute.  I think I might
3    actually be at the end.
4        Q.  Oh, would you like to add
5    something?
6        A.  I need to add something.  I did
7    have a conversation with Mr. Meuse at
8    Belmont, and he referred me to Jason.
9        Q.  Was there anything else substantive
10   on that conversation?
11       A.  Nothing.
12       MS. GERSTMAN:  I have nothing
13   further.  Counsel?
14       MR. PICKHOLZ:  Can I take one
15   minute?
16       MS. GERSTMAN:  Yes.
17       (Recess taken from 3:07 p.m. to
18   3:12 p.m.)
19   EXAMINATION BY
20   MR. HENDERSON:
21       Q.  Mr. Czarnik, you mentioned my name,
22   and we didn't visit, and we didn't get to see
23   each other, so I guess we have the SEC to
24   thank for this introduction, unpleasant as it
25   can be.

S.APP.45

Stephen Czarnik  3/27/2008  9:00:00 AM

177

1      S. Czarnik
2          I want to go into a little bit of
3      background and your representation of some of
4      these companies that we've talked about
5      today. I think you testified earlier that
6      maybe somewhere between 20 and 50 504s were
7      done over past two years. Is that accurate?
8      A. I said -- I didn't give a specific
9      number.
10     Q. Okay. It was maybe more than 20?
11     A. Yeah.
12     Q. And in each one of those was the
13     fee paid only in cash, I mean by check or
14     wire, or did you receive stock in those
15     offerings at all?
16     A. I've never received stock in a 504
17     offering.
18     Q. And these 504s, were there other
19     states' exemptions relied upon other than
20     Texas?
21     A. Until -- I don't remember the date,
22     I don't know if it was August 1st or
23     August 31st, I think Minnesota was available
24     as well, but they changed the law in
25     Minnesota.

178

1      S. Czarnik
2      Q. That's my understanding also. All
3      right. So your prior opinions would have
4      been relying on Texas and Minnesota
5      exemptions as they were available at the
6      time?
7      A. If it was appropriate.
8      Q. Did I understand you to say that
9      with respect to the BCI transaction, there
10     was no engagement letter with respect to your
11     services that would be performed; is that
12     correct?
13     A. That is correct.
14     Q. Could you tell me what you believed
15     your services would be within the confines of
16     that engagement for which I believe you were
17     paid $10,000?
18     A. My understanding was the purchase
19     of the shell, the combination of the
20     entities, which we'll call the share exchange
21     agreement, and then the offering.
22     Q. All right. Thank you. And let's
23     just go back to My Vintage Baby and Alchemy
24     Creative, because those were two that you
25     specifically identified in response to

179

1      S. Czarnik
2      questions from SEC counsel. Do you recall
3      with My Vintage Baby, was that also an oral
4      engagement letter with My Vintage Baby?
5      A. I don't recall if it was an oral
6      engagement letter with My Vintage Baby or
7      not.
8      Q. Can you describe briefly what your
9      services were, what you performed for My
10     Vintage Baby?
11         MR. PICKHOLZ: To the extent you
12     can do that without revealing any
13     attorney client communications and work
14     product with your client.
15         MR. HENDERSON: No, just a
16     description, just a description like he
17     just stated. Did he get involved in the
18     acquisition of the shell, combination,
19     and then the offering. I mean that's
20     all I'm asking.
21         MR. PICKHOLZ: Okay.
22     A. I did the acquisition of the shell,
23     the combination agreement, the offering, and
24     we did a draft of a Regulation A offering
25     statement.

180

1      S. Czarnik
2      Q. All right. A draft of the Reg A
3      statement. The Reg A offering never became
4      effective, did it?
5      A. No, it didn't become effective, to
6      my understanding.
7      Q. You testified earlier that I guess
8      sometime in February or early March you
9      became aware of the volume of trades and the
10     promotion relating to BCI, it sort of set off
11     some alarms. Am I characterizing that
12     correctly?
13     A. Yeah, except it was the first week
14     of February.
15     Q. Okay. That's fine. So that would
16     be the first week of February. So let's go
17     back, and let's take My Vintage Baby first.
18     In connection with My Vintage Baby, after you
19     had issued your opinion and essentially
20     completed your obligations under your
21     arrangement, did you have any opportunity to
22     on your own review volume amounts, press
23     releases that became public, or any sort of
24     marketing material put out by Wynn Industries
25     or anyone else?

S.APP.46

Stephen Czarnik  3/27/2008  9:00:00 AM

181

S. Czarnik

1
2     MR. PICKHOLZ:  Can you break that
3     down a little bit.
4     MR. HENDERSON:  Okay.  Let's break
5     it down.  His testimony was that he
6     became aware in the first week of
7     February, because of volume and
8     promotion activity of BCI, he kind of
9     became concerned, all right.  I hope I'm
10    stating that correctly.  I'm asking the
11    same question with respect to My Vintage
12    Baby first.  Did he have an occasion
13    after his engagement was complete with
14    respect to My Vintage Baby, which would
15    have been the completion of the
16    offering, did he have occasion to look
17    into volume and/or promotional activity
18    with respect to My Vintage Baby as he
19    did with BCI.
20    MR. PICKHOLZ:  If you understand,
21    you can answer it.
22    A.  I understand your question to be is
23    did I look at post offering My Vintage Baby
24    like I looked at post offering Beverage
25    Creations.

182

S. Czarnik

1
2     Q.  Yes, sir.
3     A.  And the answer is I don't recall
4     that I did or I didn't.  That was a year ago.
5     But I do know that with respect to Beverage
6     Creations and when my engagement was
7     effectively -- my services were over, someone
8     called me, as I testified to.
9     Q.  Yes.  No one called you with
10    respect to your recollection on My Vintage
11    Baby or Alchemy Creations?
12    A.  That's correct.  That's correct.
13    Q.  All right.  Could you tell me again
14    who called you regarding BCI?
15    A.  Joe Meuse.
16    Q.  Joe Meuse.  And was Joe Meuse a
17    client of yours?
18    A.  No.
19    Q.  What did Mr. Meuse tell you at that
20    time in that conversation?
21    A.  That the trading volume was
22    enormous and there is no public information
23    out with respect to the company.
24    Q.  So let's go back.  Do you recall
25    approximately what week whether in January or

183

S. Czarnik

1
2     February with respect to when the trading
3     began in BCI?
4     A.  I don't recall.
5     Q.  So you don't recall.  You think you
6     got this call from Mr. Meuse in the first
7     week of February?
8     A.  I'm certain of that, because I was
9     on vacation.  It was my first vacation in a
10    number of years.
11    Q.  And I see as far as documents that
12    we have that have been mentioned before, I
13    have a letter dated December 17th, '07, to
14    PacWest Transfer, which, in effect, says it's
15    okay -- correct me if I'm paraphrasing wrong,
16    it's okay to go ahead and issue these
17    tranches of shares to the three entities
18    mentioned in there without a restricted
19    legend.
20    My question is, can you approximate
21    for us after December 17th and prior to the
22    first week in February, could you in any way
23    kind of narrow the trading in BCI began?
24    A.  I don't know as I'm sitting here,
25    but I know that you could easily find out.

184

S. Czarnik

1
2     Q.  But you don't recall right now?
3     A.  No.
4     Q.  Now, I believe you testified that
5     with respect to BCI, BCI was your client in
6     this offering which is the subject of this
7     deposition; is that correct?
8     A.  Correct.
9     Q.  And the payment of the $10,000, did
10    it come directly from BCI?
11    A.  No.
12    Q.  It did not.  From whom did the
13    $10,000 payment come?
14    A.  It came from either Carl Fleming,
15    Lynn Thomas, or another entity controlled by
16    Carl, controlled or owned by Carl.  I'm not
17    sure where it came from.
18    Q.  At the time that you received that
19    $10,000 fee, and I'm assuming it was on
20    behalf of BCI?
21    A.  Yes.  That's my assumption as well.
22    Q.  All right.  Then at the time was
23    Thomas Wade, Mr. Fleming, or Lynn Thomas a
24    client of yours?
25    A.  I don't know that he was a client

S.APP.47

Stephen Czarnik  3/27/2008  9:00:00 AM

185

S. Czarnik

1
2  of mine, but I certainly know that there has
3  been occasion that I've given Carl advice.
4      Q.  So he may have been a client of
5  yours prior to the time that you had the
6  arrangement with BCI and received the
7  $10,000, he may have been a client with you?
8  That's all I'm trying to establish.  Is that
9  correct?
10      A.  I don't understand what you're
11  trying to establish, I mean, or say.
12      Q.  I'm just asking you that prior to
13  receipt of the $10,000 to do the BCI
14  offering, had Mr. Fleming or any of the
15  entities that he controlled sought your
16  advice of any legal nature for which he paid
17  you compensation for your services?
18      A.  I received -- Mr. Fleming or the
19  companies that he controls sent me funds,
20  payment for services, legal services.
21      Q.  Prior to the one we're talking
22  about now; is that correct?
23      A.  That's correct.
24      Q.  But not related to BCI?
25      A.  Correct.

187

S. Czarnik

1
2  we don't have current financials.  Did you
3  understand at the time what he meant by or
4  what you discovered were not, quote, current
5  financials?
6      A.  I think Mr. Meuse told me that
7  there was an enormous volume and we didn't
8  have any public information, which, of
9  course, would include current financials.
10      Q.  Let's go back to My Vantage Baby.
11  At any time during your knowledge of My
12  Vintage Baby during your representation and
13  shortly after or at trading commencing in My
14  Vintage Baby, do you know whether current
15  financials were available for the public?
16      A.  I know that I assisted them with
17  filing their current information on Pink
18  Sheets.
19      Q.  That would have been My Vintage
20  Baby?
21      A.  That's correct.
22      Q.  And pardon me if I'm repetitious,
23  but do you recall your fee that was paid by
24  or on behalf of My Vintage Baby, the amount
25  of that fee?

186

S. Czarnik

1
2      Q.  I'm just curious, and I'm not going
3  to ask you, I'm just going to -- ask you
4  about contents.  Did you discuss with anyone
5  about a potential waiver of conflict?
6      A.  I discussed with Feeback that --
7      Q.  Did Mr. Feeback, who I believe you
8  testified was not a client --
9      MR. CRAINE:  One moment here.  He
10  was a board member of BCI.
11      Q.  He was a board member, so he would
12  have been representing BCI in these
13  conversations?
14      A.  That's my understanding, yes.
15      Q.  Was a waiver of conflict letter or
16  memo or advice memorialized between BCI and
17  any of the Fleming-related entities?
18      A.  I don't believe that it was.
19      Q.  Do you consider the fee paid to you
20  as a fee paid to you by BCI or by a Fleming
21  entity?
22      A.  BCI.
23      Q.  Just a couple of other questions.
24  Now, Mr. Meuse told you in the first week of
25  February that we have a lot of activity and

188

S. Czarnik

1
2      A.  I don't recall.
3      Q.  In My Vintage Baby part of what
4  services you rendered were to assist the
5  company in posting current financial
6  information with PinkSheets.com; is that
7  correct?
8      A.  No.  But I carried on to make sure
9  that it was done.
10      Q.  You carried on to make sure it was
11  done?
12      A.  That's correct.
13      Q.  Now, let's go forward to BCI and
14  kind of explore the same sort of area.  So
15  you assisted the company in My Vintage Baby
16  and you carried on to make sure it was done.
17  Did you contemplate or was it discussed that
18  you would perform essentially the same
19  service with respect to BCI?
20      A.  I don't know.  What service are you
21  referring to?
22      Q.  I'm referring to what you said, I
23  believe, quote, you assisted the company and
24  saw through it that the financials were
25  posted with PinkSheets.com on My Vintage

S.APP.48

Stephen Czarnik  3/27/2008  9:00:00 AM

189

S. Czarnik

1
2      Beby, and I'm curious as to did you perform
3      those services with respect to BCI?
4          A.  I did.  I called the company when I
5      got the call from Meuse about the volume,
6      said we needed it done, we needed it
7      immediately posted, and the company sent me a
8      draft while I was on vacation, I reviewed the
9      draft, we went back and forth, and we got it
10     posted.
11         Q.  All right.  Well, then, let me go
12     back to My Vintage Baby again.  Were the
13     financials on My Vintage Baby posted prior to
14     or on the first day of trading?
15         A.  I don't know.
16         Q.  So is it fair to say that the
17     financials for BCI were not posted prior to
18     or on the first day of trading?
19         A.  I don't believe that they were.
20         Q.  Is there any explanation as to why
21     the company did not request your assistance
22     in getting those financials posted prior to
23     or at first day of trading?
24         MR. PICKHOLZ:  Don't speculate on
25     this, but if you know or have any reason

190

S. Czarnik

1
2      to have an answer, then you can answer
3      it.
4          A.  My recollection is we were working
5      together throughout the course of a few weeks
6      to get it done.  There just wasn't a sense of
7      urgency, didn't seem to be a sense of urgency
8      to it, and certainly -- that's with respect
9      to disclosure statement.  And certainly with
10     respect to the financials, as an outside
11     lawyer engaged to -- and a specialist to do a
12     special set of transactions, I have no idea
13     what their financials would be.  How could I
14     put them together?
15         Q.  I'm not implying in any way,
16     Mr. Czarnik, that you would have a role in
17     putting them together.  I'm just trying to
18     determine whether your activity as you
19     described what you did on behalf of My
20     Vintage Baby and posting current financial
21     information, did you perform similar
22     activities for BCI, and I think you testified
23     yes.  Now, these were posted sometime -- you
24     were on vacation.  You reviewed it.
25     Allegedly those were posted by BCI.  Did you

191

S. Czarnik

1
2      confirm that those numbers and that
3      information was posted by BCI?
4          A.  I believe someone called me and
5      told me they were posted.
6          Q.  Then let me ask you this.
7          MR. HENDERSON:  And I don't know,
8      Linda, whether you have it available to
9      you but the Order of Suspension dated
10     March 12, 2008.  Is that available to
11     anybody there?
12         MS. GERSTMAN:  I do not have it.
13     You're talking about BCI?
14         MR. PICKHOLZ:  On BCI.
15         MS. GERSTMAN:  Yes, I don't have
16     it.
17         Q.  Then let me just read, if I can.
18     "The Commission temporarily suspended trading
19     in the securities of BCI, ticker symbol BVRG,
20     because it appears that the market for BCI
21     securities may be reacting to manipulative
22     forces or deceptive practices and that there
23     is a lack of current and accurate public
24     information about BCI upon which an informed
25     investment decision can be made."

192

S. Czarnik

1
2          Mr. Czarnik, can you reconcile your
3      belief and understanding of what the company
4      did with respect to posting this public
5      information and the allegations of the
6      Commission in the March 12th, 2008, order of
7      suspension?
8          MR. PICKHOLZ:  Well, I guess before
9      I let him answer that, since you're on
10     the phone, obviously, you'll represent
11     to him that that's an accurate reading
12     of the document?
13         MR. HENDERSON:  Absolutely.  I'm
14     reading verbatim from the corrected
15     Securities Exchange Act of 1934, Release
16     Number 5746 March 12, 2008.
17         MR. PICKHOLZ:  Okay.  What he's
18     saying is he has the document in front
19     of him.  He's making a representation
20     that he's read it accurately.  And for
21     his question, you assume what he just,
22     you know, if what he just read is
23     accurate and what he just said is
24     accurate, that's the predicate for your
25     answer.  Okay?  Do you understand?

S.APP.49

Stephen Czarnik  3/27/2008  9:00:00 AM

193

```
1       S. Czarnik
2    Because we don't have it in front of us
3    to look at it ourselves.
4       THE WITNESS:  I understand that,
5    but now I don't understand the question.
6       Q.  Okay.  The question is that you had
7    the conversation with Mr. Meuse.  You did
8    follow up.  The public information was
9    published and made available to the investing
10   public.  And then approximately a month
11   later, four or five weeks later the SEC comes
12   out and says, in effect, there is a lack of
13   current and accurate public information about
14   BCI upon which an informed investment
15   decision can be made.  I'm wondering based on
16   that Order of Suspension, and I've read it to
17   you accurately, can you reconcile the
18   Commission's allegations with what you know
19   that the company did with respect to
20   publishing public information?
21      MS. GERSTMAN:  I object to the form
22   of the question.  You can answer,
23   though.
24      A.  I don't -- my answer is I can't
25   reconcile it because I don't know.  Perhaps
```

194

```
1       S. Czarnik
2    the information that the company provided
3    within the disclosure information statement
4    posted on Pink Sheets or their financials
5    were incorrect.  Maybe they were material
6    misstatements.  I have no way of knowing.
7       Q.  Okay.  That's a very fair
8    statement.  Just a couple more questions and
9    I'll be through with you.
10      Is it fair to say that the purpose
11   of the letter dated December 17, 2007, issued
12   to PacWest Transfer, and I believe it's an
13   exhibit there that can be put in front of
14   you, could you explain to me the purpose of
15   this letter to PacWest Transfer?
16      A.  I believe the purpose of the letter
17   is for the benefit of the transfer agent so
18   the transfer agent can issue a stock
19   certificate without restrictive legends.
20      MR. PICKHOLZ:  Just so you know,
21   I've put in front of him Exhibit 24,
22   which I believe is the letter you're
23   referring to.
24      MR. HENDERSON:  That's great!
25      MS. GERSTMAN:  Wait, Randy.  We
```

195

```
1       S. Czarnik
2    marked it.  Do you remember the number
3    on it?
4       MR. HENDERSON:  Hold on.  We're
5    looking.  Kara has a log.
6       MS. GERSTMAN:  Or do you have a
7    Bates range on it?
8       MR. HENDERSON:  Not on the one you
9    provided us.
10      MS. ALTENBAUMER-PRICE:  I believe
11   it is Exhibit 24.
12      MR. HENDERSON:  It's going to be a
13   letter dated December 17th to PacWest
14      MR. PICKHOLZ:  From who?
15      THE WITNESS:  From Stephen Czarnik?
16      MR. HENDERSON:  From Cohen &
17   Czarnik.
18      MR. PICKHOLZ:  Yes.  That's 24.
19      MR. HENDERSON:  Okay.  We're all on
20   the same exhibit?
21      MR. PICKHOLZ:  Yes.
22      Q.  So you just testified, Mr. Czarnik,
23   that this letter is intended to inform and
24   give comfort I'm assuming to the transfer
25   agent that the transfer agent may issue these
```

196

```
1       S. Czarnik
2    shares as identified and stated and in the
3    amounts and to the transferees without
4    restrictive legends; is that correct?
5       A.  That's correct.  I mean I'm not an
6    expert, by no means, but there may be rules
7    that transfer agents have to go by and they
8    require this letter.
9       Q.  All right.  Then let me follow up
10   on that.  The subscription agreements for I
11   believe Wynn Industries and for Bellatalia,
12   they are attached to my copy of your opinion
13   letter.  And I believe they've been
14   discussed, but I think it's clear that there
15   have been some -- that there are
16   representations in here that these are not
17   going to be transferred, whether the
18   representations came from the company or
19   whether representations came from the
20   transferees, but that these were taken for
21   investment purposes.  And I guess my question
22   is, one has shares without restricted legends
23   issued to them, and I ask you what would be
24   the purpose of issuing shares without a
25   restricted legend in the context of your
```

S.APP.50

Stephen Czarnik  3/27/2008  9:00:00 AM

197

```
 1           S. Czarnik
 2    opinion and this offering?
 3        A.  What would be the purpose of --
 4        Q.  Let me ask it this way.  There is a
 5    subscription agreement that contains
 6    investment representations, and I believe in
 7    reading your letter you received certain
 8    certifications or representations from BCI
 9    that these shares were going to be held for
10    investment purposes, that is, not sold two,
11    three days after trading started.  And so my
12    question is, we have those representations by
13    the transferee.  We have the representations
14    by the company.  Then if those are, in fact,
15    their representations and their agreements,
16    why would shares be issued to the transferees
17    without restricted legends and without some
18    sort of reference back to their subscription
19    agreement?
20           MR. CRAINE:  Objection.  Form.  Go
21        ahead.
22        A.  Well, because if they were issued
23    with a restrictive legend, in order to remove
24    the restriction, you would have to rely on
25    another exemption such as 144 was my
```

198

```
 1           S. Czarnik
 2    understanding.  So in this case they wouldn't
 3    have to do -- they wouldn't have to do such a
 4    thing, go back for a legal opinion.  But I
 5    mean I think that's -- that would make sense.
 6        Q.  All right.  That's a fair answer.
 7    And now I'm going to ask you of your
 8    knowledge, and please don't speculate, I'm
 9    making an assumption that the transferees
10    identified in your December 17th, 2007,
11    letter either were issued the shares without
12    -- the certificates without a restricted
13    legend or they were electronically
14    transferred to an account designated by the
15    transferees without a restricted notation on
16    them.  That's my assumption based on the
17    purpose of the letter, and, in fact, we know
18    that the shares were issued without a
19    restricted legend.  Do you have any knowledge
20    of what brokerage firms do in order to assure
21    themselves that securities that they receive
22    for the benefit of a customer are free
23    trading upon receipt?
24           MS. GERSTMAN:  Object to the form.
25           MR. PICKHOLZ:  Yeah, I'm going to
```

199

```
 1           S. Czarnik
 2    object, too.  I'm not sure he's
 3    qualified to give an opinion on what it
 4    is that brokerage firms do or don't do
 5    to satisfy their own compliance or other
 6    obligations.
 7           MR. HENDERSON:  I'm asking him if
 8    he is just aware of what brokerage firms
 9    do when they receive shares under these
10    circumstances.
11           MR. PICKHOLZ:  All firms, any
12    firms?
13           MR. HENDERSON:  Brokerage firms.
14           MR. PICKHOLZ:  Yeah, but there's a
15    lot of brokerage firms.  I assume they
16    have different procedures.  I mean if
17    there is one involved here, if you want
18    to ask him if he knows what that firm
19    does, but I'm not sure he can actually
20    -- all right.  My objection is just it's
21    vague and overbroad.  If you can
22    understand it and you can answer it, go
23    ahead.
24           MS. GERSTMAN:  Same objection.
25        Q.  Mr. Czarnik, are you aware of where
```

200

```
 1           S. Czarnik
 2    these shares were transferred.  I mean
 3    specifically do you know which brokerage
 4    firms, if any, these shares were transferred
 5    pursuant to your letter?
 6        A.  I would have to look at -- one of
 7    the exhibits was a letter from the company to
 8    the transfer agent, and I can only assume
 9    that that's where the shares were delivered
10    to.
11        Q.  Has that letter been introduced
12    before?
13           MS. GERSTMAN:  Yes.  We don't know
14    what number it is.
15           MR. PICKHOLZ:  Let me see if I can
16    find it.  23, I think.
17           MS. ALTENBAUMER-PRICE:  Exhibit 23.
18           MS. GERSTMAN:  Yes.  You should
19    look at the marked exhibit, Mr. Czarnik,
20    that's got 23 on it.
21           MR. PICKHOLZ:  Let's take the real
22    one and I'll take these back because
23    these are my copies.
24           THE WITNESS:  Okay.  23.
25           MS. GERSTMAN:  He's got it, Randy.
```

S.APP.51

Stephen Czarnik  3/27/2008  9:00:00 AM

201

```
1        S. Czarnik
2     What's your question?
3        Q   Since I don't have it in front of
4  me, to whom is the letter dressed?
5        A   PacWest Transfer.
6        Q   And it is signed by whom on behalf
7  of whom?
8        A   Signed by Bob Wieden on behalf of
9  Beverage Creations
10        Q   Now, since I don't have the
11  exhibit, could you generally describe for me
12  the purpose of this letter?
13        A   It's an instruction letter to the
14  transfer agent instructing the transfer agent
15  to issue the shares.
16        Q   In that letter does it -- I'm
17  assuming it says to whom.  Other than that,
18  does it give any transfer directions as to
19  brokerage accounts, brokerage firms?
20        A   It says Faganson & Company
21        Q   All right  Faganson & Company.  Is
22  there anywhere in the letter from the company
23  that advises Faganson & Company that these
24  are pursuant to a 504 offering and/or
25  subscription agreements whereby the
```

202

```
1        S. Czarnik
2  transferees have agreed not to immediately
3  resell their shares?  And I'll give you some
4  time to look through the instruction letter.
5        MS. GERSTMAN:  You know, I'm going
6     to object to the form.
7        MR. PICKHOLZ  Do you understand
8     it?
9        A   I don't understand  I'm sorry.
10        Q   The letter which I'm sorry, but we
11  don't have  What I'm saying is if you look
12  at that letter, it's an instructions to
13  PacWest.  Now, in these instructions to
14  PacWest, it instructs them to transfer these
15  shares to Faganson & Company  Are there any
16  other qualifications or conditions with
17  respect to what PacWest should do with
18  respect to these shares being transferred to
19  Faganson & Company?  Just look at the letter.
20        A   They're supposed to forward them,
21  the share certificate, directly to the
22  broker.
23        Q   Anything else?
24        A   Issue the share without restrictive
25  legend.
```

203

```
1        S. Czarnik
2        Q   Okay.  Without restrictive legend,
3  and then transfer those to the account at
4  Faganson.  Is that a fair leap?
5        A   Yeah  That's what the letter
6  purports to say
7        Q   So what we have here is a company
8  who has instructed, pursuant to your letter,
9  which was artfully drafted, and the company
10  then instructs the transfer agent to transfer
11  those shares without restricted legend,
12  without any other qualification, without any
13  of the other references to any type of
14  restrictions at all, any other restrictions,
15  any other qualifications, I'm sorry, or
16  conditions are not spelled out in that letter
17  that you're looking at?
18        MS. GERSTMAN:  Object to the form
19        Q   Is without restrictions the only
20  instructions given?
21        MS. GERSTMAN:  Object to the form.
22        A   My understanding is that's the only
23  instructions that were given.  I'm not sure
24  if a broker dealer requested the copy of the
25  legal opinion from the transfer agent or what
```

204

```
1        S. Czarnik
2  information they had at their disposal.
3        Q   Had you dealt with PacWest Transfer
4  before the BCI transaction?
5        A   Yes
6        Q   Do you know any of the principals
7  there?
8        A   Well, I'm not certain, but I
9  believe that Joe Meuse owns PacWest or has an
10  ownership interest.
11        Q   Could you approximate, then, for us
12  with respect to 504 offerings you've dealt
13  with, approximately in some range of how many
14  of these issues PacWest has handled?
15        A   I don't know how many -- what
16  PacWest has done.  I don't work for them
17        Q   I know, but I'm asking you this
18  You know for a fact that PacWest was a
19  transfer agent on BCI; correct?
20        A   Correct
21        Q   Was PacWest the transfer agent on
22  My Vintage Baby?
23        A   It was, yes.
24        Q   Was PacWest Transfer the transfer
25  agent on Alchemy Creative?
```

S.APP.52

Stephen Czarnik  3/27/2008  9:00:00 AM

205

1      S. Czarnik
2      A.  I don't know that it was.  I'm not
3  certain.
4      Q.  So at least you had some prior
5  experience with PacWest in delivering an
6  opinion letter?
7      A.  Yes.
8      Q.  One other question, sir.  Was there
9  an opinion letter issued by you to the
10  company as a predicate for the letter that
11  you issued to PacWest Transfer and the letter
12  that the company issued to PacWest Transfer?
13  Was there an opinion delivered to the company
14  as a predicate to these two instruction
15  letters?
16      A.  Are you asking if I did another
17  opinion and directed it at the company?
18      Q.  Yes, sir.
19      A.  No.
20      MR. HENDERSON:  I'll pass the
21  witness.
22      MS. GERSTMAN:  Anyone else?  No?
23  Going, going.  Anyone else asking
24  questions?  Okay.  I think we're
25  concluded.

207

1      S. Czarnik
2  questions until after that production.
3  So we would like to adjourn rather than
4  conclude this deposition.
5      MR. CRAINE:  That's fine.
6      MS. GERSTMAN:  Fine.
7      (Time noted:  4:50 p.m.)
8
9
10
11      _____
12      STEPHEN CZARNIK
13
14  Subscribed and sworn to before me
15  this ___ day of _____, 2008.
16
17      _____
18
19
20
21
22
23
24
25

206

1      S. Czarnik
2      COURT REPORTER:  Is anybody on the
3  phone ordering a copy of the transcript?
4      MS. ALTENBAUMER-PRICE:  Yes.
5      COURT REPORTER:  Regular delivery
6  is eight to ten business days.
7      MS. ALTENBAUMER-PRICE:  No.  We
8  need it faster than that.  Three days.
9  Three business days.
10      MS. GERSTMAN:  Anybody else have
11  anything to add from our people on the
12  phone?
13      MS. ALTENBAUMER-PRICE:  Can you
14  wait just one second.  I may defer to
15  Patrick on this comment.  Patrick, do
16  you have anything to add, or do I need
17  to make a comment?
18      MR. CRAINE:  Feel free to make a
19  comment.
20      MS. ALTENBAUMER-PRICE:  Okay.
21  Because Mr. Czarnik has indicated that
22  there are emails that he has not yet
23  produced, and we presume there is a
24  future production based on this
25  deposition, we want to reserve our

208

1
2      C E R T I F I C A T E
3  STATE OF NEW YORK      )
4                         : ss.
5  COUNTY OF WESTCHESTER  )
6
7      I, JOAN WARNOCK, a Notary Public
8  within and for the State of New York, do
9  hereby certify:
10      That STEPHEN CZARNIK, the witness
11  whose deposition is hereinbefore set
12  forth, was duly sworn by me and that
13  such deposition is a true record of the
14  testimony given by the witness.
15      I further certify that I am not
16  related to any of the parties to this
17  action by blood or marriage, and that I
18  am in no way interested in the outcome
19  of this matter.
20      IN WITNESS WHEREOF, I have hereunto
21  set my hand this 28th day of March,
22  2008.
23
24      _____
25      JOAN WARNOCK

S.APP.53

Stephen Czarnik  3/27/2008  9:00:00 AM

209

1
2    ------------- I N D E X ----------------
3    WITNESS        EXAMINATION BY        PAGE
4    Stephen Czarnik  Ms. Gersman          6
5          Mr. Henderson      176
6
7    ----------- INFORMATION REQUESTS -----------
8    DIRECTIONS: 123, 128, 131
9    RULINGS:
10   TO BE FURNISHED:
11   REQUESTS: 11, 26, 58, 74
12   MOTIONS:
13
14   ---------------- EXHIBITS ----------------
15   PLAINTIFF'S               FOR ID.
16   EXHIBIT 6           6
17   Subpoena
18   EXHIBIT 7           12
19   Letter dated March 25, 2008, to
20   Jason Pickholz from Stanley Morris
21   EXHIBIT 8           30
22   Convertible Note bearing production
23   number SJC 00033-39
24   EXHIBIT 9           30
25   Convertible Note bearing production

210

1
2    number SJC 00040-46
3    EXHIBIT 10          37
4    Convertible Note bearing production
5    number SJC 00047-53
6    EXHIBIT 11          37
7    Convertible Note bearing production
8    number SJC 00054-61
9    EXHIBIT 12          47
10   Conversion Notice bearing
11   production number SJC 00083-89
12   EXHIBIT 13          48
13   Convertible Note bearing production
14   number SJC 00062-68
15   EXHIBIT 14          50
16   Convertible Note bearing production
17   number SJC 00069-75
18   EXHIBIT 15          50
19   Convertible Note bearing production
20   number SJC 00076-82
21   EXHIBIT 16          54
22   Common Stock Purchase Agreement
23   bearing production number 00001-8
24   EXHIBIT 17          60
25   Entity Subscription Agreement

211

1
2    bearing production number APP
3    0047-52
4    EXHIBIT 18          60
5    Entity Subscription Agreement
6    bearing production number SJC
7    00021-26
8    EXHIBIT 19          60
9    Entity Subscription Agreement
10   bearing production number SJC
11   00027-32
12   EXHIBIT 20          97
13   Complaint
14   EXHIBIT 21          113
15   Letter dated February 19, 2008, to
16   Jason Wynn from Bob Wieden
17   EXHIBIT 22          136
18   Letter dated December 17, 2007,
19   bearing production number SJC
20   00101-103
21   EXHIBIT 23          139
22   Document dated December 17, 2007,
23   bearing production number APP
24   0068-69
25   EXHIBIT 24          142

212

1
2    Letter dated December 17, 2007,
3    bearing production number SJC
4    00090-92
5    EXHIBIT 25          146
6    Document dated December 17, 2007,
7    bearing production number APP
8    0070-72
9    EXHIBIT 26          149
10   Document bearing production number
11   SJC 00093-99
12   EXHIBIT 27          152
13   Document bearing production number
14   APP 0179-181
15   EXHIBIT 28          156
16   Three-page document bearing
17   production number Reynolds
18   000115-117
19   EXHIBIT 29          158
20   One-page document bearing
21   production number Reynolds 000071
22
23
24
25

S.APP.54

2