# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § § | |
| v. | § § | CIVIL ACTION NO. |
| ROBERT FEEBACK and SUMMIT ADVISORY PARTNERS, LLC, | § § § § | ECF |
| Defendants. | § | JURY DEMAND |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Commission") alleges:

## SUMMARY

1. Robert Feeback ("Feeback"), operating through Summit Advisory Partners, LLC ("Summit") directed and provided essential services in a scheme to illicitly generate profits of millions of dollars in the stock market through unregistered offerings of the stock of various penny stock companies.

2. Through the efforts of Feeback and Summit, three stock promoters – Ryan Reynolds, Jason Wynn and Carlton Fleming (Reynolds, Wynn, and Fleming, along with their corporate proxies, are hereinafter referred to as the "Promoters") – engaged in a "pump and dump" of three penny stock companies, Beverage Creations, Inc. ("BCI"), Alchemy Creative, Inc. ("Alchemy"), and My Vintage Baby ("MVBY") (collectively, "the Issuers"). From June 2007 through January 2008, the Promoters purchased millions

of shares of the Issuers' stock for pennies per share and hyped the companies through promotional mailers, touts on a stock promotion website, and company press releases. The promoters further induced family and friends to buy and sell to create the appearance of market demand. The Promoters then resold millions of shares at inflated prices for substantial profits to the public without providing the full and fair disclosures mandated by the registration provisions of the federal securities law.

3. Feeback and Summit served an essential role in the Promoters' planned end-run around federal securities law. As "consultants" on the offerings, Feeback and Summit handled "the coordination and facilitation of all required activities throughout the public offering process." Among other things, Feeback and Summit introduced the Issuers to financiers to provide initial funding and purchase the shares, assisted the Issuers in obtaining the necessary legal services and documents, and steered the public relations effort to promote the company once public trading began. Feeback's and Summit's participation and substantial assistance in the offerings was in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## DEFENDANTS

4. **Robert Feeback**, age 50, is a resident of Plano, Texas. He is the managing partner of Summit.

5. **Summit Advisory Partners, LLC**, is a Texas limited liability company based in Dallas, Texas which claims to provide managing consulting services to small emerging companies. Feeback owns 50% of Summit, and is Summit's managing partner.

## JURISDICTION AND VENUE

6. The Commission brings this action pursuant to authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b).

7. This Court has jurisdiction over this action under the provisions of Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].

8. Venue is proper in this Court pursuant to Section 22 of the Securities Act [15 U.S.C. § 77u].

9. Defendants, directly and indirectly, have made and, unless enjoined, will continue to make use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices and courses of business alleged herein in the Northern District of Texas and elsewhere.

## FACTS

### The My Vintage Baby, Alchemy, and BCI Unregistered Offerings

10. The unregistered offerings by MVBY, Alchemy, and BCI represent three iterations of a scam repeatedly perpetrated by three Texas-based penny stock promoters – Ryan Reynolds, Jason Wynn, and Carlton Fleming.

11. The Issuers targeted by the Promoters – MVBY, Alchemy, and BCI – were in severe financial distress when the Promoters launched their scam; each had minimal assets, little to no income, and were desperate for financing at the time of their unregistered offerings.

12. As of July of 2008, MVBY – which made high-end children's clothing – had never earned a profit. The company lost $450,113 in 2006, $775,206 in 2007 and $278,439 in the first half of 2008.

13. As of September 18, 2007, Alchemy – which created educational DVDs and software – had only $1.52 in the bank, $23.80 in revenues and a net loss of $608,443 for the previous three quarters.

14. As of December 2007, BCI – a purported developer of a proprietary sports drink -- had no revenue from operations, had not manufactured any beverage product, had no production facilities, had lost $43,760 in the preceding three months, had $14,500 in credit card debt, and had only $12,506 in its bank account.

15. The Promoters plan involved taking these struggling companies public and then hyping their stock to investors as "the next big thing."

16. In each of the MVBY, Alchemy, and BCI offerings, the Promoters applied the same basic "pump and dump" formula. The Promoters (a) organized a reverse merger of the company into a public shell, (b) purchased large blocks of common stock at pennies a share from the Issuer in a purported Rule 504 offering (in an effort to evade registration requirements and obtain a large percentage of the company's stock without investing much of their own cash), (c) created initial trading volume for the stock by selling some of their shares to a tightly controlled group of friends, family, and affiliated brokers, (d) touted the company to the public through spam, television advertising, and mass mailers, and then (e) dumped their shares on the investing public without registration at prices grossly inflated by their promotion activity.

17. The Promoters were underwriters who distributed BCI stock to the public. They underwrote the BCI offering by purchasing shares with a view to offering and selling the shares to others in connection with the distribution of the company's shares to public investors. In each instance, the Promoters intended to funnel their purported Rule

4

Case 1:10-cv-00745-PKC   Document 20-6   Filed 04/09/10   Page 6 of 12
Case 3:10-cv-00104-K   Document 1   Filed 01/20/2010   Page 5 of 11

504 shares to the public, thereby completing an "initial public offering" without the disclosures and other safeguards required by the registration provisions of federal securities law.

18. For each Issuer, the Promoters resold their purported Rule 504 shares to the public within days of receiving them. The Promoters received and resold their purported 504 shares as follows:

| Issuer | Promoter Defendant (Recipient) | Date Stock Received from Issuer | Date of Resale to Public |
|--------|-------------------------------|----------------------------------|---------------------------|
| MVBY | Fleming | 6/13/07 | 6/19/07 |
| MVBY | Reynolds | 6/13/07 | 6/20/07 |
| MVBY | Fleming | 6/29/07 | 7/12/07 |
| MVBY | Reynolds | 6/29/07 | 7/05/07 |
| MVBY | Wynn | 6/29/07 | 7/12/07 |
| MVBY | Reynolds | 8/17/07 | 8/17/07 |
| MVBY | Wynn | 8/17/07 | 8/17/07 |
| ALMY | Reynolds | 12/5/07 | 12/5/07 |
| ALMY | Wynn | 12/5/07 | 12/5/07 |
| ALMY | Fleming | 12/5/07 | 12/5/07 |
| MVBY | Fleming | 12/20/07 | 12/20/07 |
| MVBY | Reynolds | 12/20/07 | 12/20/07 |
| MVBY | Fleming | 1/10/08 | 1/10/08 |
| MVBY | Reynolds | 1/10/08 | 1/10/08 |
| BCI | Fleming | 1/28/08 | 1/30/08 |
| BCI | Reynolds | 1/28/08 | 1/30/08 |
| BCI | Wynn | 1/28/08 | 1/30/08 |

19. For each Issuer, the Promoters resold their 504 shares in tandem with a multimedia promotional campaign designed to artificially stimulate the stock price while the Promoters dumped their shares.

20. For example, in connection with the BCI, Alchemy, and MVBY offerings, the Promoters created millions of promotional mailers which boasted that "EARLY

5

INVESTORS COULD MAKE A FORTUNE," rated each stock a "STRONG BUY," and predicted astronomical gains within the first year.

21. The Promoters also touted the Issuers through a penny stock promotion website, www.thestockpic.com, then run by Ryan Reynolds's sister. In addition, the Promoters helped create a flurry of press releases for each Issuer to release during the first few weeks of public trading.

22. The scheme worked. In the three weeks after its January 30, 2008 debut – even as the Promoters dumped their shares on the public – BCI's stock price more than doubled, from an intraday low of $.55 per share on January 30 to its February 21 close at $1.25 per share. Likewise, in the first five weeks of trading, Alchemy's stock price soared almost 75%, from an intraday low of $1.90 per share on December 5, 2007 to an intraday high of $3.32 per share on January 11, 2008. My Vintage Baby's stock price experienced even greater gains over its first five weeks of trading, rising from an intraday low of $.40 per share to an intraday high of $2.88 per share.

23. Fueled by the pump, the Promoters sold their purported 504 shares to the investing public for a total profit of over $20 million.

24. At all times relevant to this Complaint, no registration statement was filed or in effect for any of the offerings by MVBY, Alchemy, or BCI.

25. At all times relevant to this Complaint, no registration statement was filed or in effect for any resale of the stock of MVBY, Alchemy, or BCI by the Promoters to the investing public.

26. At all times relevant to this Complaint, no exemption from registration applied to any of the offerings by MVBY, Alchemy, or BCI.

6

27. At all times relevant to this Complaint, no exemption from registration applied to any resale of the stock of MVBY, Alchemy, or BCI by the Promoters to the investing public.

28. At all times relevant to this complaint, the stock of MVBY, Alchemy, and BCI was "penny stock," as the companies' net tangible assets and average revenue were each below the thresholds established under Section 3(a)(51) of the Exchange Act [15 U.S.C. 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1], and the stock traded at a price under $5 per share at all relevant times.

### Feeback and Summit's Role in the Unregistered Offerings

29. The Issuers hired Feeback and Summit as "consultants," to provide advice on raising operating capital and promoting the company to investors. In its own words, Summit's business was to handle "the coordination and facilitation of all required activities throughout the public offering process."

30. Feeback and Summit served as the point of contact between the Issuers and the Promoters. Specifically, Feeback and Summit introduced MVBY, Alchemy, and BCI to Fleming, who provided the initial financing for each of the companies. Feeback knew that that Fleming and his company used the public securities markets as a vehicle to provide financing.

31. Feeback and Summit also hired outside contractors to help in the public offering, including an attorney, Stephen Czarnik, to draw up the appropriate legal documents, and public relations "experts" who could promote the company once public trading began.

32. Feeback and Summit organized meetings with each of the Issuers during which they discussed the plan to take the Issuers public, calling it the "IPO Process." The IPO Process, as contemplated by Feeback and Summit, included a reverse merger with a public shell company followed by a Rule 504 offering. Feeback and Summit alternately referred to the Rule 504 transaction as an "IPO" or "public offering" in its communications with the Issuers.

33. In furtherance of the IPO Process, Feeback and Summit helped coordinate reverse mergers of each Issuer into publicly traded shells.

34. Feeback and Summit then oversaw the Rule 504 offering, monitoring Czarnik's work in drafting legal documents and obtaining a ticker symbol for each of the Issuers. Feeback and Summit knew that the Promoters intended to distribute their stock to the public immediately after receiving it as part of the IPO Process.

35. Feeback and Summit helped facilitate the immediate distribution of stock to the public.

36. Feeback and Summit reviewed and approved the Issuers' rudimentary financial disclosures to Pink OTC Markets, Inc. ("Pink Sheets"), which were necessary for public trading.

37. As part of Summit's services, Feeback became a director of MVBY and BCI.

38. Next, Feeback and Summit participated in the promotion of each of the Issuers. Feeback and Summit reviewed and approved the first press release for each Issuer announcing the start of public trading. Feeback and Summit subsequently helped review and issue a flurry of press releases that accompanied each offering.

39. Feeback and Summit also pressed each Issuer to release news in the days following the IPO to keep the stock price up.

40. Finally, Feeback and Summit worked with Fleming to obtain further funding for the Issuers out of the proceeds of the IPO.

41. For its services, Summit charged the Issuers each $6,500 per month and took large blocks of restricted stock.

## COUNT I

### Violations of Sections 5(a) and 5(c) of the Securities Act

42. Paragraphs 1 through 41 are realleged and incorporated by reference.

43. The shares of MVBY, Alchemy and BCI are "securities" as that term is defined in Section 2(a)(1) of the Securities Act.

44. From June 2007 to the present, no registration statement was filed or in effect for the sale of MVBY, Alchemy or BCI stock, nor did any exemption from registration apply.

45. By was of the conduct described in paragraphs 29 to 41, Feeback and Summit were each a "necessary participant" and a "substantial factor" in the illegal unregistered offerings of MVBY, Alchemy, and BCI. Therefore, Feeback and Summit were each an "indirect seller" of MVBY, Alchemy, and BC stock.

46. MVBY, Alchemy, BCI and the Promoters each made use of the instrumentalities of interstate commerce to effect the unregistered sale of their common stock to the public. Among other things, they executed subscription agreements using interstate faxes, and ordered trades through a broker using email and telephone.

47. Feeback and Summit each made use of the instrumentalities of interstate commerce to effect the unregistered sale of MVBY, Alchemy, and BCI common stock to the public. In facilitating the offering, Feeback and Summit used e-mails, phone calls and letters to the Promoters, to the Issuers, to Czarnik, and to the Issuers' transfer agent.

48. By reason of the foregoing conduct, Feeback and Summit violated and, unless restrained and enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Enter an Order of Permanent Injunction as to each Feeback and Summit, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, restraining and enjoining them from violating Sections 5(a) and 5(c) of the Securities Act.

### II.

Enter an Order requiring Feeback and Summit to each disgorge all ill-gotten gains resulting from their participation in the conduct described above, including pre-judgment and post-judgment interest.

### III.

Enter an Order requiring Feeback and Summit to pay civil penalties pursuant to Section 20(d) of the Securities Act.

### IV.

Enter an Order barring Feeback and Summit from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act.

## V.

Grant such other and further equitable relief as this Court deems appropriate and necessary.

Respectfully submitted,

**THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Dated: January 20, 2010

/s/ Lori Jacobs
By: One of its Attorneys
Jonathan S. Polish (IL Id # 6237890)
Tim Leiman (IL Id # 6270153)
Lori Jacobs (IL Id # 6293998)
Attorneys for Plaintiff
Securities and Exchange Commission
175 West Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: 312-353-7390
Fax: 312 353-7398
jacobsL@sec.gov

11